UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OCEANOGRAFÍA, S.A. DE C.V. and
AMADO  YÁÑEZ OSUNA,

                  *Plaintiffs*,

        -against-

CITIGROUP, INC.,

              *Defendant*.

ORIGINAL COMPLAINT

JURY TRIAL DEMANDED

---

# OCEANOGRAFÍA'S AND AMADO YÁÑEZ'S ORIGINAL COMPLAINT

Maney & González-Félix PC
Mark Maney
(not yet admitted in this District)
712 Main Street, Suite 2100
Houston, Texas 77002
Telephone: 713.806.2500
mmaney@maneylaw.com

COUNSEL FOR OCEANOGRAFÍA, S.A. DE C.V.
AND AMADO YÁÑEZ

TABLE OF CONTENTS

Preliminary Statement……………………………………………………………………1

The Parties and Relevant Non-Parties…………………………………………………....4

    1.  Petróleos Mexicanos—Non-Party………………………………………………4

    2.  Oceanografía, S.A. de C.V.—Plaintiff …………………………………………....4

    3.  Amado Yáñez Osuna—Plaintiff……………………………………………………5

    4.  Citigroup, Inc.—Defendant………………………………………………………....5

    5.  Banco Nacional de Mexico, S.A.—Non-Party……………………………………5

Jurisdiction and Venue………………………………………………………………………6

Factual Allegations …………………………………………………………………………...7

    1.  From 2009 through January 2013, Oceanografía factored its Pemex invoices with Citibanamex. ………………………………………………….……………...…7

        A.  In 2008, Citigroup's Institutional Credit Group (ICG) created a Supplier Finance Program for Pemex that allowed Pemex suppliers to factor their approved Pemex invoices. ……………………………………………….……………...…7

        B.  In 2009, Oceanografía began participating in the Pemex Supplier Finance Facility. ….…..8

        C.  The factoring structure of the Pemex Supplier Finance Facility was highly beneficial to Citibanamex and thus to Citigroup. ………………………………………….…..……...9

        D.  Citigroup utilized the Pemex Supplier Facility to sell other Citigroup services and to develop a broader business relationship with Oceanografía and Amado Yáñez. ….…..…10

    2.  In 2012, Citibanamex and Oceanografía executed a standard working-capital line of credit based on the expected cash flow from Oceanografía's Pemex contracts. …………………....11

        A.  In 2012, Oceanografía's growth and internal changes within Pemex made the factoring arrangement insufficient to support Oceanografía's operations. ………………………....11

            (1)  Oceanografía experienced substantial growth from 2009 through 2012. ……….…....11

            (2)  In 2012, Pemex announced changes that affected Citibanamex's ability to continue the factoring program. ………………………………………………………………11

B. In September 2012, Oceanografía and Citibanamex executed a cash advance facility that allowed for loans, not a factoring of invoices, based on expected cash flows from designated Pemex contracts. ……………………………………………………..12

    (1) The September 2012 cash advance facility replaced the 2009 factoring facility. ……12

    (2) The September 2012 cash advance facility required Oceanografía to assign all of its rights to collect from Pemex to Citibanamex. ……………………………………...13

    (3) The September 2012 cash advance facility did not involve the transfer of any Pemex debt obligations. …………………………………………………………………...13

C. Cash advances under the September 2012 credit facility were determined by Citibanamex based on Citibanamex's review of Oceanografía's books and records. …………………14

    (1) Under the 2012 Facility, Citibanamex had complete access to Oceanografía's books and records. …………………………………………………………………….…14

    (2) Oceanografía accurately provided all information and documents requested by Citibanamex. …………………………………………………………………...……..15

    (3) Oceanografía did not provide any invoices or other documents reflecting a current Pemex debt to Oceanografía to support cash advances under the 2012 Facility........16

    (4) Citibanamex documented the credit advances. …………………………….....…18

3. An unrelated investigation leads to Pemex's discovery of fraudulent documents within Citibanamex's files related to the loans to Oceanografía. ………..…………………………18

A. The Secretaría de la Función Pública (the "SFP") audits Oceanografía's Pemex contracts.…………………………………………………………………………………18

B. The SFP illegally suspends Oceanografía's eligibility to obtain new Pemex contracts...…19

C. The SFP suspension leads to Pemex's discovery of forged or altered Pemex documents within Citibanamex's files. …………………………………………………………..…19

D. The Citibanamex records also contained forged signatures of Oceanografía officials. …20

4. Citigroup falsely blames Oceanografía and Amado Yáñez for the fraudulent documents.....21

A. On February 28, 2014, Citigroup initiated a false public relations campaign claiming the Oceanografía forged Pemex invoices to defraud Citibanamex. …………………..……21

B. Citigroup's public relations campaign includes initiating Mexican government proceedings against Oceanografía and Amado Yáñez. …………………………...…..23

5. Citigroup's claims were false. ………………………………………………..……...23

    A. The Mexican courts have exonerated Amado Yáñez and Oceanografía. …………..……23

    B. Oceanografía's estimates of its Pemex cash flow have been proven correct. ……....……24

    C. Citibanamex had the means and motive to commit the fraud, which allowed Citibanamex to account for loans to Oceanografía as debts owed by Pemex.…….…..…24

    D. Citigroup and Citibanamex tried to conceal the source of the forgeries. ………………25

    E. Oceanografía and Amado Yáñez did not forge, alter, or manufacture documents or information, and they had no reason to do so. ………………………….…..……………26

        (1) Neither Oceanografia nor Amado Yáñez committed fraud. ……....…..……………26

        (2) The forged documents were not required under the 2012 Facility, so there was no reason for Oceanografía to forge them. …………………………..…..……………27

        (3) Oceanografía could not have defrauded Citibanamex into believing Oceanografía had had $585 million (US) in approved Pemex invoices. …………………….…..…27

        (4) Oceanografía had other credit lines, so it did not need to commit fraud....….……27

    F. Citigroup was not a victim. ……………………………………………..……………..……28

6. Citigroup acted intentionally or recklessly and maliciously in falsely accusing Oceanografía and Amado Yáñez for the fraudulent acts of its subsidiary. ………………………………29

    A. Citigroup had direct and constructive knowledge of Oceanografía's financial condition and the manner in which Citibanamex booked its loans to Oceanografía. …………...…29

    B. Citigroup knew that its allegations against Oceanografía and Amado Yáñez were false..30

    C. Alternatively, Citigroup acted recklessly and maliciously in blaming Oceanografía and Amado Yáñez. ……………………………………..……………………………..30

7. Oceanografía and Amado Yáñez were injured by Citigroup's public attacks..………………31

    A. Citigroup's public relations campaign destroyed the reputations of Oceanografía and Amado Yáñez.……………………………………………...…..……………..……31

    B. As a result of Citigroup's false claims, Oceanografía was seized by the Mexican government, its reputation was destroyed, and its business value decreased. …..………32

    C. Citigroup caused Amado Yáñez to be incarcerated and to lose his business relationships…………………………………………...…..……………………32

Claims for Relief ………………………………………………………..……………..…..33

First Claim for Relief—Malicious Prosecution…………….……………………..………….…33

Second Claim for Relief—Tortious Interference …………….……………………..…………..34

Prayer for Relief …………………………………….……………………………………...34

Oceanografía, S.A. de C.V. ("Oceanografía") and Amado Yáñez Osuna, the plaintiffs, complain of Citigroup, Inc., as follows:

<h2 style="text-align:center">PRELIMINARY STATEMENT</h2>

1.    Oceanografía and its controlling shareholder, Amado Yáñez Osuna, were damaged by a cover-up orchestrated by Citigroup in an attempt to avoid the consequences of the illegal conduct of its subsidiary, Banco Nacional de Mexico, S.A. ("Citibanamex").

2.    In brief, Citibanamex committed bank fraud in Mexico and, on information and belief, in the United States when it recorded loans to Oceanografía as the purchase of rights to collect on invoices owed by the Mexican national oil company, Petróleos Mexicanos (commonly known as Pemex). The false description allowed Citibanamex (and Citigroup) to book loans to BB-rated Oceanografía as receivables from then AAA rated Pemex and to utilize funds guaranteed by Pemex that would have been unavailable to fund a loan directly to Oceanografía.

3.    By falsely recording the loans to Oceanografía as debts owed by Pemex, Citibanamex (and thus Citigroup) made millions more in profits on its Oceanografía loans.

4.    When outside circumstances made it impossible for Citibanamex or Citigroup to continue to conceal Citibanamex's bank fraud, Citigroup publicly took over the relevant operations from Citibanamex and conducted a purported investigation into Citibanamex's loans to Oceanografía.

5.    Rather than take responsibility for Citibanamex's misconduct, however, Citigroup chose to portray itself as victim and whistleblower. That plan, however, required a scapegoat—Oceanografía.

6.    So, Citigroup, through its CEO Michael Corbat, publicly and formally before Mexican government officials claimed that Amado Yáñez had forged Pemex invoices (Mexican government documents) so that Oceanografía could borrow more money from Citibanamex.

7.      To bolster the false perception that it was the victim, Citigroup publicly announced that it was adjusting its earnings downward by $360 million (US) on the false basis that Citigroup was uncertain "about Pemex's obligation to pay Citigroup for a portion of the accounts receivable Citigroup validated with Pemex." On the same day, Citigroup publicly stated, "It appears that invoices from Oceanografía were falsified to represent that Pemex had approved them."

8.      Citigroup made these allegations knowing they were false or, at a minimum, with reckless disregard of the truth of its allegations.

9.      Certainly, Citigroup knew that Oceanografía had no reason to try to manufacture Pemex invoices. Such documents were not required for Oceanografía to obtain a cash advance from Citibanamex. They were also not needed for Oceanografía to tap into its other credit lines. Moreover, Citibanamex had direct access to Oceanografía's books and records and knew exactly the level of Oceanografía's accounts receivables. It would have been a foolish effort for Oceanografía to try to mislead Citibanamex as to the level of its accounts receivable.

10.      Oceanografía had no reason to commit massive fraud when it could borrow the same amounts from Citibanamex or other banks without the fraud and when the fraud would have been farcical on its face.

11.      Citibanamex, on the other hand, had a clear motive to commit the fraud—increase its profits by booking loans to Oceanografía as debts of AAA rated Pemex.

12.      In keeping with the motives, the fraudulent descriptions were on Citibanamex's and Citigroup's books and records, where they positively affected their bottom lines, while Oceanografía correctly booked its Citibanamex loans as debts owed to Citibanamex.

13.      Not surprisingly, Amado Yáñez and all other Oceanografía officers and employees charged with crimes as a result of Citigroup's claims have been exonerated. Unfortunately, Amado

Yáñez and Oceanografía have spent nearly three years extricating themselves from Citigroup's false claims.

14.     On January 26, 2017, a Mexican appeals court ruled that there had been no legal basis for the arrest of Amado Yáñez on the criminal charges leveled by Citigroup. The matter has been remanded, so it is not yet final, but there is little room for error. The ruling exonerating Amado Yáñez will be final shortly.

15.     Mexican federal courts have even rejected Citibanamex's civil claims for debt against Oceanografía. Notably, despite its public claims, Citibanamex never brought any civil claims against Oceanografía for fraud in a court of law, probably because that would have subjected it to investigation by the courts.

16.     Although ultimately proven untrue, Citigroup's public assault on Oceanografía and Amado Yáñez has had devastating effects.

17.     Based on Citigroup's charges, Amado Yáñez was criminally charged and, when he voluntarily returned to Mexico from the United States to defend himself against Citigroup's false accusations, he was arrested and placed in the Reclusorio Sur, a notorious jail in South Mexico City.

18.     Before Citigroup's attacks, Amado Yáñez was a well-respected businessman, a family man, and a billionaire. As a direct result of Citigroup's attack, he has spent the last 29 months in the Reclusorio Sur, where his children have had to pass through throngs of unguarded prisoners to visit him in his cell. His reputation has been destroyed, and he is certainly no billionaire. He has lost at least $2.6 billion (US) in his Oceanografía investment alone. He has also lost nearly a billion dollars more in other investments.

19.     At Citigroup's request, Oceanografía was seized by the Mexican government.

20.     Before the seizure, Oceanografía was the largest provider of offshore services to Pemex and employed 11,000 people. In 2013, Citigroup (along with BBVA Bancomer) valued Oceanografía at approximately $3.5 billion (US).

21.     Today, ten thousand Oceanografía employees have lost their jobs, and a Mexican court recently valued Oceanografía at about $100 million (US).

## THE PARTIES AND RELEVANT NON-PARTIES

### 1. Petróleos Mexicanos—Non-Party

22.     Petróleos Mexicanos, commonly known as Pemex, is Mexico's national oil enterprise, founded in 1938. It is headquartered in Mexico City, Mexico. During the time period relevant to this Complaint, Pemex held a government monopoly on the exploration, production, refining, storage and sale of Mexico's petroleum reserves. In 2014, Pemex had annual revenues exceeding $117 billion and accounted for about one-third of Mexico's total government fiscal revenues and more than 7.5% of Mexico's gross domestic product.

### 2. Oceanografía, S.A. de C.V.—Plaintiff

23.     Oceanografía was organized and exists under Mexican law and maintains its principal place of business in Mexico City.

24.     In 1968, Amado Yáñez-Correa, father of Amado Yáñez Osuna, created Oceanografía in Ciudad del Carmen, Mexico for the primary purpose of providing oilfield services to Pemex.

25.     In 1995, Amado Yáñez Osuna assumed control of Oceanografía's operations. Amado Yáñez became Oceanografía's majority shareholder in approximately 2007.

26.     At the time of Citigroup's attack, Oceanografía was one of the largest offshore oil services companies operating in Mexico. Oceanografía owned or leased about 69 vessels and

employed approximately 11,000 employees. Excluding Pemex, Oceanografía owned the majority of all oil service vessels in Mexico.

27.     Oceanografía's business was highly dependent upon Pemex. Oceanografía was an oilfield services company, and Pemex held a constitutional monopoly over Mexico's petroleum industry. As a result, Pemex represented more than 90% of Oceanografía's contracts and income.

28.     As of the filing of this Complaint, Oceanografía remains under the control of the Mexican government. The appropriate authorities have authorized the filing of this lawsuit in Oceanografía's behalf.

### 3.   Amado Yáñez Osuna—Plaintiff

29.     Amado Yáñez Osuna is a Mexican citizen. At the time of Oceanografía's collapse, Amado Yáñez was Oceanografía's chief executive and majority owner.

30.     Amado Yáñez currently resides in the Reclusorio Sur, in Southern Mexico City.

### 4.   Citigroup, Inc.—Defendant

31.     Citigroup is organized under Delaware law and maintains its principal place of business at 399 Park Avenue, New York, New York.

32.     Citigroup is the third largest bank in the world.

33.     By its own account, Citigroup has the "broadest presence of any financial institution in Latin America." Mexico is Citigroup's largest market outside of the United States, accounting for 13% of Citigroup's annual global revenue.

### 5.   Banco Nacional de Mexico, S.A.—Non-Party

34.     Banco Nacional de Mexico, S.A. ("Citibanamex") is an indirectly wholly-owned subsidiary of Citigroup. Until October of last year, Citibanamex was known as Banamex.

35.     Citigroup operates in Mexico through Citibanamex. In 2009, Citigroup's then-CEO Vikram Pandit stated in no uncertain terms: "Quiero dejarlo muy claro: Citi y Banamex son uno

mismo; el futuro de Citi está en los mercados emergentes, está en Latinoamérica, está en México, con Banamex;" that is, Citigroup and Banamex are "one in the same," and Citigroup's future was "in emerging markets," particularly "in Mexico, with Banamex."

36.     Oceanografía has contractual claim against Citibanamex that are governed by contracts calling for the exclusive jurisdiction of Mexican courts.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Oceanografía and Amado Yáñez Osuna, on the one hand, and Citigroup, on the other, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Court also has jurisdiction over this matter pursuant to 12 U.S.C. § 632 because this action arises "out of transactions involving international or foreign banking."

38.     The exercise of jurisdiction over Citigroup is consistent with the United States Constitution because Citigroup is present in this District and independently because the plaintiffs' claims are based on Citigroup's actions in and directed from this District.

39.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because Citigroup resides in this District and pursuant to 28 U.S.C. § 1391(b)(2) and because a substantial portion of the events or omissions giving rise to Oceanografía's and Amado Yáñez's claims occurred within this District where Citigroup orchestrated its international cover-up.

FACTUAL ALLEGATIONS

*1. From 2009 through January 2013, Oceanografía factored its Pemex invoices with Citibanamex.*

  *A. In 2008, Citigroup's Institutional Credit Group (ICG) created a Supplier Finance Program for Pemex that allowed Pemex suppliers to factor their approved Pemex invoices.*

40.      Citigroup's most important clients are managed by the Institutional Clients Group (the "ICG"), one of two main business divisions at Citigroup, the other being Global Consumer Banking, which focuses on retail banking.

41.      Pemex, as one of Citigroup's most influential public sector clients in Latin America, is one of the clients managed by Citigroup's ICG from New York.

42.      In 2008, Citigroup, through the ICG, established a cash advance facility within Citibanamex to provide cash advances to Pemex contractors, including Oceanografía. The Pemex cash advance facility followed the same form that Citigroup used for its clients—such as Wal-Mart and United Technologies—around the world.

43.      The Pemex cash advance facility allowed Pemex contractors, like Oceanografía, to factor their Pemex invoices. As Citigroup explained as to an identical program developed for United Technologies Corporation (UTC):

  o   Once receivables are "accepted" by UTC, suppliers have the ability to access cash on their receivables

  o   Suppliers gets short term funding:

      – Without recourse (*i.e.* no clawback)
      – At attractive rates, based on UTC's credit strength
      – Without using the Supplier's own credit lines, and
      – Without paying the high discount costs associated with typical factoring arrangements
      – The program equips Suppliers with an off-balance sheet funding solution

  o   Citi takes on the payment risk of UTC

o  Not mandatory for Suppliers to be customers of Citi or open any Citi accounts

In other words, "UTC and Citi have entered into a partnership that enables preferred suppliers to sell their UTC receivables to Citi at a favorable rate commensurate with UTC's credit strength."

44.     The Pemex cash advance facility followed the same factoring model. Under the program, a Pemex contractor with an approved Pemex invoice could sell that invoice to Citibanamex at a discount, and Pemex would then pay Citibanamex directly.

45.     A critical component of the Pemex facility was the establishment of a multibillion dollar credit line guaranteed by Pemex that Citibanamex used to purchase the approved Pemex invoices, using Pemex's AAA credit rating.

### B. In 2009, Oceanografía began participating in the Pemex Supplier Finance Facility.

46.     Oceanografía's rapid growth created a need for some kind of working capital facility.

47.     That need was exacerbated by the long delay in receiving payments on Oceanografía's approved Pemex invoices. Even after Oceanografía had completed its work and had its invoices had been approved by the appropriate Pemex officials, Pemex would usually take 90 to 180 days to make payment.

48.     Therefore, on February 13, 2009, Oceanografía executed Citibanamex's "'CONTRATO FINANCIAMIENTO A PROVEEDORES' PEMEX"—or Financing Contract for Pemex Suppliers.

49.     The agreement was a factoring arrangement, whereby Oceanografía sold its approved Pemex invoices to Citibanamex in exchange for an immediate cash payment. Specifically, the 2009 contract executed by Citibanamex and Oceanografía stated that Oceanografía was assigning its rights to collect on its invoices Citibanamex in exchange for the discounted value of the assigned rights.

50.     Per the contract, once Oceanografía's rights were assigned (that is, sold), Citibanamex was wholly responsible for collecting the amounts owed.

### C. The factoring structure of the Pemex Supplier Finance Facility was highly beneficial to Citibanamex and thus to Citigroup.

51.     The factoring arrangement was highly beneficial to Citibanamex.

52.     The factoring facility allowed Citibanamex to substitute Pemex—and its then AAA credit rating—for Oceanografía's credit risk. In fact, one of the documents utilized to support advances under the original cash advance facility was a document entitled, "RELACION DE DERECHOS DE CREDITO DESCONTADOS," or Discounted Credit Rights Account document. This document was a Citibanamex form Oceanografía was required to submit along with the approved Pemex invoice. The Discounted Credit Rights document stated on its face that Pemex was the "Deudor" or Debtor as to the advance.

53.     Moreover, on information and belief, Citibanamex and Citigroup did not have to maintain substantial reserves to offset the cash advance facility because the factoring arrangement was not a loan to Oceanografía, but the purchase of a debt owed by Pemex.

54.     Citibanamex and Citigroup passed little of these benefits on to Pemex's suppliers and heavily discounted Oceanografía's Pemex invoices.

55.     Oceanografía's participation in the factoring program expanded rapidly from 2008 through the end of 2012.

56.     In 2009, Citibanamex purchased about $70 million in Oceanografía's Pemex invoices.

57.     In 2010, Citibanamex purchased about $55 million in Oceanografía's Pemex invoices.

58.     In 2011, Citibanamex purchased about $280 million in Oceanografía's Pemex invoices.

59.     In 2012, Citibanamex purchased about $450 million in Oceanografía's Pemex invoices.

*D. Citigroup utilized the Pemex Supplier Facility to sell other Citigroup services and to develop a broader business relationship with Oceanografía and Amado Yáñez.*

60.     After Oceanografía began using the Pemex Supplier Facility, Citigroup, through ICG, utilized the relationship to cross-sell other Citigroup services to Oceanografía. These activities gave Citigroup direct access to Oceanografía's books and records.

61.     Among many activities, in 2008, Citibank, N.A. ("Citibank")—a wholly owned Citigroup subsidiary—acted as Oceanografía's trustee in a $335 million bond issuance. During the due diligence for this issuance, Citibank had access to Oceanografía's financials including Oceanografía's Pemex contracts.

62.     Citigroup also acquired knowledge of Oceanografía's business model and finances through its role advising Oceanografía regarding various major purchases and capital campaigns.

63.     In 2012, to assist Oceanografía's planned acquisition of Cal Dive, a publicly traded U.S. based oil services company, Citigroup Global Markets, a Citigroup subsidiary, analyzed Oceanografía's cash flows and prepared presentations and reports.

64.     In the same year, Citigroup Global Markets advised Oceanografía regarding its proposed purchase of the *Goliath*, the world's largest oil-service vessel.

65.     Citigroup's direct relationship with Oceanografía continued after the end of the factoring arrangement described above. For example, in 2013, Citigroup Global Markets assisted Oceanografía in its efforts to recruit investors. In connection with this engagement, Citigroup Global Markets prepared investor presentations describing Oceanografía's finances, including the cash flow from its Pemex contracts. Also, in January 2014, Citigroup's Latin America Investment Banking Group—based in New York—prepared an investor presentation touting Oceanografía's Pemex business.

66.     Finally, Citigroup gained knowledge of Oceanografía's business model and finances by managing trusts in Citibanamex that Oceanografía used to pay certain creditors and investors.

67.     Citigroup and its officers also worked to develop a relationship with Amado Yáñez and garner his personal business as well. In this way, Citigroup became aware of Amado Yáñez's varied business and property interests.

*2.  In 2012, Citibanamex and Oceanografía executed a standard working-capital line of credit based on the expected cash flow from Oceanografía's Pemex contracts.*

*A.  In 2012, Oceanografía's growth and internal changes within Pemex made the factoring arrangement insufficient to support Oceanografía's operations.*

*(1) Oceanografía experienced substantial growth from 2009 through 2012.*

68.     Under the leadership of Amado Yáñez, Oceanografía grew rapidly, driven by its burgeoning relationship with Pemex. From 2009 through 2013, its net revenues more than quintupled to almost $1 billion (US).

69.      This rapid growth was gradually outstripping the ability of a pure factoring arrangement to fulfill Oceanografía's capital needs.

*(2) In 2012, Pemex announced changes that affected Citibanamex's ability to continue the factoring program.*

70.      In 2012, Enrique Peña Nieto won Mexico's presidential election on a platform that included substantial Pemex reform. In very brief, for the first time since the nationalization of Mexico's petroleum reserves in 1938—the genesis of Pemex—Mexico was going to allow private companies to exploit Mexico's petroleum reserves.

71.     This dramatic change signaled an end to the total dependence of Oceanografía (and all other Pemex suppliers) on Pemex for work. Oceanografía predicted the changes would lead to even greater growth in its business.

72.     Also, in 2012, Pemex announced that, pursuant to new federal financial laws, Pemex was implementing a new electronic billing platform that would eliminate the physical invoices that had been used under the original factoring facility and the long delay in paying approved invoices.

73.     The change in Pemex payment procedures severely limited Citibanamex's ability to structure its loans to Pemex suppliers as a purchase of Pemex invoices. Under the original factoring facility, Oceanografía and Citibanamex personnel would jointly go to a particular division and office in Pemex's accounting department to obtain Pemex's assignment of the physical invoices to Citibanamex. That division and office were closed as a result of the new payment procedure.

74.     Under the new Pemex payment procedures, there was no practical means to obtain Pemex's consent to the transfer of the rights of collection on a then-current debt obligation of Pemex. By the time there was an actual Pemex debt to transfer, there was insufficient delay in payment to justify a factoring arrangement.

75.     These changes, however, did not eliminate Oceanografía's and other Pemex contractors' need for a cash advance facility. Oceanografía and Citibanamex officials therefore began to explore other credit options.

B. *In September 2012, Oceanografía and Citibanamex executed a cash advance facility that allowed for loans, not a factoring of invoices, based on expected cash flows from designated Pemex contracts.*

*(1) The 2012 Facility replaced the 2009 factoring facility.*

76.     Knowing the change in Oceanografía's circumstances and Pemex's procedures, in 2012, Citibanamex approached Oceanografía with a proposal for a modified cash advance facility that Citibanamex presented to Oceanografía as a substitute for the prior factoring arrangement. According to Citibanamex, the new cash advance facility was to operate like a futures contract; that is, Citibanamex would loan based on the future value of Oceanografía's Pemex contracts.

77.     Oceanografía and Citibanamex executed the modified cash advance facility—called the "contract regulador" or regulating contract in the document—on September 21, 2012 (the "2012 Facility").

78.     The 2012 Facility fully replaced the original 2009 factoring arrangement.

*(2) The 2012 Facility required Oceanografía to assign all of its rights to collect from Pemex to Citibanamex.*

79.     To secure payment under the 2012 Facility, Oceanografía was required to assign all of its collection rights on its designated Pemex contracts, not just particular invoices. In other words, the cash advance facility required that Oceanografía obtain Pemex's global consent to pay Citibanamex and not Oceanografía on the designated contracts.

80.     Oceanografía had never before been requested to broadly assign its collection rights to Citibanamex. By law, the assignment of collection rights under a Pemex contract was indivisible; once the assignment occurred, Citibanamex received all Pemex payments related to the contract even if Oceanografía owed no money to Citibanamex. In essence, Citibanamex became the lockbox for Oceanografía. This assignment of rights could not be changed without Citibanamex's consent.

81.     Citibanamex's rights under the original factoring arrangement were much narrower. Citibanamex was paid directly only on the specific invoices sold to it. Since an invoice is a recognized debt obligation of Pemex, rights to collect on an invoice (as opposed to a contract) can be transferred individually.

82.     Following the execution of the 2012 Facility, Oceanografía assigned the full collection rights on virtually all of its Pemex contracts to Citibanamex.

*(3) The 2012 Facility did not involve the transfer of any Pemex debt obligations.*

83.     Unlike the original factoring arrangement, where Pemex was committing to pay a particular sum to Citibanamex, Pemex's consent to a general assignment of collection rights was not

ORIGINAL COMPLAINT—*page 13*

an agreement to pay any particular sum or any sums at all. In fact, under the 2012 Facility, Pemex never specifically assigned any rights to any invoice or other payment to Citibanamex. At the time of Pemex's consent, there was no present Pemex debt to transfer or sell. Pemex was merely agreeing that any sums eventually paid on a specified contract would be paid to Citibanamex and not to Oceanografía.

84.     Accordingly, the 2012 Facility required Oceanografía to warrant that Pemex would ultimately pay the required contract amounts, and if Pemex did not, Oceanografía was obligated to repay the borrowed sums.

85.     Oceanografía had no such obligation under the original factoring arrangement.

### C. Cash advances under the 2012 Facility were determined by Citibanamex based on Citibanamex's review of Oceanografía's books and records.

#### (1) Under the 2012 Facility, Citibanamex had complete access to Oceanografía's books and records.

86.     The process under the 2012 Facility differed from that under the original factoring arrangement.

87.     Under the original factoring facility between 2009 and 2012, Citibanamex's practice was to approve Oceanografía's cash advance requests if an Oceanografía invoice contained a Pemex stamp indicating that Pemex was committed to pay the invoice.

88.     Thus, under the original factoring arrangement, Oceanografía never had to discuss with Citibanamex the maximum amount it could borrow. Oceanografía knew it could borrow the specified percentage of the face value of its approved Pemex invoices. Citibanamex was protected because Pemex was directly obligated to pay Citibanamex on that specific invoice pursuant to Citibanamex's contract with Pemex, an obligation backed by Pemex's multi-billion dollar line of credit with Citibanamex.

89.     The situation under the September 2012 facility was different. Borrowings under the 2012 Facility were not based on the transfer of a specific Pemex debt to Citibanamex, but the expected cash flow from Pemex contracts secured by the general assignment of collection rights.

90.     Citibanamex therefore imposed two restrictions on Oceanografía's advances under the 2012 Facility. First, Citibanamex capped advances at about 50% of the value of the assigned Pemex contracts. Second, Citibanamex informed Oceanografía that it was concerned that Oceanografía might utilize cash advances to acquire other companies or vessels, and therefore, Citibanamex would strictly limit Oceanografía's cash advances to the capital necessary to administer Oceanografía's existing contracts.

91.     To ensure compliance with its conditions, Citibanamex demanded constant and complete access to Oceanografía's books and records and the right to inspect Oceanografía's facilities and work sites.

*(2) Oceanografía accurately provided all information and documents requested by Citibanamex.*

92.     This change in procedure substantially increased the interactions between Oceanografía and Citibanamex. At least monthly, Oceanografía would inform Citibanamex of its capital needs to perform under the contracts that had been nominated as part of the 2012 Facility. In response, Citibanamex officers would review the accounting documents related to Oceanografía's request in Oceanografía's offices.

93.     Citibanamex and Oceanografía personnel would also jointly confer with Pemex officials to confirm Oceanografía's progress on the designated Pemex contracts.

94.     Once Citibanamex had confirmed Oceanografía's credit needs and had reviewed the supporting documents, it would advance the approved sum under the 2012 Facility.

95.    As to each advance under the 2012 Facility, Oceanografía complied with Citibanamex's procedures and provided all requested information to support advances under the 2012 Facility.

*(3) Oceanografía did not provide any invoices or other documents reflecting a current Pemex debt to Oceanografía to support cash advances under the 2012 Facility.*

96.    None of the documents provided to Citibanamex pursuant to the 2012 Facility represented a current Pemex debt owed to Oceanografía.

97.    In particular, Oceanografía presented no invoices (or *facturas* in Spanish) to support any cash advance made pursuant to the 2012 Facility.

98.    As will be seen below, Citigroup—intentionally or not—has confused invoices (*facturas*) with Pemex work estimates (or *estimaciones*), which were provided to Citibanamex as part of its review for approving cash advances under the 2012 Facility.

99.    Both *estimaciones* and *facturas* have been used by Pemex for decades, and both documents have specific legal significance under Mexican law.

100.    Oceanografía never provided or assigned a Pemex invoice pursuant to the 2012 Facility.

101.    Oceanografía did provide Citibanamex with Pemex work estimates.

102.    A Pemex work estimate describes the status of a contractor's work under a particular Pemex contract. Pemex has required that *estimaciones* be created monthly on all of its contract for years, even before Oceanografía began factoring Pemex invoices (*facturas*) in 2009. For large contracts, including virtually all of Oceanografía's contracts, Pemex requires contractors like Oceanografía to contract with a third party to record the daily activity on a particular contract. At the end of the month, the independent contractor prints the daily log of activities, which is reviewed by the on-site representatives of both the contractor and Pemex. Upon their review, the log—the

*estimacion*—is signed and sent to Pemex officials offsite. At this time, a copy of the initial *estimacion* is provided to the contractor—to Oceanografía.

103.    An *estimacion* is not a record of a Pemex debt or obligation. The only legal debt obligations of Pemex are *facturas* or promissory notes. An *estimacion* is exactly that, an estimate of the work performed on a Pemex contract. Apart from Pemex's obligations under the relevant contract, there was no present Pemex commitment to pay any much less a particular sum for the work described in the *estimacion*.

104.    Pemex retain all of its rights to challenge the work or the value of that work set out in the *estimacion* or to raise any contractual defense. In fact, Pemex could and did review the *estimaciones* on Oceanografía contracts and make changes. At times, discrepancies in one *estimacion* would carry over into the *estimacion* for the next month. In practice, review and final approval of the quantity and value of the work set out in a Pemex *estimacion* could take months.

105.    Citibanamex understood that *estimaciones* were not invoices and that Pemex was not committed to pay the amounts set forth in the on-site *estimaciones* provided to Citibanamex, and therefore, the 2012 Facility required Oceanografía to warrant that Pemex would ultimately pay for the work described in the *estimacion*. Thus, if for any reason Pemex did not pay for the work performed, Oceanografía was required to pay the loan directly.

106.    In addition, Citibanamex representatives worked closely with both Pemex officials and Oceanografía to confirm the accuracy of the estimates of Oceanografía's Pemex workflow. Citibanamex representatives routinely visited both Pemex's and Oceanografía's offices to verify the status of Oceanografía's ongoing Pemex projects and the expected cash flows from those projects. Citibanamex also had the right to physically visit Oceanografía's work sites, and Oceanografía was frequently required to helicopter Citibanamex and Citigroup officers to offshore platforms for a review of Oceanografía's work.

107.    Citibanamex also knew that, since the change in the Pemex billing platform, Oceanografía generally had minimal outstanding accounts receivable at Pemex in comparison to the amount of work set out in Oceanografía's contracts.

*(4) Citibanamex documented the cash advances.*

108.    Citibanamex, not Oceanografía, documented the credit advances. Oceanografía would provide the relevant information to Citibanamex, and Citibanamex drafted the documents for Oceanografía's signature.

109.    All of this was done in the context of an extremely close working relationship among Oceanografía, Citibanamex, and Pemex. Oceanografía trusted Citibanamex to provide accurate documents consistent with 2012 Facility and the frequent meetings between the parties.

**3. *An unrelated investigation leads to Pemex's discovery of fraudulent documents within Citibanamex's files related to the loans to Oceanografía.***

*A. The Secretaría de la Función Pública (the "SFP") audits Oceanografía's Pemex contracts.*

110.    In June 2013, the Secretaría de la Función Pública (the "SFP")—the Mexican agency responsible for overseeing public contracts—began an audit of Oceanografía's Pemex contracts.

111.    The SFP audit was unrelated to Oceanografía's banking relationship with Citibanamex.

112.    The SFP audit found no indication of fraud within Oceanografía's operations.

113.    The SFP, however, did find that Oceanografía had failed to fully satisfy requirements for posting performance bonds (*fianzas*) on some of its Pemex contracts. Under Mexican law, a Pemex contractor must post a performance bond equal to 10% of the value of the contracts. Pemex can claim coverage under the bond if the contractor defaults.

114.    On February 11, 2014, the SFP issued its audit report concluding that the performance bonds Oceanografía had posted on 9 of its 29 Pemex contracts were not for the full 10% value of the underlying Pemex contract.

*B. The SFP illegally suspends Oceanografía's eligibility to obtain new Pemex contracts.*

115.    Based on its audit finding, on February 11, 2014, the SFP suspended Oceanografía's ability to obtain new Pemex contracts for a period of slightly more than 21 months.

116.    The SFP suspension did not reach Oceanografía's existing Pemex contracts.

Ultimately, a Mexican court determined that the SFP suspension was illegal, and it was dissolved. As of the date of this Complaint, Oceanografía is eligible to participate in Pemex bids and to provide services to Pemex, although Oceanografía's capacity to enter into such contracts has been substantially destroyed by Citigroup.

117.    Although illegal and eventually lifted, the SFP suspension precipitated a series of unfortunate events for Oceanografía, as well as Amado Yáñez and 10,000 other Oceanografía employees.

*C. The SFP suspension leads to Pemex's discovery of forged or altered Pemex documents within Citibanamex's files.*

118.    Following SFP's public announcement of the suspension, Citigroup officers were sent to Mexico purportedly to conduct an internal investigation by Citigroup into its subsidiary's loans to Oceanografía. Samuel Libnic, Citigroup's head of legal matters for Latin America, led Citigroup's internal review.

119.    The Citigroup investigation was a sham. Far from trying to determine the truth, Citigroup focused on minimizing its exposure to Citibanamex's own fraud.

120.    Citigroup, however, did provide Pemex with documents from Citibanamex's files that Citibanamex and Citigroup claimed Oceanografía had provided to Citibanamex to support about 166 cash advances totaling about $500 million (US) pursuant to the 2012 Facility.

121.   Included in the documents related to the 166 cash advances were copies of Pemex documents Citigroup maintains reflect approved Oceanografía invoices to Pemex, verified with the signature of the appropriate Pemex official.

122.   On February 20, 2014, Pemex stated that the Pemex documents provided by Citigroup to Pemex had been forged or altered and had not been found in Pemex's files, at least in the form produced by Citibanamex.

123.   In total, Pemex identified about 166 purported Pemex documents that had been forged or altered.

### D. The Citibanamex records also contained forged signatures of Oceanografía officials.

124.   The Pemex signatures were not the only forgeries found in Citibanamex's files.

125.   For each of the approximately 166 cash advances, Citibanamex produced a (forged or altered) Pemex document and a Citibanamex form document entitled, "RELACION DE DERECHOS DE CREDITO DESCONTADOS," or Discounted Credit Rights Account, all of which carried the purported signature of Amado Yáñez in behalf of Oceanografía.

126.   This same document had been used when Oceanografía was factoring its Pemex invoices. The Discounted Credit Rights Account document stated that the debtor on the obligation was Pemex, not Oceanografía. Therefore, as to the 2012 Facility, it was inaccurate. During at least the time of the original factoring arrangement, this was a Citibanamex document, prepared by Citibanamex on its form, and provided to Oceanografía for its signature.

127.   Some of these documents were signed by Citibanamex officials as to cash advances related to trusts managed by Citibanamex for Oceanografía's creditors.

128.   Recently, in one of the criminal proceedings against Amado Yáñez, a Mexican government expert issued his report concluding that the signature of Amado Yáñez on *all of* the Discounted Credit Rights Account documents provided by Citibanamex to Pemex and to the

Mexican authorities was a forgery. Amado Yáñez was not even in Mexico when many of the documents were allegedly signed by him.

### 4. *Citigroup falsely blamed Oceanografía and Amado Yáñez for the fraudulent documents.*

#### A. *On February 28, 2014, Citigroup initiated a false public relations campaign claiming the Oceanografía forged Pemex invoices to defraud Citibanamex.*

129.   Aware that Mexican authorities intended to launch a criminal investigation into the fraudulent scheme uncovered by Pemex, Citigroup had no choice but to publicly acknowledge the issue.

130.   On February 28, 2014, Citigroup finally did, and its public relations attack on Oceanografía and Amado Yáñez began. Although Citigroup admitted the existence of the fraudulent scheme, it couched itself as victim and whistleblower. From February 28, 2014, on, Citigroup repeatedly asserted to Mexican authorities and media outlets that Citigroup and Citibanamex had been victimized by an elaborate fraud perpetrated by Oceanografía.

131.   The central basis of Citigroup's public relations campaign was that the fraud involved fraudulent Pemex invoices, manufactured and provided by Oceanografía.

132.   On February 28, 2014, Citigroup CEO Michael Corbat issued a public memorandum stating, "It appears that invoices from Oceanografía were falsified to represent that Pemex had approved them. A Citibanamex employee processed them, and as much as $400 million was misappropriated throughout the course of the fraud."

133.   Also on February 28, 2014, Citigroup issued a press release stating that Citigroup had uncovered a fraud related to Oceanografía's "accounts receivable financing program." The Citigroup press release continued: "on February 20, 2014, Pemex asserted that a significant portion of the accounts receivables recorded by Citibanamex in connection with the Pemex accounts receivable

financing program were fraudulent and that the valid receivables were substantially less than the $585 million referenced above."

134.   Citigroup failed to mention that Citibanamex no longer loaned money to Oceanografía based on the transfer of rights on approved Pemex invoices.

135.   Citigroup also failed to mention that Citibanamex had direct access to Oceanografía's books and records and to Pemex and knew that Oceanografía did not have $585 million (US) in approved Pemex invoices.

136.   The Citigroup press release also claimed that it believed "the fraud is isolated to this particular client"—*i.e.*, Oceanografía. Citigroup has since admitted that this claim was untrue.

137.   Citigroup's false claims were also put forth in its SEC filings. In its Form 10-Q for the period ending March 31, 2014, under a section heading titled "Oceanografía Fraud," Citigroup announced that it was adjusting downward its earnings by $360 million (US) because of "uncertainty about Pemex's obligation to pay Citigroup for a portion of the accounts receivable Citigroup validated with Pemex as of year-end 2013 (approximately $113 million)."

138.   This statement is untrue, and Citibanamex never validated $585 million in Oceanografía accounts receivable with Pemex. To the contrary, Citibanamex had constant contact with Pemex and knew the exact status of Oceanografía's accounts receivable.

139.   Citigroup's Form 10-K for the year ending December 31, 2013, made the same assertions: "In February 2014, Citi discovered that credit had been extended to Oceanografía based on fraudulent accounts receivables documents."

140.   Citigroup has never rescinded, amended, or qualified any of the false allegations it leveled against Oceanografía or Amado Yáñez.

### B. *Citigroup's public relations campaign included initiating Mexican government proceedings against Oceanografía and Amado Yáñez.*

141.   As part of Citigroup's effort to foist blame on Oceanografía and Amado Yáñez, Citigroup officers met with representatives of the Mexican Attorney General's office and falsely alleged that Oceanografía had engineered a substantial fraud on Citibanamex.

142.   Citigroup conceded its efforts to initiate proceedings against Oceanografía and Amado Yáñez in Corbat's public memorandum when he stated that Citigroup was "coordinating with law enforcement agencies in Mexico," and was "work[ing] with Mexico's Attorney General to initiate criminal actions in connection with this matter." Citibanamex witnesses have also testified before Mexican courts that they are acting under the direction of Citigroup officials.

143.   Based on Citigroup's false accusations about Oceanografía and at Citigroup's urging, Mexico's Attorney General sought and obtained an order seizing Oceanografía.

144.   In April 2014, the PGR seized Oceanografía and removed Amado Yáñez from control of his own company.

145.   On May 12, 2014, Citigroup also orchestrated the issuance of an arrest for Amado Yáñez on fraud charges. A second arrest warrant was issued on October 28, 2014, also based on Citigroup's allegations.

### 5. *Citigroup's claims were false.*

### A. *The Mexican courts have exonerated Amado Yáñez and Oceanografía.*

146.   On January 26, 2017, a Mexican appellate court ruled that there was no legal basis for the arrest of Amado Yáñez.

147.   Every Oceanografía employee or officer charged with crimes related to Citigroup's allegations have also been exonerated.

148.   Mexican courts have also thus far rejected Citibanamex's claim that Oceanografía owes it money on the approximately 166 credit advances pressed by Citigroup.

**B. *Oceanografía's estimates of its Pemex cash flow have been proven correct.***

149.   Cash advances under the 2012 Facility were based on Oceanografía's estimates of the cash flow from its Pemex contracts, as confirmed by Citibanamex.

150.   Those estimates have been proven to be correct. Pemex has paid more than the advanced sums on all the contracts placed under the 2012 Facility—either to Citibanamex or to the Mexican agency that seized Oceanografía.

151.   This fact independently demonstrates that the information and documents Oceanografía provided to Citibanamex were not fraudulent—they accurately reflected Oceanografía's contractual work with Pemex.

**C. *Citibanamex had the means and motive to commit the fraud, which allowed Citibanamex to account for loans to Oceanografía as debts owed by Pemex.***

152.   The nature of the forgeries is telling.

153.   First, the forgeries were found in Citibanamex's files, not Oceanografía's.

154.   Second, the forgeries are exactly the type of documents Citibanamex needed to continue to account for its Oceanografía loans as a factoring arrangement.

155.   From the documents produced by Citibanamex in Mexican court proceedings, it appears that many of the documents Citigroup now claims are approved Pemex invoices were actually preliminary *estimaciones* that had been crudely altered to correspond to the amounts being advanced to Oceanografía. Thus, the documents were never invoices as stated by Citigroup. And, the 171 Discounted Credit Rights Account documents with the forged signatures of Amado Yáñez name Pemex as the Deudor or debtor for the cash advance, consistent with Citibanamex's attempts to book the cash advance as a Pemex debt and not an Oceanografía debt.

156.    Citigroup concedes the forgeries were designed to resemble Pemex invoices. Citigroup simply claims that the documents were created by Oceanografía and not Citibanamex.

157.    Thus, Citibanamex had the means and motive to commit the fraud was Citibanamex.

Apparently, unbeknownst to Oceanografía, Citibanamex decided that it was unwilling to lose the benefits of a factoring arrangement that allowed it to record Pemex as the debtor, not Oceanografía, so it simply accounted for its loans to Oceanografía under the 2012 Facility as a factoring of Pemex invoices. This sleight of hand, however, apparently also necessitated that the forged documents be placed in Citibanamex's files.

158.    On information and belief, the forged documents allowed Citibanamex to (1) book the loans to Oceanografía as Pemex debt, (2) improperly utilize the Pemex line of credit to make the Oceanografía cash advances, (3) avoid applicable banking regulations that required it to maintain a certain percentage of customer deposits and notes as reserves, and (4) increase its profit on its loans to Oceanografía.

159.    On information and belief, Citibanamex and Citigroup accounted for the Oceanografía loans as receivables from Pemex so that Citibanamex and Citigroup could benefit from Pemex's higher credit rating and so it could utilize improperly the multi-billion dollar credit line established with Pemex.

160.    On information and belief, Citibanamex and Citigroup failed to consistently maintain sufficient reserves to balance the cash advanced to Oceanografía under the 2012 Facility.

D. *Citigroup and Citibanamex tried to conceal the source of the forgeries.*

161.    Another telling indication of the source of the forgeries is the attempt by a Citibanamex officer to destroy or conceal the original Citibanamex documents. At between 3 and 4 in the morning of February 27, 2014, Citibanamex security cameras recorded a Citibanamex officer—who had responsibility for documenting the Oceanografía loans—breaking into a

Citibanamex vault containing the original Oceanografía loan documents and leaving shortly after with the files under his arm. The clandestine attempt to remove the original documents occurred just as the fraud was being publicly disclosed.

162.    Security guards monitoring the security cameras responded, and the Citibanamex officer was arrested that same morning, but Citigroup attorneys declined to press charges, and he was released.

163.    Citigroup tried directly to conceal the source of the forgeries by falsely asserting that the fraud was limited to Oceanografía. A key element of Citigroup's cover-up was its claim that the fraud was limited to Oceanografía. Citigroup could not blame Oceanografía for fraudulent Pemex documents found in Citibanamex files from other Pemex suppliers.

164.    Citigroup has been forced to admit that the Citibanamex fraud was not limited to Oceanografía, but Citigroup has otherwise refused to publicly provide further details.

165.     The fact that forged documents were also found in other Citibanamex files demonstrates that Citibanamex itself was the culpable party. On information and belief, similar fraudulent documents can be found in all Citibanamex files related to cash advances to Pemex suppliers after 2012.

E. *Oceanografía and Amado Yáñez did not forge, alter, or manufacture documents or information, and they had no reason to do so.*

*(1) Neither Oceanografía nor Amado Yáñez committed fraud.*

166.    Neither Oceanografía nor Amado Yáñez forged, altered, or manufactured any of the supporting information or documents provided to Citibanamex.

167.    And, of course, had Amado Yáñez forged the documents, he would not have needed to forge his own signature.

*(2) The forged documents were not required under the 2012 Facility, so there was no reason for Oceanografía to forge them.*

168.    There was no reason for Oceanografía to forge approved Pemex invoices because such documents were not required for cash advances under the 2012 Facility. Cash advances under the 2012 Facility were based on a general assignment of collection rights, not specific sales of Pemex debt.

*(3) Oceanografía could not have defrauded Citibanamex into believing Oceanografía had $585 million (US) in approved Pemex invoices.*

169.    Any effort by Oceanografía to manufacture hundreds of millions of dollars in fake Pemex invoices would have been futile.

170.    At all times during the 2012 Facility, Citibanamex had direct access to Oceanografía's records and to Pemex. Therefore, Citibanamex had intimate knowledge of Oceanografía's accounts receivables with Pemex and of Pemex's accounting of the progress of Oceanografía's work. Citibanamex knew the exact level of Oceanografía's accounts receivable with Pemex; it would not have been fooled by forged documents.

171.    There was simply no way that Citibanamex could have been defrauded by Oceanografía into believing that Oceanografía had more than $585 million (US) in accounts receivable with Pemex.

*(4) Oceanografía had other credit lines, so they did not need to commit fraud.*

172.    Worried about its dependence on Citibanamex, particularly the lockbox arrangement, Oceanografía had arranged credit lines with at least two other banks—BBVA Bancomer and Deutsche Bank. Neither of the credit lines from these banks required the assignment of Pemex invoices or accounts receivable. In fact, Oceanografía had strong ties with financial companies and banks around the world from which it could have obtained funds without defrauding Citibanamex.

173.    Oceanografía had also arranged for temporary funding to continue to operate while it challenged the SPF disbarment from future Pemex contracts.

174.    Oceanografía's plan to switch banks was derailed by Citigroup's attack on Oceanografía.

175.    So, Oceanografía had no motive to forge Pemex invoices to borrow from Citibanamex when it could borrow from another bank with no fraud at all.

176.    Thus, the only party with the means and motive to commit the fraud was Citibanamex.

### F.  *Citigroup was not a victim.*

177.    Throughout its cover-up, Citigroup falsely postured itself as a victim.

178.    The Mexican government has thus far categorically rejected Citigroup's damage assertion. In October 2014, a Mexican court ruled that Oceanografía had no outstanding balance on the 2012 Facility. Citibanamex appealed the decision. The appellate court affirmed the bankruptcy court's order in substantial part, determining that Citibanamex failed to show that Oceanografía owed any outstanding cash advances, but that Oceanografía owed Citibanamex *unrelated* outstanding debts equaling $8 million.

179.    If Citigroup has lost any money, it results from the disclosure and cessation of the fraudulent scheme. The scheme itself was designed and implemented by Citibanamex for the sole purpose of benefitting Citibanamex and Citigroup.

6. *Citigroup acted intentionally or recklessly and maliciously in falsely accusing Oceanografía and Amado Yáñez for the fraudulent acts of its subsidiary.*

   A. *Citigroup had direct and constructive knowledge of Oceanografía's financial condition and the manner in which Citibanamex booked its loans to Oceanografía.*

180.   Citigroup had direct and constructive knowledge of Oceanografía's banking relationship with Citibanamex and of Oceanografía's books and records.

181.   Citigroup's ICG employees were responsible for Citigroup's (and therefore Citibanamex's) relationship with Pemex.

182.   Citigroup's ICG employees developed the credit facilities utilized by Oceanografía and had been given access to Oceanografía's books and records on many occasions.

183.   In addition, many Citigroup officers had simultaneous responsibilities within Citibanamex, providing Citigroup with direct and constructive knowledge of Citibanamex's activities. For example, Manuel Medina-Mora simultaneously held high positions at both Citigroup and Citibanamex, including as Co-President of Citigroup and Chairman of Citibanamex's Board of Directors.

184.   Citigroup also learned of the changes in Oceanografía's credit facilities with Citibanamex through its advisory relationship with Oceanografía.

185.   Citigroup also had direct and constructive knowledge of how Citibanamex recorded its loans to Oceanografía. On information and belief, Citigroup's own books and records reflect the same accounting treatment.

186.   At a minimum, Citigroup learned of the exact nature of the banking relationship between Oceanografía and Citibanamex during its purported investigation into the Citibanamex fraud.

B. *Citigroup knew that its allegations against Oceanografía and Amado Yáñez were false.*

187.     Citigroup's allegations against Oceanografía and Amado Yáñez were false.

188.     On information and belief, Citigroup knew that its allegations against Oceanografía and Amado Yáñez were false from the first time it made them on February 28, 2014. Citigroup issued its press release and public memorandum just hours after a Citibanamex officer was arrested trying to remove the relevant files from Citibanamex's vault.

189.     At a minimum, at some point following February 28, 2014, Citigroup learned that its allegations were false, but it has refused to retract its criminal complaints or public statements.

190.     Citigroup instituted, and pressured for the continuation of, legal proceedings against Oceanografía and Amado Yáñez and conducted its false public relations campaign intentionally and with knowledge of Oceanografía's and Yáñez's contractual relations and their rights, including their rights to be free from government interference without cause and to conduct business, and with the specific intent to interfere with those rights.

191.     Citigroup's attack had exactly the result Citigroup intended—Oceanografía and Amado Yáñez have received the blame for Citibanamex's fraud.

C. *Alternatively, Citigroup acted recklessly and maliciously in blaming Oceanografía and Amado Yáñez.*

192.     In the alternative, Citigroup acted recklessly and maliciously in blaming Oceanografía and Amado Yáñez for the acts of its subsidiary.

193.     Citigroup instituted, and pressured for the continuation of, legal proceedings against Oceanografía and Amado Yáñez and conducted its false public relations campaign maliciously and with a reckless disregard of the truth and with knowledge of Oceanografía's and Yáñez's contractual relations and their rights, including their rights to be free from government interference without cause and to conduct business, and with the specific intent to interfere with those rights.

194.    Citigroup acted with wanton and reckless disregard and with conscious indifference and utter disregard of the effect its conduct would have on Oceanografía and Yáñez.

7.    *Oceanografía and Amado Yáñez were injured by Citigroup's public attacks.*

A.    *Citigroup's public relations campaign destroyed the reputations of Oceanografía and Amado Yáñez.*

195.    Citigroup's statements were crafted to cast the blame on Oceanografía and Amado Yáñez in the eyes of the public and the relevant authorities. Citigroup's statements were malicious and made without privilege, particularly because Citigroup knew the statements to be false or made them with reckless disregard for their truth or falsity and made them to distance itself from its own role in the Citibanamex fraud and from Citibanamex's liability.

196.    Despite their falsity Citigroup's claims carried credibility.

197.    Citigroup's false statements had the desired effect.

198.    For example, on June 7, 2014, the Economist reported, "When a government audit prompted the suspension of Oceanografía's work for Pemex in February, Citibanamex checked the invoices against which it had lent to Oceanografía with Pemex. It found that $400m of them were fake." The Economist noted that Citigroup had fired a number of Citibanamex employees, but "[w]hen it sacked them, Citi stressed that the employees were paying the price for failing to detect the fraud, not for taking part in it." Indeed, the Economist noted that Citigroup "so far has cast itself as the victim…."

199.    A March 24, 2014, Forbes article stated, "Citigroup's charge prompted the Mexican Attorney General's office to issue a summons against Yáñez…."

200.    Similar articles appeared in mainstream and financial media outlets around the world, all parroting Citigroup's false claim that Oceanografía and Amado Yáñez had forged Pemex invoices

to extract more money from Citibanamex and uniformly omitting that the falsified Pemex invoices were not required for Oceanografía to obtain advances from Citibanamex under the 2012 Facility.

**B.** *As a result of Citigroup's false claims, Oceanografía was seized by the Mexican government, its reputation destroyed, and its business value decreased.*

201.    As a result of Citigroup's attacks, Oceanografía has suffered the near total loss of the value of its business, including at least 20 existing contracts and many future business opportunities.

202.    On March 1, 2014, at Citigroup's request, the PGR seized Oceanografía and all its assets and placed them under the control of el Servicio de Administración y Enajenación de Bienes ("SAE").

203.    The seizure prevented Oceanografía from continuing its normal business operations. The seizure, coupled with the damage to Oceanografía's reputation, caused many important personnel to leave the company. Ultimately, Oceanografía was unable to complete all of its contracted work. Pemex assessed substantial contractual penalties and ultimately cancelled multiple contracts.

204.    In the eight months following initiation of Citigroup's public campaign to lay blame for the Citibanamex fraud at Oceanografía's door, Pemex terminated 20 Oceanografía contracts. Oceanografía also lost its right to acquire Cal Dive.

205.    Just prior to Citigroup's attack, Citigroup (along with BBVA Bancomer) valued Oceanografía in 2013 at a value of about $3.5 billion (US). This estimate was in line with other expert opinions about Oceanografía's value. In September 2013, Oceanografía was valued by Blackstone Energy Partners at $2.8 billion (US). The prior year, Avent International, another private equity firm, had valued Oceanografía at $2.6 billion (US).

206.    Today, Oceanografía is worth less than $100 million (US).

207.   As a result of Citigroup's actions, ten thousand Oceanografía employees lost their jobs.

### C. *Citigroup caused Amado Yáñez to be incarcerated and to lose his business relationships.*

208.   The damage to Amado Yáñez was even more devastating.

209.   Amado Yáñez has spent the last 29 months in the Reclusorio Sur.

210.   The Reclusorio Sur was built in 1978 to contain 3,500 detainees. It currently holds more than 5,200. Conditions there are nearly indescribable. Guards are posted only at the walls, so the detainees range freely within. Even apart from the danger, the conditions are unbearable. Oppressive noise is a constant, and, within the range of horrible odors, the preference is for an overwhelming disinfectant.

211.   Amado Yáñez's family members have also suffered. In order to visit him, they have had to suffer intrusive physical searches and trips through throngs of unguarded, staring prisoners.

212,   Citigroup's false attack has destroyed Amado Yáñez's reputation and business interests.

213.   He has lost at least $2.6 billion (US) in his Oceanografía investment alone. He has also lost nearly a billion dollars more in other investments as a result of Citigroup's attack.

### CLAIMS FOR RELIEF

*First Claim for Relief—Malicious Prosecution*

214.   Citigroup's conduct described above constitutes malicious prosecution.

215.   Citigroup initiated, procured, and pressured for the continuation of, legal proceedings against Oceanografía and Amado Yáñez through false allegations.

216.   Both Oceanografía and Amado Yáñez have or will be exonerated from the false allegations laid by Citigroup.

217.     Citigroup acted intentionally, maliciously, and with reckless disregard of the truth and in intentional interference with Oceanografía's and Amado Yáñez's rights.

218.     Oceanografía and Amado Yáñez are entitled to actual and to punitive damages.

*Second Claim for Relief—Tortious Interference*

219.     Citigroup's conduct described above constitutes tortious interference of existing and prospective business relationships.

220.     In February 2014, Oceanografía had in place 29 valid and lucrative contracts with Pemex and multiple existing contracts with its suppliers, including vessel owners, and others, including Cal Dive.

221.     Oceanografía also had a long-standing and valuable business relationship with Pemex and its suppliers apart from its existing contracts.

222.     Amado Yáñez had existing contracts with Oceanografía and with numerous other business interests.

223.     Citigroup knew of the existence of Oceanografía's and Amado Yáñez's contracts and prospective business relationships.

224.     Without legal justification, Citigroup intentionally and unjustifiably interfered with these contractual and non-contractual business relationships when Citigroup (1) issued public statements falsely alleging that Oceanografía and Amado Yáñez were responsible for orchestrating the Citibanamex fraud and that Citibanamex and Citigroup were victims and (2) caused legal proceedings to be brought against Oceanografía and Amado Yáñez.

225.     Citigroup acted intentionally, maliciously, and with reckless disregard of the truth and in intentional interference with Oceanografía's and Amado Yáñez's rights.

226.     Oceanografía and Amado Yáñez are entitled to actual and to punitive damages.

REQUEST FOR RELIEF

227.    Oceanografía and Amado Yáñez Osuna respectfully pray that this Court award them

actual and punitive damages and all other relief to which they are entitled under law or equity.

Dated: February 26, 2017

Respectfully submitted,

Maney & González-Félix PC

By: /s/ Mark Maney
Mark Maney
(not yet admitted in this District)
712 Main Street, Suite 2100
Houston, Texas 77002
Telephone: 713.806.2500
mmaney@maneylaw.com

ATTORNEYS FOR OCEANOGRAFÍA, S.A. DE C.V.
AND AMADO YÁÑEZ