UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OCEANOGRAFÍA, S.A. DE C.V. and
AMADO YÁÑEZ OSUNA,

*Plaintiffs*,

-against-

CITIGROUP, INC., CITIBANK, N.A.,
CITIGROUP GLOBAL MARKETS, INC.,
and BANCO NACIONAL DE MÉXICO, S.A.,

*Defendants.*

No. 17-CV-1434 (RJS)

FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED

---

# OCEANOGRAFÍA'S AND AMADO YÁÑEZ'S FIRST AMENDED COMPLAINT

Maney & González-Félix PC
Mark Maney
(admitted *pro hac vice*)
712 Main Street, Suite 2100
Houston, Texas 77002
Telephone: 713.806.2500
mmaney@maneylaw.com

COUNSEL FOR OCEANOGRAFÍA, S.A. DE C.V.
AND AMADO YÁÑEZ

TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

1.  This matter is about a Citi cover-up. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  Citi, independently of Banamex, acted as Oceanografía's financial advisor on a
    number of United States transactions, all of which were damaged by Citi's cover-up. . . . . . .1

    A.  Citi assisted Oceanografía on a number of transactions pursuant to contracts requiring
        application of New York law and acceptance of jurisdiction in New York . . . . . . . . . . .1

    B.  Citi breached its New York law contracts with Oceanografía. . . . . . . . . . . . . . . . . . . . .2

3.  Oceanografía's relationship with Banamex was initiated and managed by Citi. . . . . . . . . . . 2

    A.  Citi recommended Banamex to Oceanografía for its short-term capital needs. . . . . . . . . 2

    B.  In 2009, Oceanografía began factoring its Pemex invoices with Banamex. . . . . . . . . . . .3

    C.  In 2012, Oceanografía stopped utilizing the Pemex Supplier Finance Facility and
        executed a new working capital facility with Banamex. . . . . . . . . . . . . . . . . . . . . . . . . . . .3

4.  Forged Pemex documents were discovered in Banamex's Oceanografía loan files. . . . . . . . 4

5.  Citi falsely blamed the forgeries on Oceanografía and Yáñez. . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Citi knew that Oceanografía was no longer factoring its Pemex invoices, but Banamex
        was still accounting for its transfers to Oceanografía as if it were. . . . . . . . . . . . . . . . . . .4

    B.  Citi concedes that Banamex was inaccurately recording its Oceanografía financings as
        Pemex debt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    C.  To preserve its relationship with Pemex, Citi blamed the forgeries on Oceanografía
        and Yáñez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    D.  Citi knew that Oceanografía could not have committed the alleged fraud. . . . . . . . . . . . .6

        (1)  Citi knew that, pursuant to both Pemex's contract with Banamex and Mexican law,
             Pemex could be Banamex's debtor only with Pemex's direct consent. . . . . . . . . . . .6

        (2)  Under Pemex's electronic invoicing platform, there were no physical invoices to
             provide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

        (3)  Citi and Banamex had independent knowledge of  Oceanografía's finances,
             including the level of its Pemex invoices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    E.  Citi helped Banamex try to destroy the original forgeries. . . . . . . . . . . . . . . . . . . . . . . . .7

    F.  Citi knew that Oceanografía had no motive to commit the fraud but that Banamex
        did. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

6. Oceanografía and Yáñez have been exonerated from Citi's false charges. . . . . . . . . . . . . . . .8

    A. Yáñez has been exonerated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B. Oceanografía has been released from the control of Mexican criminal authorities. . . . . . 9

    C. Mexican courts have held that Oceanografía does not owe Banamex on the 2012 Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

7. Despite their exonerations, Citi's cover-up damaged Yáñez and Oceanografía. . . . . . . . . . . 9

    A. Citi's claims were false but credible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B. Citi's cover-up breached its New York contracts with Oceanografía. . . . . . . . . . . . . . .10

    C. Citi's cover-up caused damage in Mexico and the United States . . . . . . . . . . . . . . . . . 10

    D. Yáñez was jailed on Citi's false charges and his business interests were damaged . . . . . 10

    E. Oceanografía's value was destroyed by Citi's false charges . . . . . . . . . . . . . . . . . . . . . . .11

The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    1. Oceanografía S.A. de C.V.—Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    2. Amado Yáñez Osuna—Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    3. Citigroup, Inc.—Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    4. Citibank, N.A.—Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    5. Citigroup Global Markets, Inc.—Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    6. Banco Nacional de Mexico, S.A.—Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Jurisdiction and Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Factual Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    1. In about 2007, Oceanografía and Citi began a business relationship. . . . . . . . . . . . . . . . . .14

        A. Oceanografía expanded dramatically under the management of Amado Yáñez Osuna. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

        B. Citi's Institutional Clients Group sought a business relationship with Oceanografía and Amado Yáñez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C. In 2008, Oceanografía contracted with Citi and Banamex to act as trustee and collateral agent on a $335 million bond issuance, but Citi and Banamex later breached the contract and interfered with Oceanografía's relationship with its bondholders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    (1) Citi's first role with Oceanografía was on the issuance of $335 million in bonds in the United States market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    (2) Citi demanded that all parties consent to the application of New York law and New York jurisdiction. . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    (3) Citi and Banamex waived any objection on the basis of *forum non conveniens* in the contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    (4) Citi and Banamex breached the contract and interfered with Oceanografía's relationship with its bondholders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D. In 2012, Oceanografía contracted with Citi for assistance in acquiring Cal Dive in the United States, but Citi breached the contract and prevented the acquisition . . . . . . 17

    (1) Oceanografía hired Citi on its planned acquisition of Cal Dive, a public company in the United States. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    (2) The Citi-drafted contract calls for the application of New York law and New York jurisdiction. . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    (3) Citi, including Citigroup Global Markets, breached the contract and interfered with the Cal-Dive acquisition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

E. In 2012, Oceanografía hired Citi, including Banamex, to assist Oceanografía in acquiring the *Goliath*, but Citi's cover-up caused the loss of the vessel and breached the contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    (1) The original Citi-drafted contract called for Mexican law and courts. . . . . . . . . . . .18

    (2) A later Citi-drafted contract for the *Goliath* acquisition replaced the Mexican law contract and called for New York law and courts. . . . . . . . . . . . . . . . . . . . . . .18

    (3) Citi's cover-up breached the contract with Oceanografía and caused the loss of the  *Goliath*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

F. Oceanografía contracted with Citi to act as Oceanografía's exclusive financial advisor on the acquisition of equity investments – Project Blue—which Citi then destroyed with its cover-up. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    (1) Oceanografía hired Citi to find United States investors . . . . . . . . . . . . . . . . . . . . . .20

    (2) Citi performed Project Blue under the same contract as the Cal Dive acquisition. . 20

(3) Project Blue gave Citi complete access to Oceanografía's books and records . . . . . 20

(4) Citi's cover-up breached its contract and interfered with Project Blue and Oceanografía's relationship with its outside investors. . . . . . . . . . . . . . . . . . . . . . . . .21

2.  In 2008, Citi created a supplier finance facility with Pemex that allowed Pemex suppliers to factor their Pemex invoices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.  Citi's most important client in Mexico and Latin America was Pemex, not Oceanografía. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

B.  In 2008, Citi persuaded Pemex to adopt a Citi-designed supplier finance facility that followed a standard form that Citi had created for customers around the world. . . . . . .21

C.  The Citi-designed factoring program was based on a direct contractual relationship between Banamex and Pemex. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

(1) The core component of the Citi-designed program was a contract between Banamex and Pemex. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

(2) The Citi-designed program required the direct consent to pay by the Buyer (Pemex). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.  Citi managed the Pemex Supplier Finance Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

E.  The Citi-designed program functioned only if the Buyer/Pemex (not Pemex's supplier) was ultimately obligated to pay Banamex . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

(1) A bank's reserve requirements depend on the credit rating of the party obligated to pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

(2) Pemex had to give its direct consent to Banamex. . . . . . . . . . . . . . . . . . . . . .25

(3) The Citi-designed program required Pemex to establish a line of credit with Banamex to secure its promise to pay the factored invoices. . . . . . . . . . . . . . . . . .25

(4) The Citi-designed program made payments to the Supplier (Oceanografía) non-recourse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

F.  The Citi-designed factoring arrangement prevented fraud by Pemex suppliers like Oceanografía by requiring Pemex's direct consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

(1) A Pemex invoice could not be factored without Pemex's direct consent. . . . . . . . .26

(2) Before 2012, Pemex gave its consent personally with a physical stamp and signature. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

(3) In mid-2012, Pemex began issuing electronic invoices and giving its direct consent electronically. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

(a) Pemex instituted an electronic invoicing platform. . . . . . . . . . . . . . . . . . . . .27

(b) Pemex ceased issuing physical invoices or physically recording its assent to a factoring arrangement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

(c) The electronic invoicing platform was more secure than the physical invoicing practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

(d) Citi and Banamex had access to the electronic invoicing platform . . . . . . .27

3.   On Citi's recommendation, in 2009, Oceanografía began factoring its Pemex invoices pursuant to the Pemex Supplier Finance Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

A.   In 2009, Oceanografía began to factor its Pemex invoices pursuant to the Pemex Supplier Finance Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

(1) Oceanografía contracted with Banamex to utilize the Pemex Supplier Finance Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

(2) Payments to Oeanografía under the Pemex Supplier Finance Facility were non-recourse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B.   The Citi-designed factoring structure of the Pemex Supplier Finance Program was highly beneficial to Banamex and thus to Citi. . . . . . . . . . . . . . . . . . . . . . . . . . . .29

(1) The structure of the Pemex Supplier Finance Facility allowed Banamex to book its Oceanografía financings as Pemex debt. . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

(2)  Booking the Oceanografía financings as Pemex debt allowed Banamex to avoid maintaining reserves, increasing Banamex's and Citi's profits. . . . . . . . . . . . . . . . . . .29

4.   In 2012, Banamex and Oceanografía executed a new working-capital credit facility based on the expected cash flow from Oceanografía's Pemex contracts. . . . . . . . . . . . . . . . 30

A.   In 2012, Oceanografía's growth and internal changes within Pemex made the factoring arrangement less attractive to Oceanografía. . . . . . . . . . . . . . . . . . . . . . . . . . .30

(1) Oceanografía experienced substantial growth from 2009 through 2012 . . . . . . . . .30

(2) In 2012, Pemex announced changes that threatened diminished benefits of the Pemex Supplier Finance Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

(3) The announced changes at Pemex and Oceanografía's growth induced Oceanografía to explore new credit facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

B.   In September 2012, Oceanografía executed a new cash advance facility with Banamex that replaced the 2009 Pemex Supplier Finance Facility. . . . . . . . . . . . . . . . . 31

C. The 2012 Facility was substantially different from the Pemex Supplier Finance Program or any other Citi accounts receivable program. . . . . . . . . . . . . . . . . . . . . . . . .32

   (1) Banamex limited financings under the 2012 Facility. . . . . . . . . . . . . . . . . . . . . . . . . 32

   (2) Banamex limited Oceanografía's use of funds under the 2012 Facility. . . . . . . . . . .33

   (3) The 2012 Facility granted Banamex access to Oceanografía's books and records. . .33

   (4) The 2012 Facility required substantially more documentation than pursuant to the Pemex Suppler Finance Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

D. The 2012 Facility did not involve the transfer of Pemex debt obligations. . . . . . . . . . . . 34

   (1) Pursuant to the 2012 Facility, Oceanografía assigned its general rights to collect from Pemex, but not the right to any specific payment or debt. . . . . . . . . . . . . . . . 34

   (2) Pursuant to the 2012 Facility, Pemex never agreed to pay Banamex a sum certain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E. Oceanografía did not provide invoices or other documents reflecting a current Pemex debt or accounts receivable to support cash advances under the 2012 Facility. . 36

   (1) Following Pemex's adoption of electronic invoices, Oceanografía could no longer provide approved Pemex invoices to Banamex. . . . . . . . . . . . . . . . . . . . . . . 36

   (2) Under the new electronic invoicing platform, only Pemex could deliver an approved invoice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

   (3) Pemex work estimates are not invoices and do not reflect accounts receivable. . . . .36

   (4) Pemex work estimates do not constitute debt obligations or proof of accounts receivable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   (5) Citi and Banamex knew that estimaciones were not invoices. . . . . . . . . . . . . . . . .38

F. Banamex documented the financings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

5. An unrelated investigation led to Pemex's discovery of fraudulent Pemex documents within Banamex's files related to the loans to Oceanografía. . . . . . . . . . . . . . . . . . . . . . . . 39

A. The Secretaría de la Función Pública (the "SFP") audited Oceanografía's Pemex contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B. The SFP illegally suspended Oceanografía's eligibility to obtain new Pemex contracts for 21 months. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C. The SFP suspension led to Pemex's discovery of forged or altered Pemex documents within Banamex's files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    D.  The Banamex records also contained forged signatures of Oceanografía officials. . . . . .41

    E.  On February 20, 2014, Citi took over the relevant operations of Banamex and purported to launch an investigation into the forged invoices. . . . . . . . . . . . . . . . . . . . . . 41

6.  Citi falsely blamed the forgeries on Oceanografía and Amado Yáñez. . . . . . . . . . . . . . . . . 42

    A.  Citi admits that, despite execution of the 2012 Facility, Banamex continued to record its Oceanografía financings as Pemex debt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

        (1)  Citi admits Banamex was recording its Oceanografía financings as Pemex debt. . . .42

        (2)  The parties dispute the responsibility for the erroneous accounting treatment. . . . .42

    B.  On February 28, 2014, Citi initiated a false public relations campaign claiming that Oceanografía and f Yáñez had factored forged Pemex invoices. . . . . . . . . . . . . . . . . . . .43

        (1)  Citi decided to blame Oceanografía and Yáñez for Banamex's fraud. . . . . . . . . . . .43

        (2)  Citi's cover-up included press releases, SEC filings, and other direct communications issued from Citi's New York Office. . . . . . . . . . . . . . . . . . . . . . . . .44

            (a)  On February 28, Citi issued a press release claiming fraud in the accounts receivable program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

            (b)  Citi's initial press release was filed with the SEC. . . . . . . . . . . . . . . . . . . . . . . . .45

            (c)  On February 28, 2014, Citi CEO Corbat issued a public memorandum to Citi employees blaming Oceanografía for falsifying Pemex invoices. . . . . . . . . .45

            (d)  On March 3, 2014, Citi issues its Annual Report for 2013, which repeated its false claim that Oceanografía forged Pemex invoices. . . . . . . . . . . . . . . . . . . .46

            (e)  On March 3, 2014, Citi's Chief Financial Officer claimed that the only fraud within Citi's supplier finance facilities was related to Oceanografía. . . . . . . . . .46

            (f)  Citi's quarterly report on March 31, 2014 set out Citi's claim of an "Oceanografía fraud." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

            (g)  On April 14, 2014, Citi reiterated its claim that the fraud was limited to Oceanografía. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

            (h)  On March 14, 2014, Citi repeated its story. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

            (i)  On May 27, 2014, Citi repeated that it would seek recover for its alleged loss. . 49

            (j)  On May 29, 2014, Citi repeated its false claim that the fraud was limited to Oceanografía. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

(3)  Citi also pushed its false narrative indirectly through the press. . . . . . . . . . . . . . . . .50

C.  Citi's cover-up successfully cast blame on Oceanografía and Amado Yáñez for Banamex's fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

(1)  Citi bolstered its false claims by making them formally. . . . . . . . . . . . . . . . . . . . . .50

(2)  Citi's cover-up was successful. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

D.  Citi's cover-up included successfully initiating Mexican government proceedings against Oceanografía and Amado Yáñez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

E.  Citi has never rescinded or modified its claims against Oceanografía or Yáñez. . . . . . .53

7.  Citi's claims were intentionally false. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

A.  Citi knew that Oceanografía could not have defrauded Banamex into believing Oceanografía had $585 million in approved Pemex invoices. . . . . . . . . . . . . . . . . . . . . 53

(1)  Citi and Banamex knew that Pemex Supplier Finance Facility required a direct communication from Pemex. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

(2)  Citi and Banamex knew that Pemex's electronic invoicing system made the alleged fraud impossible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

(3)  Citi and Banamex knew Oceanografía's financial condition and knew that Oceanografía did not have anywhere near $585 million in approved Pemex invoices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

(4)  On information and belief, Citi knew that Banamex was improperly using the Pemex line of credit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

B.  Citi knew that Banamex had the means and motive to commit the fraud, which allowed Banamex to account for Oceanografía financings as Pemex debt. . . . . . . . . . .56

C.  Citi knew that Oceanografía had no motive for the fraud. . . . . . . . . . . . . . . . . . . . . . . .56

D.  Citi and Banamex tried to conceal the source of the forgeries . . . . . . . . . . . . . . . . . . .56

E.  Banamex forged invoices related to other Pemex suppliers. . . . . . . . . . . . . . . . . . . . . .57

F.  Citi knew that its allegations against Oceanografía and Amado Yáñez were false. . . . . .58

G.  Alternatively, Citi acted recklessly and maliciously in blaming Oceanografía and Amado Yáñez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

H.  The defendants conspired to complete the cover-up. . . . . . . . . . . . . . . . . . . . . . . . . . . .59

8.  Citi's cover-up caused substantial effects in the United States. . . . . . . . . . . . . . . . . . . . . . . . .59

A.  Citi's cover-up breached its New York law contracts with Oceanografía. . . . . . . . . . . . .59

B.  Citi's cover-up has caused substantial litigation in the United States. . . . . . . . . . . . . . . 59

9.  The Mexican courts have exonerated Amado Yáñez and Oceanografía. . . . . . . . . . . . . . . . .60

A.  Amado Yáñez has been exonerated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B.  Oceanografía has been exonerated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

10.  Oceanografía and Amado Yáñez were injured by Citi's cover-up. . . . . . . . . . . . . . . . . . . . .61

A.  Citi's cover-up interfered with all of Oceanografía's business interests, destroyed its reputation, and ultimately decimated its business value. . . . . . . . . . . . . . . . . . . . . . . . . .61

(1)  Citi's fraudulent cover-up destroyed Oceanografía's Mexican business interests. . . .61

(2)  Citi's fraudulent cover-up destroyed at least $700 million in Oceanografía's United States business interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

(3)  Citi's cover-up destroyed Oceanografía's value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

B.  Citi caused Amado Yáñez to be incarcerated and to lose his business relationships. . . . 63

Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

First Claim for Relief—Malicious Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

Second Claim for Relief—Tortious Interference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

Third Claim for Relief—Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

Fourth Claim for Relief—Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

Request for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Oceanografía, S.A. de C.V. ("Oceanografía") and Amado Yáñez Osuna ("Yáñez"), the plaintiffs, complain of Citigroup, Inc., Citibank, N.A., Citigroup Global Markets, Inc., and Banco Nacional de México, S.A., the defendants, as follows:

PRELIMINARY STATEMENT

### 1. *This matter is about a Citi cover-up.*

1. In keeping with the old Washington adage, "It's not the crime, it's the cover up," Oceanografía and its controlling shareholder, Amado Yáñez Osuna, were damaged by a cover-up orchestrated by Citigroup and its affiliates, Citibank and Citigroup Global Markets, (together "Citi") in an attempt to avoid the consequences of the illegal conduct of Citigroup's Mexican subsidiary, Banco Nacional de México. At all relevant times, Banco Nacional de México was commonly referred to as Banamex. It has since changed its name to Citibanamex.

2. The term "Citi" as used in this Complaint does not include Banamex unless otherwise noted.

3. The claims raised against Citi and Banamex in this lawsuit relate *entirely* to the Citi managed cover-up, not the underlying fraud committed by Banamex in Mexico. Citi's false cover-up, not Banamex's fraud, caused Oceanografía and Yáñez years of legal difficulties and the loss of billions of dollars. Indeed, until the cover-up, Banamex's bank fraud had no apparent effect on Oceanografía.

### 2. *Citi, independently of Banamex, acted as Oceanografía's financial advisor on a number of United States transactions, all of which were damaged by Citi's cover-up.*

#### A. *Citi assisted Oceanografía on a number of United States transactions pursuant to contracts requiring application of New York law and acceptance of jurisdiction in New York.*

4. The Citi-Oceanografía relationship that ended with Citi's cover-up began with Citi in New York. For years, Citi, through its Institutional Clients Group, cultivated a direct financial advisory relationship with Oceanografía and its principal owner and CEO, Amado Yáñez.

5.      Pursuant to a series of contracts, the relationship between Citi and the plaintiffs was and is governed by New York law. Before acting as Oceanografía's financial advisor, Citi required Oceanografía to sign a series of contracts, all of which were expressly made under New York law and required acceptance of the jurisdiction of New York courts.

### B. Citi breached its New York law contracts with Oceanografía.

6.      Based on these New York contracts, Citi assisted in the issuance of $335 in Oceanografía bonds in the United States, advised Oceanografía on the $300 million acquisition of a public United States company, advised Oceanografía on the $225 million acquisition of the largest oilfield service vessel in the world, and valued Oceanografía at $3.5 billion in an effort to obtain equity investors in the United States.

7.      Citi's cover-up destroyed the value of those contracts to Oceanografía and breached the duty of good faith established by the New York law invoked in all of the contracts.

8.      The claims raised against Banamex in this action relate *solely* to Banamex's interference with and breach of two United States contracts, signed by Banamex and Citi: (1) the contract related to a United States bond issuance for Oceanografía and (2) a contract for Citi's and Banamex's assistance in the acquisition of a maritime vessel. In the contract related to the bond issue, Citibank and Banamex consented to the jurisdiction of this Court and waived any argument that this forum might be inconvenient. Oceanografía's claims related to the banking relationship between Oceanografía and Banamex are governed by contracts calling for Mexican law and courts.

### 3. Oceanografía's relationship with Banamex was initiated and managed by Citi.

### A. Citi recommended Banamex to Oceanografía for its short-term capital needs.

9.      After Oceanografía's $335 million bond issue, which addressed Oceanografía's long-term capital requirements, Citi recommended that Oceanografía obtain short-term capital from Banamex.

10.     Although Citi's Mexican banking operations are conducted through Banamex, Citi continued to manage the relationship. Thus, as Citi stated in its SEC filings, "Citi, through Banamex, had extended approximately $585 million of short-term credit to Oceanografía …."

### B. In 2009, Oceanografía began factoring its Pemex invoices with Banamex.

11.     At first, Oceanografía obtained short-term financing from Banamex entirely through the factoring of its invoices to the Mexican national oil company, Petróleos Mexicanos (commonly known as Pemex). The factoring of Pemex invoices was done through Banamex's "Pemex Supplier Finance Program."

12.     Citi oversaw the Pemex Supplier Finance Program because Citi had designed and implemented the program with Pemex according to a format Citi had created and used throughout the world. Citi also maintained control over the facility because Pemex was Citi's most important client in Latin America. The key Banamex officials controlling the factoring arrangement with Pemex were also Citi officers, and transfers to Oceanografía were approved by individuals who were employees of both Citi and Banamex.

### C. In 2012, Oceanografía stopped utilizing the Pemex Supplier Finance Facility and executed a new working capital facility with Banamex.

13.     In 2012, when various issues made the factoring arrangement less attractive, Oceanografía executed a new working capital facility with Banamex (the "2012 Facility"). Citi's oversight of Oceanografía's financings at Banamex continued.

14.     The shift away from the Pemex Supplier Finance Facility was a critical change. In brief, under the Pemex Supplier Finance Facility, Pemex was a party to all transactions between Banamex and Oceanografía and directly assented to becoming Banamex's debtor. Therefore, once Oceanografía sold an approved Pemex invoice—with Pemex's assent—to Banamex, Oceanografía had no further obligation to Banamex. Under the 2012 Facility, Banamex provided financings to

Oceanografía based on the expected value of Oceanografía's Pemex contracts, but Pemex was not a party to the individual transactions and never assented to owing any specific amounts to Banamex. Oceanografía did assign its collection rights from Pemex—so that Pemex was required to make any contract payments ultimately owed to Oceanografía to a collection account at Banamex—but Pemex made no promise to pay any particular sum. Accordingly, if Pemex did not make all of the expected payments under an Oceanografía contract—for any reason, including alleged breach of contract— Oceanografía remained liable to Banamex under the 2012 Facility.

### 4.   *Forged Pemex documents were discovered in Banamex's Oceanografía files.*

15.     In early 2014, an unrelated audit caused Pemex to review some of the documents in Banamex's Oceanografía files. On February 20, 2014, Pemex informed Citi that it had discovered what Citi describes as forged Pemex invoices within Banamex's files.

16.     Within hours of the "discovery" of the forgeries, Citi acted, sending Citi officers to Mexico and taking over the relevant operations of Banamex. Citi publicly stated that it was initiating an immediate investigation of the alleged forgeries.

17.     From February 20, 2014, on, Citi was in charge of the relevant Banamex operations.

### 5.   *Citi falsely blamed the forgeries on Oceanografía and Yáñez.*

### A.   *Citi knew that Oceanografía was no longer factoring its Pemex invoices, but Banamex was still accounting for its transfers to Oceanografía as if it were.*

18.     Citi's purported investigation was a sham. Citi already knew what was happening at its Mexican subsidiary—Banamex was falsely recording transfers to Oceanografía as the purchase of Pemex debt, as if Oceanografía had not stopped using the Pemex Supplier Finance Facility. By falsely recording payments to Oceanografía (a private entity with a BB- credit rating) as debts owed by Pemex (a governmental agency with a AAA rating), Banamex avoided reserve requirements and

improved its operating capital. The forged Pemex invoices found in Banamex's files supported Banamex's inaccurate books and records.

### B. *Citi concedes Banamex was inaccurately recording its Oceanografía financings as Pemex debt.*

19.     Citi has repeatedly conceded in its SEC filings and other public statements that, following the enactment of the 2012 Facility, Banamex continued to account for its Oceanografía financings as Pemex debt. For example, on March 31, 2014, in its Form 10Q, Citi announced that it was adjusting downward its earnings by $360 million because of "uncertainty about *Pemex's obligation to pay Citigroup* …." (emphasis supplied) Citi also stated in an SEC filing that its estimated loss was "the difference between the $585 million *Citi had recorded as owed by Pemex to Citi* as of December 31, 2013, and an estimated $185 million that Citi currently believes is *owed by Pemex*." (emphasis supplied)

20.     Pemex, however, was not Banamex's debtor and had not agreed to pay any specific amounts to Banamex.

21.     Thus, there is no dispute that Banamex was at least inaccurately (if not fraudulently) recording its transfers to Oceanografía. The key issue is whether Citi appropriately cast blame on Oceanografía for that fraud.

### C. *To preserve its relationship with Pemex, Citi blamed the forgeries on Oceanografía and Yáñez.*

22.     The foundation of this case is that Citi falsely laid the blame for the forgeries on Oceanografía and Yáñez, asserting in its SEC filings and New York press releases that Oceanografía and Yáñez had forged the Pemex invoices. The reality is that Citi knew that this scenario was impossible.

23.     Despite its knowledge, Citi was simply not ready to confess that its Mexican subsidiary had forged invoices from Citi's most important client in Latin America, Pemex. Citi chose

instead to portray itself as victim and whistleblower. That plan, however, required a scapegoat—Oceanografía.

24.     So, within days of the discovery of the forged invoices, Citi publicly stated that Oceanografía was the fraudulent actor. The false statements were issued by Citigroup CEO Michael Corbat out of New York in press releases in English and in Citi's SEC filings in the United States.

### D. Citi knew that Oceanografía could not have committed the alleged fraud.

25.     Citi (not Banamex) had designed and implemented the factoring arrangement with Pemex, and Citi continued to oversee the program. As a result, Citi knew that the alleged fraud was impossible under the strictures of the Citi-designed factoring program.

26.     There are at least four reasons (known to Citi) why Oceanografía could not have pulled off the fraud charged by Citi in its public statements out of New York.

### (1) Citi knew that, pursuant to both Pemex's contract with Banamex and Mexican law, Pemex could be Banamex's debtor only with Pemex's direct consent.

27.     Citi had worked directly with Pemex to insure a factoring structure that prevented the use of fraudulent invoices.

28.     A key protection in the Citi-designed factoring program was that payments could not be triggered by documents provided solely by a Pemex supplier like Oceanografía. The Citi-designed and managed system required direct notification *from Pemex (part of the Mexican government)* that Pemex would pay the factored invoices.

29.     That security was also critical to Pemex because Pemex's promise to pay on the invoices was backed by Pemex's multi-billion-dollar line of credit with Banamex. Without Pemex's direct consent to the factoring of an invoice, Citi could not legally tap into that Pemex line of credit.

30.     This requirement also conformed with Mexican law, which does not allow Mexican governmental agencies to incur debt obligations without their direct consent.

*(2) Under Pemex's electronic invoicing platform, there were no physical invoices to provide.*

31.     Citi knew that Pemex had instituted an electronic invoicing platform in 2012 and had worked with Pemex to strengthen the Pemex Supplier Finance Facility using that new platform.

32.     Therefore, Citi knew that, following the adoption of the Pemex electronic invoice platform, there were no longer physical invoices of the type Citi claimed Oceanografía had forged, so the core allegation in Citi's cover-up— "It appears that invoices from Oceanografía were falsified to represent that Pemex had approved them"—was and is demonstrably false. Citi knew that, if Oceanografía had been using the Pemex Supplier Finance Facility, any Pemex invoices would have been electronic and would have been delivered directly to Banamex by Pemex through the electronic invoicing platform.

*(3) Citi and Banamex had independent knowledge of Oceanografía's finances, including the level of its Pemex invoices.*

33.     In any event, it would have been a futile effort for Oceanografía to try to mislead Citi or Banamex as to the level of its Pemex invoices. In fact, Citi had just completed an extensive financial review of Oceanografía in an effort to obtain equity capital for Oceanografía.

34.     Banamex also had access to Oceanografía's books and records.

E. *Citi helped Banamex try to destroy the original forgeries.*

35.     A telling indication of Citi's knowledge is that just days before Citi's CEO issued a press release from New York blaming Oceanografía for the forgeries, Citi lawyers were in Mexico arranging the release of a Banamex/Citi official who had been arrested for trying to destroy the original forgeries.

36.     At between 3 and 4 in the morning of February 23, 2014, Banamex security cameras recorded a Citi/Banamex officer named Erik Cervantes Murillo breaking into a Banamex vault containing the original Oceanografía files and leaving shortly after with the files under his arm.

Security guards monitoring the vault responded, and the Cervantes was arrested with the stolen documents in the trunk of his car, but the same morning, Citi attorneys declined to press charges, and Cervantes was released.

37.     Citi has never produced the original documents found in the trunk of Cervantes' car when he was arrested.

38.     Five days later, on February 28th, Citi's CEO issued the first public statement blaming Oceanografía and Yáñez for the forgeries Citi's own officer tried to bury.

### F. *Citi knew that Oceanografía had no motive to commit the fraud but that Banamex did.*

39.     Citi knew that Oceanografía had no motive to forge Pemex invoices because, as Citi knew, Pemex invoices were not required for Oceanografía to obtain financing under the 2012 Facility or pursuant to Oceanografía's financing facilities with other banks. Oceanografía had no reason to commit massive fraud when it could obtain the same amounts from Banamex or other banks without any fraud and when the fraud would have been farcical on its face.

40.     On the other hand, Citi knew that Banamex had a clear motive to commit the fraud—The forged invoices supported Banamex's false recording of its Oceanografía financings as Pemex debt, which allowed Banamex (and Citi) to avoid reserve requirements, substantially increasing Banamex's and Citi's profits and balance sheets.

41.     In keeping with the motives, the fraudulent documents were in Banamex's files, where they positively affected Banamex's bottom line.

### 6. *Oceanografía and Yáñez have been exonerated from Citi's false charges.*

### A. *Yáñez has been exonerated.*

42.     Not surprisingly, Amado Yáñez has been exonerated. Unfortunately, Amado Yáñez and Oceanografía have spent nearly three years extricating themselves from Citi's false claims.

43.     On January 26, 2017, a Mexican federal court ruled that there had been no legal basis for the arrest of Amado Yáñez on the criminal charges leveled by Citi. That ruling is being challenged by Banamex under Citi's direction, but the opinion retains its legal force.

### B. Oceanografía has been released from the control of Mexican criminal authorities.

44.     Citi's false claims caused the Procuraduría General de la República (the PGR) to seize Oceanografía and a criminal receiver under the auspices of the *Servicio de Administración y Enajenación de Bienes* (or SAE), a Mexican governmental agency, was put in place. The receiver replaced Yáñez as the person in charge of Oceanografía.

45.     The SAE receiver was removed on July 5, 2017. By that time, however, the receiver served dual roles as the SAE receiver representing the Mexican government and as a bankruptcy receiver representing the Mexican bankruptcy court. The role for the bankruptcy court continues, although an agreed bankruptcy plan has been filed.

### C. Mexican courts have held that Oceanografía does not owe Banamex on the 2012 Facility.

46.     Throughout its cover-up, Citi falsely postured itself as a victim, but after reviewing the evidence, the Mexican courts rejected Citi's damage assertion.

47.     In October 2014, a Mexican bankruptcy court ruled that Oceanografía had no outstanding balance on the 2012 Facility. The relevant portion of the opinion was affirmed on appeal.

### 7. Despite their exoneration, Citi's cover-up damaged Yáñez and Oceanografía.

### A. Citi's claims were false but credible.

48.     As one of the largest banks in the world, Citi's claims that Oceanografía had submitted forgeries to Banamex were credible. Citi bolstered the credibility of its false claims by

putting them in its SEC filings. Although ultimately proven untrue, Citi's public assault on Oceanografía and Amado Yáñez has had devastating effects.

### B. *Citi's cover-up breached its New York contracts with Oceanografía.*

49.     Oceanografía hired Citi on four separate occasions to assist Oceanografía on transactions that totaled approximately $1 billion in value.

50.     Citi's cover-up destroyed the value of all four transactions.

51.     Citi's cover-up therefore breached these New York contracts. Banamex joined that breach as to two of the four contracts.

### C. *Citi's cover-up caused damage in Mexico and the United States.*

52.     The damage caused by Citi's cover-up was divided between Mexico and the United States. Although Oceanografía's (and thus Yáñez's) core business was in Mexico, based on Citi's advice, Oceanografía was almost entirely dependent on the US markets for its fixed capital. As a result, Citi's attack (1) caused Oceanografía to lose its access to capital, (2) severely damaged its relationship with its investors, who were chiefly outside of Mexico, and (3) prevented Oceanografía from obtaining the benefits of two lucrative acquisitions in the United States.

53.     Citi's allegations have also engendered substantial legal proceedings in the United States, including investigations by the SEC and DOJ into Citi's conduct related to Banamex and Oceanografía and a RICO lawsuit brought against Citi by Oceanografía's creditors in United States federal court in Florida.

### D. *Yáñez was jailed on Citi's false charges and his business interests were damaged.*

54.     Based on Citi's false claims, Amado Yáñez was criminally charged and, when he voluntarily returned to Mexico from the United States to defend himself against Citi's false accusations, he was arrested and placed in the Reclusorio Sur, a notorious jail in South Mexico City.

55.     Amado Yáñez spent 906 days in the Reclusorio Sur, where his children had to pass through throngs of unguarded prisoners to visit him in his cell.

56.     Amado Yáñez has lost at least $2.6 billion in his Oceanografía investment alone. He has also lost nearly another billion dollars in other investments in Mexico and the United States.

### E. Oceanografía's value was destroyed by Citi's false charges.

57.     Citi's cover-up destroyed the value of Oceanografía's bonds, caused its seizure by Mexican criminal authorities, and cost Oceanografía the trust of its clients and investors. The seizure of Oceanografía and imposition of an SAE receiver triggered a wave of lost and terminated contracts virtually destroying Oceanografía's business.

58.     Before it was seized, Oceanografía was the largest provider of offshore services to Pemex and employed 11,000 people. In 2013, Citi (along with BBVA Bancomer) valued Oceanografía at approximately $3.5 billion.

59.     Today, ten thousand Oceanografía employees have lost their jobs, and a Mexican court valued Oceanografía at about $100 million. The $3.5 billion loss in value traces directly to Citi's cover-up.

## THE PARTIES

### 1. Oceanografía, S.A. de C.V.—Plaintiff

60.     Oceanografía was organized and exists under Mexican law and maintains its principal place of business in Mexico City.

61.     As of the filing of this Amended Complaint, Oceanografía has been released from the control of SAE receiver, but remains under the control of the Mexican bankruptcy court, although an agreed bankruptcy plan has been filed and should be effective by mid-December. This action was authorized by the former SAE receiver, who at the time acted as both SAE receiver and the bankruptcy receiver. The receiver had the power of attorney to authorize the lawsuit.

## 2. *Amado Yáñez Osuna—Plaintiff*

62.     Amado Yáñez Osuna is a Mexican citizen. At the time of Oceanografía's collapse, Amado Yáñez was Oceanografía's chief executive and majority owner.

63.     Amado Yáñez resides in Mexico City.

## 3. *Citigroup, Inc.—Defendant*

64.     Citigroup is organized under Delaware law and maintains its principal place of business at 399 Park Avenue, New York, New York.

65.     Citigroup is the third largest bank in the world.

66.     By its own account, Citigroup has the "broadest presence of any financial institution in Latin America." Mexico is Citigroup's largest market outside of the United States, accounting for 13% of Citigroup's annual global revenue.

67.     Citigroup has been served.

## 4. *Citibank, N.A.—Defendant*

68.     Citibank is a wholly-owned Citigroup subsidiary. Citibank is organized under the laws of the United States and has its principal place of business at 388 Greenwich Street, 14th Floor, New York, New York 10013.

## 5. *Citigroup Global Markets, Inc.—Defendant*

69.     Citigroup Global Markets is a wholly-owned Citigroup subsidiary. It is organized under the laws of the State of New York and has its principal place of business at 390 Greenwich Street, New York, New York 10013.

## 6. *Banco Nacional de Mexico, S.A.—Defendant*

70.     Banco Nacional de Mexico, S.A. ("Banamex") is an indirect wholly-owned subsidiary of Citigroup. Since October of last year, Banamex has been known as Citibanamex.

71.     Citi operates in Mexico through Banamex. In 2009, Citigroup's then-CEO Vikram Pandit stated in no uncertain terms: "Quiero dejarlo muy claro: Citi y Banamex son uno mismo; el futuro de Citi está en los mercados emergentes, está en Latinoamérica, está en México, con Banamex;" that is, Citigroup and Banamex are "one and the same," and Citi's future was "in emerging markets," particularly "in Mexico, with Banamex."

72.     Banamex is a party to this action solely as to the two New York law contracts it executed.

## JURISDICTION AND VENUE

73.     This Court has jurisdiction over this matter pursuant to the Edge Act, 12 U.S.C. § 632, because Citibank, N.A. is a corporation organized under the laws of the United States and this is an action "arising out of transactions involving international or foreign banking … or out of other international or foreign financial operations …."

74.     The exercise of jurisdiction over the defendants is consistent with the United States Constitution because Citigroup, Citibank, and Citigroup Global Markets are present in this District and because all defendants consented to jurisdiction here on the claims presented in this complaint. Independently, the exercise of jurisdiction over the defendants is consistent with the United States Constitution because the plaintiffs' claims are based on the defendants' actions in and directed from this District.

75.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because (1) Citigroup, Citibank, and Citigroup Global Markets reside in this District and pursuant to 28 U.S.C. § 1391(b)(2); (2) a substantial portion of the events or omissions giving rise to Oceanografía's and Amado Yáñez's claims occurred within this District where the defendants orchestrated their cover-up, and (3) the defendants consented to venue and jurisdiction here.

FACTUAL ALLEGATIONS

1. *In about 2007, Oceanografía and Citi began a business relationship.*

   A. *Oceanografía expanded dramatically under the management of Amado Yáñez Osuna.*

76.     In 1968, Amado Yáñez-Correa, father of Amado Yáñez Osuna, formed Oceanografía in Ciudad del Carmen, Mexico for the primary purpose of providing oilfield services to Petróleos Mexicanos, commonly known as Pemex.

77.     Pemex is Mexico's national oil enterprise, founded in 1938. It is headquartered in Mexico City, Mexico. During the time period relevant to this Complaint, Pemex held a government monopoly on the exploitation of Mexico's petroleum reserves. Oceanografía's business was therefore highly dependent upon Pemex, which represented more than 90% of Oceanografía's contracts and income

78.     In 1995, Amado Yáñez Osuna, assumed control of Oceanografía's operations. Amado Yáñez became Oceanografía's majority shareholder in approximately 2007.

79.     Oceanografía grew dramatically under the direction of Amado Yáñez. By the time of Citi's cover-up, Oceanografía was one of the largest offshore oil services companies operating in Mexico. Oceanografía owned or leased 75 vessels and employed approximately 11,000 employees. Excluding Pemex, Oceanografía owned the majority of all oil service vessels in Mexico.

   B. *Citi's Institutional Clients Group sought a business relationship with Oceanografía and Amado Yáñez.*

80.     Oceanografía's growing size and importance within Mexico came to the attention of Citi and particularly its Institutional Clients Group (the "ICG"). The ICG is one of two main business divisions at Citigroup, the other being Global Consumer Banking, which focuses on retail banking.

81.     Citi's ICG worked diligently to develop a business relationship with Oceanografía through its new CEO, Amado Yáñez Osuna.

C.  *In 2008, Oceanografía contracted with Citi and Banamex to act as trustee and collateral agent on a $335 million bond issuance, but Citi and Banamex later breached the contract and interfered with Oceanografía's relationship with its bondholders.*

(1) *Citi's first role with Oceanografía was on the issuance of $335 million in bonds in the United States market.*

82.     Citi's first role with Oceanografía was in 2008 on the issuance of $335 million in bonds in the United States market pursuant to 17 C.F.R. § 230.144A.

83.     The bond issuance expressly excluded sales to any Mexican citizens or entities. Mexico was the only nation so excluded.

84.     Citi nominated Citibank to be the trustee for the issuance and Banamex to be the collateral agent.

85.     Citibank and Banamex acted as trustee and collateral agent, respectively, for the bond issuance until well after Citi's cover-up had caused Oceanografía's seizure by Mexican authorities.

86.     The bonds were ultimately issued in July of 2008.

(2) *Citi demanded that all parties consent to the application of New York law and New York jurisdiction.*

87.     The indenture for the bond issuance was expressly governed by New York law.

88.     The indenture also required all parties, including Oceanografía, Citibank, and Banamex, to agree to be subject to the jurisdiction of courts sitting in New York:

> Each of the parties hereto hereby irrevocably and unconditionally submits to the jurisdiction of: (i) the United States District Court for the Southern District of New York or of any New York State court (in either case sitting in Manhattan, New York City) and (ii) the courts of its own corporate domicile, in each case with all applicable courts of appeal therefrom, with respect to actions brought against it as a defendant, for purposes of all legal proceedings arising out of or relating to this Indenture or the

transactions contemplated hereby; provided that nothing herein shall be deemed to limit the ability of any party to this Indenture to bring suit against any other party to this Indenture in any other permissible jurisdiction.

89.     The contract governing the indenture involved obligations covering far more than one million dollars.

### (3) Citi and Banamex waived any objection on the basis of forum non conveniens in the contract.

90.     In addition, all parties, including Oceanografía, Citi, and Banamex, were required to waive any objections to suit in this Court, including an express waiver of any claim that New York is an inconvenient forum:

Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding throughout in such a court, any other jurisdiction that it may be entitled by reason of its present or future domicile, any claim that any such proceeding brought in such a been brought in an inconvenient forum and any objection based on place of residence or domicile.

### (4) Citi and Banamex breached the contract and interfered with Oceanografía's relationship with its bondholders.

91.     Citi's cover-up destroyed all of the benefits of the bond issuance for Oceanografía and interfered with the bond issuance.

92.     That interference breached the underlying contract's duty of good faith and fair dealing established by New York law. Banamex participated in the cover-up and likewise breached the duty of good faith.

93.     Immediately following Citi's public statements on February 28, 2014, claiming that Oceanografía had obtained more than $580 million from Banamex through the use of forged Pemex invoices, the value of the Oceanografía bonds cratered, rendering them virtually useless. Citi's and Banamex's cover-up and the drop in bond prices subjected Oceanografía to significant legal

difficulties, and damaged Oceanografía's ability to obtain funds from the critical United States financial market.

94.     Using the allegations of fraud leveled by Citi, Oceanografía's bondholders were assisted in the shutting down of Oceanografía's operations using the rights they obtained through the bond issuance.

95.     Oceanografía's bondholders concur that Citi interfered with their bonds. They have brought suit against Citi in federal court in Florida asserting RICO claims.

### D. In 2012, Oceanografía contracted with Citi for assistance in acquiring Cal Dive in the United States, but Citi later breached the contract and prevented the acquisition.

#### (1) Oceanografía hired Citi on its planned acquisition of Cal Dive, a public company in the United States.

96.     In early 2012, Oceanografía turned to Citi as its "exclusive financial advisor" on the acquisition of Cal Dive International Inc., a publicly-traded U.S.-based oil services company.

97.     Citi nominated Citigroup Global Markets, a Citigroup subsidiary, to provide the requested assistance.

98.     As part of its assistance on the Cal Dive acquisition, Citi analyzed Oceanografía's cash flows and Pemex contracts and prepared presentations and reports.

#### (2) The Citi-drafted contract called for the application of New York law and New York jurisdiction.

99.     In April of 2012, Oceanografía executed a contract with Citigroup Global Markets naming it Oceanografía's "exclusive financial advisor" on the planned acquisition.

100.    The contract was not limited to the Cal Dive acquisition or to Citigroup Global Markets. The contract expressly covered any prior relationship or dealings between Oceanografía and any Citi affiliate. Citi reserved the right to "render the services hereunder through one or more of its affiliates."

101.    Citi demanded that Oceanografía agree to the application of New York law "without regard to conflicts of law principles" and to the jurisdiction of courts sitting in New York in any matter related to Citi's advisory services.

*(3) Citi, including Citigroup Global Markets, breached the contract and interfered with the Cal-Dive acquisition.*

102.    Oceanografía was on the verge of completing the $300 million Cal Dive acquisition when Citi began its cover-up. Indeed, the month prior to Citi's attack, Citi was actively promoting equity investment into Oceanografía based in part on the pending Cal Dive acquisition.

103.    Citi's cover-up destroyed Oceanografía's efforts to acquire Cal Dive. Oceanografía lost this US-based opportunity and all of the funds that it invested in the attempt, including all funds paid to Citigroup Global Markets for its advice and services.

E.   *In 2012, Oceanografía hired Citi, including Banamex, to assist Oceanografía in acquiring the* Goliath, *but Citi's cover-up caused the loss of the vessel and breached the contract.*

104.    In 2012, Citigroup Global Markets became the "exclusive financial advisor" to Oceanografía regarding its proposed purchase of the *Goliath*, the world's largest oil-service vessel.

*(1) The original Citi-drafted contract called for Mexican law and courts.*

105.    On July 11, 2012, Citi prepared a contract for it to act as financial agent for the acquisition. The original July 11 contract described a team of Banamex and Citi officials who would assist Oceanografía in financing the acquisition.

106.    The July 11, 2012 contract called for the application of Mexican law and for the exclusive jurisdiction of courts sitting in Mexico City.

*(2) A later Citi-drafted contract for the* Goliath *acquisition replaced the Mexican law contract and called for New York law and courts.*

107.    On October 12, 2012, Citi and Oceanografía executed a new contract that replaced the prior Mexican-law agreement.

108.    The Citi-drafted contract expressly included Citigroup Global Markets "on behalf of Citi," defined as "CGMI [Citigroup Global Markets], Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc., Acciones y Valores Banamex, S.A. de C.V., Banco Nacional de Mexico S.A. … and/or any of their affiliates as may be appropriate to consummate the transactions contemplated hereby."

109.    Therefore, for the purposes of allegations in this section 1.E., the term "Citi" includes Banamex.

110.    Section 10 of the contract stated: "This Commitment Letter will be governed by, and construed in accordance with, the law of the State of New York." The same section stated that the second contract superseded all prior agreements.

111.    Finally, the Citi contract stated: "You irrevocably and unconditionally (i) submit to the exclusive jurisdiction of any New York State or Federal Court located in the City of New York over any suit, action or proceeding arising out of or relating to this Commitment letter…. Waive any objection to the laying of venue … and any claim that any such suit, action or proceeding has been brought in an inconvenient forum."

### (3) Citi's cover-up breached its contract with Oceanografía and caused the loss of the Goliath.

112.    Although Oceanografía was able to complete its acquisition of the *Goliath* shortly before Citi's cover-up at a cost of more than $200 million, Oceanografía lost the *Goliath* as direct result of Citi's cover-up.

113.    Oceanografía's resulting loss reaches in the hundreds of millions of dollars.

F. *Oceanografía contracted with Citi to act as Oceanografía's exclusive financial advisor on the acquisition of equity investments—Project Blue—which Citi then destroyed with its cover-up.*

*(1) Oceanografía hired Citi to find United States investors.*

114.    During the same time frame as the prospective acquisitions of Cal Dive and the *Goliath*, Citi acted as Oceanografía's "exclusive financial advisor" on efforts to obtain more equity investment.

115.    The effort was called "Project Blue."

116.    Project Blue targeted United States investors. As part of this effort, Citigroup's Latin America Investment Banking Group—based in New York—prepared an investor presentation touting Oceanografía's Pemex business. The presentation was in English.

117.    Citi nominated Citigroup Global Markets to manage Project Blue.

*(2) Citi performed Project Blue under the same contract as the Cal Dive acquisition.*

118.    Rather than draft a new contract, Citi completed this project under the same contract originally applicable to the Cal Dive acquisition.

119.    This contract was governed by New York law and required Oceanografía to accept New York jurisdiction over any dispute and to waive any objection on the basis of inconvenient forum.

*(3) Project Blue gave Citi complete access to Oceanografía's books and records.*

120.    Oceanografía spent about a million dollars on audits to support Project Blue. All of that information was directly available to Citi.

121.    Project Blue thus gave Citi access to, and knowledge of, all aspects of Oceanografía's business, including its books and records and the level of its approved invoices, accounts receivable, and work in progress.

122.    Citi was still presenting Project Blue to potential United States investor in January 2014, the month before its cover-up began. The presentation included a listing of all of

Oceanografía's Pemex contracts and Citi's estimated value of those existing contracts—$2.73 billion, more than five times the level of transfers Citi claims were made to Oceanografía.

*(4) Citi's cover-up breached its contract and interfered with Project Blue and Oceanografía's relationship with its outside investors.*

123.    Citi's cover-up destroyed Project Blue and interfered with the relationship between Oceanografía and its outside investors, particularly those in the United States.

124.    After Citi asserted that Oceanografía had committed a massive fraud based on forged governmental documents, Oceanografía had no chance of obtaining new American investors through Project Blue.

125.    Citi's conduct breached the duty of good faith and fair dealing in the underlying contract and wholly prevented Oceanografía from receiving any of the intended benefits of the contract.

*2.  In 2008, Citi created a supplier finance facility with Pemex that allowed Pemex suppliers to factor their Pemex invoices.*

*A. Citi's most important client in Mexico and Latin America was Pemex, not Oceanografía.*

126.    Oceanografía was not Citi's main business target within Mexico. Pemex, one of the largest enterprises in Latin America, was the prize of Mexico and of Latin America.

127.    Pemex, therefore, was more important to Citi than Oceanografía.

128.    Citi's Pemex relationship was managed directly by Citi's ICG officials from New York and Citi's Latin American headquarters in Miami. The same Citi personnel oversaw Citi's Oceanografía relationship.

*B. In 2008, Citi persuaded Pemex to adopt a Citi-designed supplier finance facility that followed a standard form that Citi had created for customers around the world.*

129.    In 2008, Citi, through the ICG, persuaded Pemex to implement a Citi-designed supplier finance program to provide short-term financing to Pemex contractors like Oceanografía.

130.    The Citi-designed system was called the Pemex Supplier Finance Program.

131.    The Citi-instituted supplier finance program at Pemex followed the same factoring model that Citi used throughout the world. Citi advertised its "programmatic approach" to factoring and actively touted the uniformity of its supplier finance program across the world. According to Citi's promotional materials, "Citi is the only major supplier finance provider that operates its own proprietary processing platform."

132.    Citi advertised that it has implemented its supplier finance program with some of the largest companies in the world, including Wal-Mart, Rolls Royce, United Technologies, Proctor & Gamble, and Verizon.

### C. The Citi-designed factoring program was based on a direct contractual relationship between Banamex and Pemex.

#### (1) The core component of the Citi-designed program was a contract between Banamex and Pemex.

133.    Citi distinguished its factoring program from other factoring or accounts receivable programs by calling it a supplier finance program and by emphasizing the program's "Buyer Centric" approach. According to Citi, the key distinction was that the Citi-designed supplier finance facility was, a "three way match" among Citi, Citi's client (the Buyer), and the seller of services to Citi's client.

134.    As explained by Citi, "Supplier Finance is a partnership between a Buying Entity and Citi allowing the Buying Entity's suppliers to enter into a programme to sell their receivables to Citi in respect of goods and services delivered to, and accepted by, the Buying Entity."

135.    The Citi program was designed particularly to address the credit crisis that started around 2008. According to Citi, its system provided substantial benefits to Citi's main customer—Pemex—during the credit crisis when its suppliers found it difficult to find ordinary financing. The Citi program allowed "large multinational companies (MNCs), especially those with strong credit

ratings," to assist "their smaller, lower-rated suppliers" to raise capital, thereby reducing the risk to, and costs of, the buyer's supply chain.

136.    Thus, Citi's client under this program was the buyer—Pemex—not the seller of goods or services—Oceanografía.

### (2) The Citi-designed program required the direct consent to pay by the Buyer (Pemex).

137.    The Citi program required the direct contractual commitment of the Buyer (Pemex) to pay Banamex on the invoices transferred under the program. Only with that direct commitment could Citi or Banamex leverage Pemex's credit rating to provide working capital to Oceanografía.

138.    Citi described the structure of Citi's supplier finance facilities in a brochure prepared for prospective purchasing customer like Pemex:



139.     Pursuant to the Citi-designed structure, the "first step" in selling an invoice would be for Pemex to approve the invoice and to communicate that approval directly to Citi.

140.     The "last step" is that Citi debited its customer's (that is, Pemex's) account at Banamex.

141.     In this way, according to Citi, the Citi-designed system "uses the superior credit characteristics of the buyer – and close scrutiny of payment documentation – to advance funds to the supplier at a much lower cost of funds than they would usually be able to borrow at."

### D. Citi managed the Pemex Supplier Finance Program.

142.     Although Citi designed and implemented the program, Citi's operations in Mexico are conducted through Banamex, a Mexican bank. Thus, as Citi asserted in SEC filings made during its cover-up, "Citi, through Banamex, had extended approximately $585 million of short-term credit to Oceanografía …."

143.     Citi, however, continued to supervise and manage the program.

### E. The Citi-designed program functioned only if the Buyer/Pemex (not Pemex's supplier) was ultimately obligated to pay Banamex.

#### (1) A bank's reserve requirements depend on the credit rating of the party obligated to pay.

144.     Citi could leverage the Buyer's superior credit rating only if its risk of repayment was on the Buyer (Pemex).

145.     According to banking law in Mexico and the United States, Citi had to maintain reserves based on the risk of the party obligated to pay it. If Oceanografía had the ultimate obligation to pay Banamex, then Banamex would have to maintain a substantial reserve. If, on the other hand, Banamex recorded the obligation as a Pemex debt, then (due to Pemex's superior credit rating and governmental status) Banamex was not required to maintain any reserve at all.

146.    Accounting for the factoring as the purchase of Pemex debt also improved Banamex's balance sheet.

*(2) Pemex had to give its direct consent to Banamex.*

147.    As explained above, the Citi-designed program required a direct contractual commitment from the Buyer, here Pemex. That direct commitment was also required for Banamex to name Pemex as its debtor pursuant to Mexican law.

*(3) The Citi-designed program required Pemex to establish a line of credit with Banamex to secure its promise to pay the factored invoices.*

148.    Pemex's commitment to pay Banamex on the Oceanografía invoices was secured by a multi-billion-dollar line of credit with Banamex.

149.    Banamex could not legally utilize the Pemex line of credit without Pemex's direct consent to pay a particular invoice.

*(4) The Citi-designed program made payments to the Supplier (Oceanografía) non-recourse.*

150.    Payments to providers under Citi's supplier finance program were expressly non-recourse. As set out in Citi's promotional materials: "Non-Recourse Payment - Payment to supplier is non-recourse so it is theirs to keep once paid …."

151.    As Citi explained as to an identical program Citi developed for United Technologies Corporation (UTC):

o   Once receivables are "accepted" by UTC, suppliers have the ability to access cash on their receivables

o   Suppliers gets short term funding:

    – *Without recourse* (*i.e.* no clawback)
    – At attractive rates, based on UTC's credit strength
    – Without using the Supplier's own credit lines, and
    – Without paying the high discount costs associated with typical factoring arrangements

– The program equips Suppliers with an off-balance sheet funding solution

o   *Citi takes on the payment risk of UTC*

o   Not mandatory for Suppliers to be customers of Citi or open any Citi accounts. (emphasis supplied)

In other words, "UTC and Citi have entered into a partnership that enables preferred suppliers to sell their UTC receivables to Citi at a favorable rate commensurate with UTC's credit strength."

F.   *The Citi-designed factoring arrangement prevented fraud by Pemex suppliers like Oceanografía by requiring Pemex's direct consent.*

152.    As designed by Citi, the Pemex Supplier Finance Program prevented the use of fraudulent invoices.

*(1) A Pemex invoice could not be factored without Pemex's direct consent.*

153.    The protection against fraudulent invoices was simple. For a Pemex invoice to be factored, Pemex had to directly agree with Banamex that Pemex was obligated on the invoice and would pay Banamex. Without Pemex's direct consent, Banamex would not factor an invoice from a Pemex supplier like Oceanografía or utilize the Pemex line of credit.

*(2) Before 2012, Pemex gave its consent personally with a physical stamp and signature.*

154.    Originally, Oceanografía and Banamex personnel would jointly go to a particular office in Pemex's accounting department in Campeche Mexico to obtain Pemex's assignment of the physical invoices to Banamex. A Pemex officer would approve the factoring by placing a physical stamp and his signature on the invoice before a representative of both Banamex and Oceanografía.

(3) *In mid-2012, Pemex began issuing electronic invoices and giving its direct consent electronically.*

(a) *Pemex instituted an electronic invoicing platform.*

155.     In mid-2012, Pemex instituted an electronic invoicing platform called the *Boveda de Factura Electronica* (Electronic Invoice Vault).

(b) *Pemex ceased issuing physical invoices or physically recording its assent to a factoring arrangement.*

156.     After adoption of the Electronic Invoice Vault, Pemex ceased issuing physical invoices.

157.     Pemex's physical office in Campeche was closed as part of the new invoicing platform. As a result, there was no way to obtain a physical Pemex signature on an invoice. All signatures were electronic.

(c) *The electronic invoicing platform was more secure than the physical invoicing practice.*

158.     The Pemex electronic invoice platform increased the security of the Pemex invoicing system. Indeed, one of Pemex's stated reasons for the change to electronic invoicing was to eliminate the "possibility of forged invoices."

159.     Citi also worked with Pemex to ensure the continued security of the Pemex Supplier Finance Program with electronic invoices.

160.     The anti-fraud protection under the electronic invoicing system was essentially the same as under the original physical invoice process—factoring required a direct commitment by and from Pemex. Under the new system, that assent was provided electronically.

(d) *Citi and Banamex had access to the electronic invoicing platform.*

161.     Pemex's Electronic Invoice Vault was especially transparent to Banamex and to Citi. Subscribing to the Pemex system allowed both Citi and Banamex officials to directly access relevant

Pemex invoices. In this way, Citi and Banamex could easily check whether Pemex had issued an invoice or whether Pemex had agreed to a requested assignment of an invoice to Banamex.

162.    Thus, per the Citi-designed factoring program, Banamex always had the direct assurance of Pemex that the invoice would be paid by Pemex.

3.  *On Citi's recommendation, in 2009, Oceanografía began factoring its Pemex invoices pursuant to the Pemex Supplier Finance Program.*

163.    Citi recommended that Oceanografía utilize the Citi-created Pemex Supplier Finance Program.

A. *In 2009, Oceanografía began to factor its Pemex invoices pursuant to the Pemex Supplier Finance Facility.*

(1) *Oceanografía contracted with Banamex to utilize the Pemex Supplier Finance Facility.*

164.    Based on Citi's biased advice, on February 13, 2009, Oceanografía executed Banamex's "'CONTRATO FINANCIAMIENTO A PROVEEDORES' PEMEX"—or Financing Contract for Pemex Suppliers.

165.    The contract was a standard form.

166.    The agreement was a straightforward factoring arrangement in keeping with the Citi-designed accounts receivable program. Pursuant to the program, Oceanografía could sell its approved Pemex invoices to Banamex in exchange for an immediate cash payment. Specifically, the 2009 contract executed by Banamex and Oceanografía stated that Oceanografía was assigning specific Pemex invoices to Banamex in exchange for the discounted value of the invoice.

(2) *Payments to Oceanografía under the Pemex Supplier Finance Facility were non-recourse.*

167.    Oceanografía never owed anything to Banamex pursuant to the Pemex Supplier Finance Facility. Oceanografía assigned/sold its Pemex invoice to Banamex for an immediate payment, with no obligation to return that payment. If Pemex paid the invoice more quickly than

anticipated, Banamex might be obligated to pay Oceanografía an additional payment, but Oceanografía was never obligated to pay any amounts to Banamex.

168.     The contract contained no clauses setting out payment obligations of Oceanografía or for any security for any payments by Oceanografía. As a result, the contract was a mere 9 pages long, including the attached signature card.

### B. The Citi-designed factoring structure of the Pemex Supplier Finance Program was highly beneficial to Banamex and thus to Citi.

169.     The factoring arrangement was highly beneficial to Banamex.

### (1) The structure of the Pemex Supplier Finance Facility allowed Banamex to book its Oceanografía financings as Pemex debt.

170.     The structure of the Pemex Supplier Finance Facility allowed Banamex to substitute Pemex—and its then AAA credit rating—for Oceanografía's credit risk—at BB-. One of the documents utilized to support payments under the Pemex Supplier Finance Facility was a document entitled, "RELACION DE DERECHOS DE CREDITO DESCONTADOS," or Discounted Credit Rights Account document. This document was a Banamex form Oceanografía was required to submit along with the approved Pemex invoice.

171.     The Discounted Credit Rights document stated on its face that Pemex was the "Deudor" or Debtor as to the payment.

### (2) Booking the Oceanografía financings as Pemex debt allowed Banamex to avoid maintaining reserves, increasing Banamex's and Citi's profits.

172.     According to Mexican law and regulations, since payments to Oceanografía pursuant to the Pemex Supplier Finance Facility were non-recourse to Oceanografía, leaving Pemex as the only obligated party, Banamex did not have to maintain substantial reserves to offset the transfers to Oceanografia.

173.    Mexican banking regulations would have required Banamex to maintain a substantial reserve on any amounts where Banamex's risk rested on BB- rated Oceanografía, but the same regulations imposed no reserve obligation if AAA-rated and governmental agency Pemex was the responsible party. The factoring arrangement allowed that substitution, because when the Pemex invoice was factored, Pemex was directly obligated to pay Banamex the amount of the invoice, and Oceanografía had no further obligations.

174.    The elimination of the reserve requirement dramatically increased Banamex's profits. These financial benefits flowed to Citi, but Banamex and Citi passed little of these benefits on to Pemex's suppliers and heavily discounted Oceanografía's Pemex invoices.

**4.  *In 2012, Banamex and Oceanografía executed a new working-capital facility based on the expected cash flow from Oceanografía's Pemex contracts.***

**A. *In 2012, Oceanografía's growth and internal changes within Pemex made the factoring arrangement less attractive to Oceanografía.***

*(1) Oceanografía experienced substantial growth from 2009 through 2012.*

175.    Under the leadership of Amado Yáñez Osuna, Oceanografía grew rapidly, driven by its burgeoning relationship with Pemex and its access to US capital. From 2009 through 2013, Oceanografía's net revenues more than quintupled to almost $1 billion.

176.    As a result, Oceanografía's participation in the factoring program expanded rapidly from 2008 through the end of 2012.

177.    Eventually, the high cost of factoring and the ever-increasing availability of other financing sources with the waning of the debt crisis made other financing options more attractive to Oceanografía than the Pemex Supplier Finance Program.

*(2) In 2012, Pemex announced changes that threatened diminished benefits of the Pemex Supplier Finance Facility.*

178.    In 2012, Enrique Peña Nieto won Mexico's presidential election on a platform that included substantial Pemex reform. In very brief, for the first time since the nationalization of Mexico's petroleum reserves in 1938—the genesis of Pemex—Mexico was to allow private companies to exploit Mexico's petroleum reserves.

179.    This dramatic change signaled an end to the total dependence of Oceanografía (and all other Pemex suppliers) on Pemex for work. Oceanografía predicted the changes would lead to even greater growth in its business.

180.    In addition, Pemex's new electronic invoicing platform was supposed to reduce the long delay in paying approved invoices.

181.    While, as a practical matter, neither goal was achieved to the expected extent, the announced changes induced Oceanografía to rethink its financing arrangements.

*(3) The announced changes at Pemex and Oceanografía's growth induced Oceanografía to explore new working capital facilities.*

182.    Although the factoring program continued to be available, the announced changes at Pemex and Oceanografía's growth reduced the attractiveness to Oceanografía of continuing to utilize the Pemex Supplier Finance Facility to factor its Pemex invoices to obtain working capital. Therefore, Oceanografía began to explore other financing options with Banamex and other financial institutions.

**B.  In September 2012, Oceanografía executed a new working capital facility with Banamex that replaced the 2009 Pemex Supplier Finance Program.**

183.    Knowing the change in Oceanografía's circumstances and Pemex's procedures, in 2012, Banamex approached Oceanografía with a proposal for a new working capital facility that Banamex presented to Oceanografía as a substitute for the prior factoring arrangement. According

to Banamex, the new working capital facility was to operate like a futures contract; that is, Banamex would fund based on the expected future value of Oceanografía's Pemex contracts.

184.   Oceanografía and Banamex executed the new working capital facility—called the "contract regulador" or regulating contract in the document—on September 21, 2012 (the "2012 Facility").

185.   The 2012 Facility fully replaced the 2009 Pemex Supplier Finance Facility. Starting with the execution of the 2012 Facility in September 2012, Oceanografía no longer participated in the Pemex Supplier Finance Program or any other version of Citi's accounts receivable program.

## C. The 2012 Facility was substantially different from the Pemex Supplier Finance Program or any other Citi accounts receivable program.

186.   The 2012 Facility did not follow the same format as Citi's accounts receivable programs throughout the world.

### (1) Banamex limited financings under the 2012 Facility.

187.   Under the Pemex Supplier Finance Facility between 2009 and 2012, Oceanografía never had to discuss with Banamex the amount of money it could receive. Oceanografía knew it could receive the specified percentage of the face value of its approved Pemex invoices. Banamex was protected because Pemex was directly obligated to pay Banamex on that specific invoice pursuant to Banamex's contract with Pemex, an obligation backed by Pemex's multi-billion-dollar line of credit with Banamex.

188.   The situation under the September 2012 facility was different. Financings under the 2012 Facility were not based on the assignment of a specific Pemex debt to Banamex, but the expected cash flow from Pemex contracts secured by a general assignment of collection rights under those contracts.

189.     Therefore, while the 2012 Facility on its face allowed for financings of up to 90% of the value of a Pemex contract placed in the facility, Banamex capped financings at about 50% of Banamex's estimated value of Oceanografía's Pemex contracts.

*(2) Banamex limited Oceanografía's use of funds under the 2012 Facility.*

190.     Payments to Oceanografía pursuant to the Pemex Supplier Finance Facility were non-recourse, so Banamex was unconcerned with how Oceanografía used the funds it received. In contrast, under the 2012 Facility, Oceanografía was ultimately obligated to repay Banamex if the estimated future payments from Pemex did not arrive.

191.     Banamex, therefore, was concerned with how Oceanografía used the funds it received. In particular, Banamex informed Oceanografía that it was concerned that Oceanografía might utilize the financings to acquire other companies or vessels, rather than service the Pemex contracts that supported the financings.

192.     To alleviate this concern, Banamex limited Oceanografía's financings to the capital necessary to administer Oceanografía's existing contracts. Banamex enforced this restriction through a review of Oceanografía's books and records.

*(3) The 2012 Facility granted Banamex access to Oceanografía's books and records.*

193.     To ensure compliance with its conditions, Banamex demanded constant and complete access to Oceanografía's books and records and the right to inspect Oceanografía's facilities and work sites.

194.     The 2012 Facility expressly authorized Banamex to visit Oceanografía to inspect its books and records.

195.     This change in procedure substantially increased the interactions between Oceanografía and Banamex. At least monthly, Oceanografía would inform Banamex of its capital needs to perform under its Pemex contracts as part of the 2012 Facility. In response, Banamex and

Citi officers would review the accounting documents related to Oceanografía's request in Oceanografía's offices.

196.    Banamex and Oceanografía personnel would also jointly confer with Pemex officials to confirm Oceanografía's progress on the designated Pemex contracts.

197.    Citi had independent access to Oceanografía's books and records as part of Project Blue and its other advisory roles with Oceanografía.

### (4) The 2012 Facility required substantially more documentation than pursuant to the Pemex Supplier Finance Facility.

198.    Due to all of the restrictions and because there was no direct Pemex commitment to pay, documentation of financings under the 2012 Facility was substantially more involved than under the Pemex Supplier Finance Facility.

### D. The 2012 Facility did not involve the assignment of Pemex debt obligations.

### (1) Pursuant to the 2012 Facility, Oceanografía assigned its general rights to collect from Pemex, but not the right to any specific payment or debt.

199.    To secure the financings under the 2012 Facility, Oceanografía was required to assign to Banamex all collection rights on Oceanografía's designated Pemex contracts, not just particular invoices. In other words, the 2012 Facility required that Oceanografía obtain Pemex's global consent to pay a collection account at Banamex (the "Cuenta de Cobra" or Collection Account) and not Oceanografía on the designated contracts.

200.    Oceanografía had never before been requested to broadly assign its collection rights to Banamex. Assignments of rights under the Pemex Supplier Finance Program were on an invoice by invoice basis made with Pemex's direct consent.

201.    By law, the assignment of collection rights under a Pemex contract was indivisible; once the assignment occurred, Banamex received all Pemex payments related to the contract even if

Oceanografía owed no money to Banamex. In essence, Banamex became the lockbox for Oceanografía. This assignment of rights could not be changed without Banamex's consent.

202.    Following the execution of the 2012 Facility, Oceanografía assigned the full collection rights on virtually all of its Pemex contracts to Banamex.

*(2) Pemex never agreed to pay Banamex a sum certain pursuant to the 2012 Facility.*

203.    Unlike the Pemex Supplier Finance Facility, under the 2012 Facility, there was no Pemex commitment to pay a sum certain to Banamex. In particular, the general assignment of collection rights was not an agreement by Pemex to pay any particular sum or any sums at all.

204.    In fact, at the time of the assignment of collection rights on a particular Pemex contract to Banamex—the only Pemex agreements related to the 2012 Facility—it was impossible for there to be an assignment of a Pemex debt obligation. There were no present Pemex debt obligations to assign or sell—there had been no work performed on the new contract, and no invoices approved.

205.    Pemex's consent was therefore limited to agreeing that it would pay any amounts that might be owed in the future to Oceanografía to the Collection Account at Banamex (and not to Oceanografía directly).

206.    According to the relevant Pemex practice and Mexican law, an assignment of a right to collect does not confer on the assignee (Banamex) a right to enforce Pemex to pay any amounts. Banamex could seek legal redress if Pemex paid some amount to Oceanografía and not the Collection Account, but if Pemex never paid on the Oceanografía contracts, Banamex would have no standing to object to the lack of payment.

207.    Banamex's rights under the original factoring arrangement were narrower but greater. Under the Pemex Supplier Finance Facility, Pemex contractually agreed to pay Banamex on the specific Oceanografía invoices assigned to it under the facility. The assigned and approved

Pemex invoices were, according to Mexican law and the contract, recognized debt obligations of Pemex. Therefore, Banamex could seek legal redress if Pemex failed to pay.

E. *Oceanografía did not provide invoices or other documents reflecting a current Pemex debt or accounts receivable to support financings under the 2012 Facility.*

(1) *Following Pemex's adoption of electronic invoices, Oceanografía could no longer provide approved Pemex invoices to Banamex.*

208.    Even if Banamex could have invoked the Pemex Supplier Finance Program and made Pemex its debtor without (1) a contract with Pemex and Oceanografía invoking that program or (2) a direct commitment from Pemex, none of the documents provided to Banamex pursuant to the 2012 Facility represented a current Pemex debt owed to Oceanografía that could be sold to Banamex.

209.    Following Pemex's adoption of its electronic invoicing platform (the *Boveda de Factura Electronica* or Electronic Invoice Vault), it was impossible for Oceanografía to provide physical Pemex invoices to Banamex. In particular, Oceanografía could not have presented invoices (or *facturas* in Spanish) with a Pemex signature. Pemex no longer physically signed invoices.

(2) *Under the new electronic invoicing platform, only Pemex could deliver an approved invoice.*

210.    It was still possible to factor a Pemex invoice under the electronic invoicing system, but the delivery of an approved invoice had to be made directly by Pemex through its electronic invoicing platform. Therefore, it was impossible for Oceanografía to provide approved Pemex invoices to Banamex.

(3) *Pemex work estimates are not invoices and do not reflect accounts receivable.*

211.    As will be seen below, Citi—intentionally or not—has confused invoices (*facturas*) with Pemex work estimates (or *estimaciones*), which were provided to Banamex as part of its review for approving financings under the 2012 Facility.

212.    Both *estimaciones* and *facturas* have been used by Pemex for decades, and both documents have specific legal significance under Mexican law.

213.    Oceanografía did not deliver approved Pemex invoices pursuant to the 2012 Facility.

214.    Oceanografía did provide Banamex with Pemex work estimates.

215.    A Pemex work estimate describes the status of a contractor's work under a particular Pemex contract. Pemex has required that *estimaciones* be created monthly on all of its contract for years, even before Oceanografía began factoring Pemex invoices (*facturas*) in 2009. For large contracts, including virtually all of Oceanografía's contracts, Pemex required contractors like Oceanografía to contract with a third party to record the daily activity on a particular contract. At the end of the month, the independent contractor prints the daily log of activities, which is reviewed by the on-site representatives of both the contractor and Pemex. Upon their review, the log—the *estimacion*—is signed and sent to Pemex officials offsite. At this time, a copy of the initial *estimacion* is provided to the contractor—to Oceanografía.

*(4) Pemex work estimates do not constitute debt obligations or proof of accounts receivable.*

216.    An *estimacion* is not a record of a Pemex debt or obligation. An *estimacion* is exactly that, an estimate of the work performed on a Pemex contract. Apart from Pemex's obligations under the relevant contract, there was no present Pemex commitment to pay any amounts at all, much less a particular sum for the work described in the *estimacion*.

217.    Pemex retains all of its rights to challenge the work or the value of the work set out in an *estimacion* or to raise any contractual defense to payment. In fact, Pemex could and did review the *estimaciones* on Oceanografía contracts and make changes. At times, discrepancies in one *estimacion* would carry over into the *estimacion* for the next month. In practice, review and final approval of the quantity and value of the work set out in a Pemex *estimacion* could take months.

*(5) Citi and Banamex knew that estimaciones were not invoices.*

218.     Both Citi and Banamex knew that, by practice and law, *estimaciones* were not invoices and that Pemex was not committed to pay the amounts set forth in the on-site *estimaciones* provided to Banamex. Both Citi and Banamex had actual and constructive knowledge of the legal differences between invoices and work estimates. The differences are set out in Mexican law and have been a part of Pemex's practices for years.

219.     In addition, Citi/Banamex officials reviewed Oceanografía's work estimates every month with Oceanografía, and Citi/Banamex officials worked closely with both Pemex officials and Oceanografía to confirm the accuracy of those estimates and the estimates of Oceanografía's expected Pemex work flow. Citi/Banamex representatives routinely visited both Pemex's and Oceanografía's offices to verify the status of Oceanografía's ongoing Pemex projects and the expected cash flows from those projects. Banamex also had the right to physically visit Oceanografía's work sites, and Oceanografía was frequently required to helicopter Banamex and Citi officers to offshore platforms for a review of Oceanografía's work.

## F.  Banamex documented the financings.

220.     Banamex, not Oceanografía, documented the financings under the 2012 Facility. Oceanografía would provide the relevant information to Banamex. Once Banamex had confirmed Oceanografía's capital needs and had reviewed the supporting documents, Banamex drafted the documents for Oceanografía's signature and then transferred the approved sum to Oceanografía.

221.     All of this was done in the context of an extremely close working relationship among Oceanografía, Banamex, and Pemex. Oceanografía trusted Banamex to provide accurate documents consistent with the 2012 Facility and the frequent meetings among the parties.

222.     As to each financing under the 2012 Facility, Oceanografía complied with Banamex's procedures and provided all requested information.

5. *An unrelated investigation led to Pemex's discovery of fraudulent Pemex documents within Banamex's Oceanografía files.*

A. *The Secretaría de la Función Pública (the "SFP") audited Oceanografía's Pemex contracts.*

223.    In June 2013, the Secretaría de la Función Pública (the "SFP")—the Mexican agency responsible for overseeing public contracts—audited Oceanografía's Pemex contracts.

224.    The SFP audit was part of an announced general audit of all Pemex contractors and was unrelated to Oceanografía's banking relationship with Banamex.

225.    The SFP audit found no indication of fraud or illegal conduct by Oceanografía.

226.    The SFP, however, did conclude that Oceanografía had failed to fully satisfy requirements for posting performance bonds (*fianzas*) on some of its Pemex contracts. Under Mexican law, a Pemex contractor must post a performance bond equal to 10% of the value of the contracts. Pemex can claim coverage under the bond if the contractor defaults.

227.    On February 11, 2014, the SFP issued its audit report concluding that the performance bonds Oceanografía had posted on 9 of its 29 Pemex contracts were not for the full 10% value of the underlying Pemex contract.

228.    The alleged deficiency had resulted because, on multi-year contracts, Oceanografía had (with Pemex's consent) provided bonds sufficient to cover 10% of each year's individual obligations, not 10% of the value of the entire multi-year contract. Although Pemex had consented to Oceanografía's bonds and there was coverage during the entire contract, the SFP concluded that there was a technical violation of the relevant regulations.

B. *The SFP illegally suspended Oceanografía's eligibility to obtain new Pemex contracts for 21 months.*

229.    On the same day as its audit finding, the SFP suspended Oceanografía's ability to obtain new Pemex contracts for a period of slightly more than 21 months.

230.    The SFP suspension did not affect Oceanografía's existing Pemex contracts.

231.    Ultimately, a Mexican court determined that the SFP suspension was illegal, and it was dissolved. Oceanografía remains eligible to participate in Pemex bids and to provide services to Pemex, although Oceanografía's capacity to enter into such contracts has been substantially destroyed by Citi.

232.    Although illegal and eventually lifted, the SFP suspension precipitated a series of unfortunate events for Oceanografía, as well as Amado Yáñez and 10,000 other Oceanografía employees.

### C. The SFP suspension led to Pemex's discovery of forged or altered Pemex invoices within Banamex's files.

233.    The SFP's public announcement of the suspension led to a further review of Banamex's relationship with Oceanografía. As part of that review, Pemex was provided copies of documents in Banamex's files that Citi claims supported about 166 transfers to Oceanografía totaling some $585 million pursuant to the 2012 Facility. Oceanografía denies that it received transfers in that amount.

234.    Included in the documents Banamex provided to Pemex were copies of Pemex documents Citi maintains reflect approved Oceanografía invoices to Pemex, verified with the signature of the appropriate Pemex official.

235.    On February 20, 2014, Pemex stated that the Pemex documents from Banamex files had been forged or altered and had not been found in Pemex's files, at least not in the form produced by Banamex.

236.    In total, Pemex identified about 166 purported Pemex documents that had been forged or altered.

### D. *The Banamex records also contained forged signatures of Oceanografía officials.*

237.     The Pemex signatures were not the only forgeries found in Banamex's files.

238.     For each of the approximately 166 transfers claimed by Citi, Banamex has produced a (forged or altered) Pemex document and a Banamex form document entitled, "RELACION DE DERECHOS DE CREDITO DESCONTADOS," or Discounted Credit Rights Account, all of which carried the purported signature of Amado Yáñez in behalf of Oceanografía.

239.     This same document had been used when Oceanografía was factoring its Pemex invoices. The Discounted Credit Rights Account document stated that the debtor on the obligation was Pemex. Therefore, as to the 2012 Facility, it was inaccurate. During at least the time of the original factoring arrangement, this was a Banamex document, prepared by Banamex on its form, and provided to Oceanografía for its signature.

240.     Some of these same forms were signed by Banamex officials as to payments related to trusts managed by Banamex for Oceanografía's creditors.

241.     In one of the criminal proceedings against Amado Yáñez, a Mexican government expert issued his report concluding that the signature of Amado Yáñez on *all of* the Discounted Credit Rights Account documents provided by Banamex to Pemex and to the Mexican authorities was a forgery. Amado Yáñez was not even in Mexico when many of the documents were allegedly signed by him.

### E. *On February 20, 2014, Citi took over the relevant operations of Banamex and purported to launch an investigation into the forged invoices.*

242.     In response to Pemex's February 20, 2014, announcement, Citi officers were sent to Mexico purportedly to conduct an internal investigation by Citi into its subsidiary's dealings with Oceanografía. Samuel Libnic, Citi's General Counsel for Latin America, led Citi's internal review. Libnic officed in Citi's Latin America headquarters in Miami.

243. From February 20, 2014, Citi controlled the relevant operations of Banamex and in particular the investigation and cover-up. Banamex officers and internal counsel have testified under oath that from February 20, on, they were under the direction of Citi's officers in the United States as to all matters involving Oceanografía.

244. Citi's control of Banamex included all aspects of the cover-up.

245. In particular, the Citi investigation was a sham. Far from trying to determine the truth, Citi focused on minimizing its exposure to Banamex's own fraud.

*6. Citi falsely blamed the forgeries on Oceanografía and Amado Yáñez.*

*A. Citi admits that, despite execution of the 2012 Facility, Banamex continued to record its Oceanografía financings as Pemex debt.*

*(1) Citi admits Banamex was recording its Oceanografía financings as Pemex debt.*

246. Citi has admitted a key fact—Citi's SEC filings concede that Banamex was recording its payments to Oceanografía as debts of Pemex so that Citi was concerned "about Pemex's obligation to pay Citigroup." Another Citi SEC filing estimated Citi's purported loss as "the difference between the $585 million *Citi had recorded as owed by Pemex to Citi* as of December 31, 2013, and an estimated $185 million that Citi currently believes is *owed by Pemex*." (emphasis supplied)

247. According to Citi, Oceanografía was continuing to use the same Citi-designed accounts receivable system utilized by Citi worldwide.

*(2) The parties dispute the responsibility for the erroneous accounting treatment.*

248. The core dispute in this case is whether Citi properly blamed Oceanografía for Banamex's improper accounting.

249. The story set out in Citi's public statements and SEC filings is that Banamex was duped by Oceanografía into accepting more than a half-a-billion dollars in forged Pemex invoices during a time when there were no such physical invoices. In other words, Citi contends that

Banamex paid Oceanografía more than a half-a-billion dollars based on Pemex's purported promise to pay certain invoices without ever bothering to ask Pemex if this was so, despite being required to do just that under its contract and pursuant to Mexican law. Banamex also allegedly failed to review Oceanografía's books and records during its monthly trips to Oceanografía's accounting department.

250.     Oceanografía, on the other hand, claims that it never provided Pemex invoices under the 2012 Facility, that Banamex and Citi both knew that Oceanografía had nowhere near that level of approved Pemex invoices, and moreover, the factoring of Pemex invoices was dependent on Pemex's separate and direct confirmation of Pemex's commitment to pay a particular invoice— which both Citi and Banamex knew.

251.     Apparently, unbeknownst to Oceanografía, Banamex decided that it was unwilling to lose the benefits of a factoring arrangement that allowed it to record Pemex as its debtor, so it simply accounted for the financings under the 2012 Facility as a factoring of Pemex invoices. This sleight of hand, however, apparently also necessitated that the forged documents be placed in Banamex's files. The forged documents allowed Banamex to (1) book Oceanografía financings as Pemex debt, (2) improperly utilize the Pemex line of credit to make the payments to Oceanografía, (3) avoid applicable banking regulations that required it to maintain a reserve, and (4) increase its profits.

B. *On February 28, 2014, Citi initiated a false public relations campaign claiming the Oceanografía and Yáñez had factored forged Pemex invoices.*

*(1) Citi decided to blame Oceanografía and Yáñez for Banamex's fraud.*

252.     Aware that Mexican authorities intended to launch a criminal investigation into the fraudulent documents identified by Pemex, Citi had no choice but to publicly acknowledge the issue.

253.    Citi, however, was simply unready to confess that its subsidiary had forged invoices from Citi's most important client in Latin America, Pemex. Citi chose instead to portray itself as victim and whistleblower. That plan, however, required a scapegoat—Oceanografía. So, Citi decided its interests were best served by blaming the forgeries on its client, Oceanografía, and Oceanografía's principal owner, Yáñez, rather than admit the truth.

254.    The foundation of Citi's cover-up was that Oceanografía had factored forged Pemex invoices to support payments under the Citi-designed accounts receivable program. For example, Citi announced that it was adjusting its earnings downward by $360 million because of "uncertainty about Pemex's obligation to pay Citigroup," not Oceanografía's ability to pay Banamex. Citi also repeatedly stated that it reviewed all of its accounts receivable programs world-wide to determine if there was similar fraud elsewhere.

255.    Citi launched its cover-up a mere eight days following Pemex's notification of the fraudulent documents and the initiation of Citi's sham investigation.

*(2) Citi's cover-up included press releases, SEC filings, and other direct communications issued from Citi's New York Office.*

*(a) On February 28, Citi issued a press release claiming fraud in the accounts receivable program.*

256.    The Citi cover-up began with a February 28, 2014, press release from Citigroup in New York that couched Citi as victim and whistleblower. The February 28, 2014 press release stated that the fraud related to Oceanografía's "accounts receivable financing program." According to Citi, "on February 20, 2014, Pemex asserted that a significant portion of the accounts receivable recorded by Banamex in connection with the Pemex accounts receivable financing program were fraudulent and that the valid receivables were substantially less than the $585 million referenced above."

257.    The Citi press release continued: "on February 20, 2014, Pemex asserted that a significant portion of the accounts receivable recorded by Banamex in connection with the Pemex

accounts receivable financing program were fraudulent and that the valid receivables were substantially less than the $585 million referenced above."

258.   The Citi press release also claimed that it believed "the fraud is isolated to this particular client"—*i.e.*, Oceanografía. Citi has since admitted that this claim was untrue.

259.   Citi CEO Corbat noted that Citi was already actively seeking the intervention of law enforcement: "we have been responding forcefully over the past week by assessing the overall exposure to Citi, coordinating with law enforcement, pursuing recovery of the misappropriated funds, and seeking accountability for anyone involved." Also: We "are exploring our legal options and coordinating with law enforcement agencies in Mexico." "We are exploring every available option to recoup the misappropriated funds and we will be relentless in pursuing their recovery."

260.   From February 28, 2014, on, Citi repeatedly asserted that Citi and Banamex had been victimized by an elaborate fraud perpetrated by Oceanografía.

### (b) Citi's initial press release was filed with the SEC.

261.   Citi formalized its February 28 press release by attaching it to a Form 8-K filed with the SEC on February 28, 2014.

### (c) On February 28, 2014, Citi CEO Corbat issued a public memorandum to Citi employees blaming Oceanografía for falsifying Pemex invoices.

262.   On the same day, Citi CEO Michael Corbat issued a public memorandum to Citi's employees worldwide about the fraud within Banamex. The memorandum was released to, and republished by, the Wall Street Journal.

263.   Citi's CEO described the fraud within Banamex as follows: "it appears that invoices from [Oceanografía] were falsified to represent that Pemex had approved them."

264.   "A Banamex employee processed them, and as much as $400 million was misappropriated through the course of the fraud."

(d) *On March 3, 2014, Citi issues its Annual Report for 2013, which repeated its false claim that Oceanografía forged Pemex invoices.*

265.    Citi's Annual Report for 2013 reiterated Citi's claims of fraud. The report began with a letter from CEO Michael Corbat from New York stating, "We discovered that invoices that were paid through an accounts receivable financing program in Mexico were falsified, resulting in a $235 million reduction to our 2013 net income."

266.    Citi's Form 10-K for the year ending December 31, 2013, made the same assertions: "In February 2014, Citi discovered that credit had been extended to Oceanografía based on fraudulent accounts receivable documentation."

267.    Citi claimed its alleged loss "resulted from the difference between the $585 million Citi had recorded as owed by Pemex to Citi as of December 31, 2013, and an estimated $185 million that Citi currently believes is owed by Pemex, with an offset to compensation expense of approximately $40 million associated with the Banamex variable compensation plan."

268.    Citi's Annual Report was filed with the SEC as Citi's Form 10-K.

(e) *On March 3, 2014, Citi's Chief Financial Officer claimed that the only fraud within Citi's supplier finance facilities was related to Oceanografía.*

269.    On the same day as Citi issued its 2013 Annual Report, its Chief Financial Officer, John Gerspach, participated in an Institutional Investor Conference. Citi later published a transcript of the conference on its website.

270.    Gerspach squarely stated that the fraudulent documents within Banamex's files were limited to Oceanografía:

> When we learned of the issues in this one product with this one client in Mexico, we kicked off a rapid review of similar – of this product offering around the world. Now that encompasses $16 billion worth – I'm sorry, $14 billion worth of receivables around the world for supplier finance-type of products. The only customer where we saw any issues like this was in this one client relationship.

Gerspach reiterated that Citi would seek "all available options to recover the misappropriated funds."

> (f) *Citi's quarterly report on March 31, 2014 set out Citi's claim of an "Oceanografía Fraud."*

271.    Citi's false claims were also put forth in its Form 10-Q for the period ending March 31, 2014.

272.    Citi's quarterly report contained a section heading titled, "Oceanografía Fraud."

273.    The SEC report announced that Citi was adjusting downward its earnings by $360 million "as a result of a fraud discovered in a Petróleos Mexicanos (Pemex) supplier program involving Oceanografía SA de CV (OSA), a Mexican oil services company and a key supplier to Pemex." Citi professed "uncertainty about Pemex's obligation to pay Citigroup for a portion of the accounts receivable Citigroup validated with Pemex as of year-end 2013 (approximately $113 million)."

274.    This statement was untrue. Banamex had never validated any amounts with Pemex, much less $585 million in invoices, despite the fact that Citi and Banamex could have checked the invoices on Pemex's Electronic Invoicing Vault at any time. Citi knew that the factoring program was not being used by Oceanografía.

275.    The report also conceded that the SEC and the Department of Justice had begun inquiries into the situation.

> (g) *On April 14, 2014, Citi reiterated its claim that the fraud was limited to Oceanografía.*

276.    On April 14, 2014, Citi CEO Corbat and its CFO Gerspach participated in a transcribed earnings call. The transcript was later published on Citi's website.

277.    During the April call, Citi CEO Corbat again clarified that Banamex had been recording its Oceanografía financings as Pemex debt and that Citi was now concerned about "Pemex's obligation to pay us for a portion of the accounts receivable we validated with them as of year-end." This statement was untrue. Neither Citi nor Banamex had validated any accounts receivable or

invoices with Pemex, at year-end or any other time since Oceanografía executed the 2012 Facility. Also, Citi knew that Pemex was never obligated to pay Citi any sum certain under the 2012 Facility.

278.    Citi CEO Corbat stated:

Regarding the fraud in Mexico, we're progressing along several fronts. First, we've completed our rapid review and have not identified similar issues with any other account receivables program globally, other than with the Pemex supplier program. We've reviewed over 1,100 facilities with over $14 billion of receivable financings.

279.    Corbat conceded that "similar issues" were found within Banamex as to at least one other supplier related to the Pemex Supplier Finance Facility. He added, however, that there was "nothing, I think, that leads us to have a broader fear either in Mexico or across the rest of the franchise."

280.    Corbat also reiterated that Citi was "working closely with the Attorney General in Mexico."

    *(h) On May 14, 2014, Citi repeated its story.*

281.    On May 14, 2014, Citi CEO Corbat sent a letter from his New York office to all Citi employees.

282.    His letter was consistent with Citi's core claim that Oceanografía orchestrated the fraud, which Corbat described in his letter as "a significant fraud in the Pemex accounts receivable supplier financing program," despite the fact that Oceanografía was no longer utilizing the Pemex Supplier Finance Facility or selling its accounts receivable to Banamex.

283.    Corbat claimed that Citi "would hold accountable any employee who enabled [the fraud], whether through lax supervision, circumvention of our controls, violations of our Code of Conduct, or otherwise." Corbat noted that one employee had already been terminated and that Citi was not terminating another 11 employees "whose actions or inactions failed to protect our company from this fraud."

284.     Corbat noted that, "before our investigation concludes, we expect that several other employees, both inside and outside of Mexico, may receive forms of disciplinary action as well."

285.      Note: Even though Corbat recognized that Citi's investigation continued, he left no opening to suggest that Banamex conducted the fraud or to contradict Citi's claim that this was "Oceanografía fraud."

*(i) On May 27, 2014, Citi repeated that it would seek recovery for its alleged loss.*

286.     On May 27, 2014, in an investment conference organized by Deutsche Bank Global Services, Citi CFO John Gerspach spoke on Citi's behalf.

287.     Citi published a transcript of the conference on its website.

288.     During the conference, Citi's CFO stated that Citi was going to pursue all avenues to recover the funds. Yet, neither Citi nor Banamex brought fraud claims against Oceanografía.

*(j) On May 29, 2014, Citi repeated its false claim that the fraud was limited to Oceanografía.*

289.     On May 29, 2014, Citi CEO Corbat spoke at a Sanford C. Bernstein Strategic Decisions Conference. Citi later published a transcript of the conference on its website.

290.     Corbat claimed that Citi had "reviewed about 1,100 of these facilities, all 1,100 facilities that we have around the world," representing "about $14 billion in outstanding receivables financing around the world."

291.     According to Corbat, based on that review, Citi was "comfortable away from this one supplier, the Pemex supplier program that all those, the guidelines, the polices, the way they were being initiated, were proper. So we're comfortable that it is contained to this situation."

292.     This statement was untrue. There was at least one other Pemex supplier with the same issues, and, on information and belief, there were many.

293.   Corbat reiterated that the terminated employees were responsible for their "inaction," not for orchestrating the fraud itself.

*(3) Citi also pushed its false narrative indirectly through the press.*

294.   Citi's cover-up was not limited to formal press releases, SEC filings and a few conferences.

295.   On information and belief, Citi actively cooperated with the press to spread its narrative.

C. *Citi's cover-up successfully cast blame on Oceanografía and Amado Yáñez for Banamex's bank fraud.*

*(1) Citi bolstered its false claims by making them formally.*

296.   Citi's statements were crafted to cast the blame on Oceanografía and Amado Yáñez in the eyes of the public and the relevant authorities, including Mexican criminal authorities and the United States Securities Exchange Commission and other governmental agencies.

297.   Citi's statements were malicious and made without privilege, particularly because Citi knew the statements to be false or made them with reckless disregard for their truth or falsity and made them to distance itself from its own role in the Banamex fraud and from Banamex's liability.

298.   Despite their falsity Citi's claims carried credibility.

299.   Between Citi—one of the largest banks in the world—and Oceanografía—a regional company—Citi's credibility went unquestioned for years until the truth eventually prevailed.

300.   Citi's false claims carried particular credibility because Citi is a United States bank, publicly traded, and thus under the regulatory auspices of a number of regulatory agencies of the United States.

301.   Citi further bolstered the credibility of its claims by making them in SEC filings.

*(2) Citi's false cover-up was successful.*

302.   Citi's attack had exactly the result Citi intended—Oceanografía and Amado Yáñez received the blame for Banamex's fraud.

303.   Press reports, particularly in the United States and Mexico, uniformly followed Citi's storyline and put the blame on Oceanografía.

304.   The press also indicated Citi's involvement in spreading its false narrative.

305.   On June 7, 2014, the Economist reported, "When a government audit prompted the suspension of Oceanografía's work for Pemex in February, Banamex checked the invoices against which it had lent to Oceanografía with Pemex. It found that $400m of them were fake."

306.   The Economist noted that Citi "so far has cast itself as the victim…." The Economist noted that Citi had fired a number of Banamex employees, but "[w]hen it sacked them, Citi stressed that the employees were paying the price for failing to detect the fraud, not for taking part in it."

307.   A March 24, 2014, a Forbes article stated, "Citigroup's charge prompted the Mexican Attorney General's office to issue a summons against Yáñez…."

308.   The BBC reported on February 28, 2014 that Citi's loss was caused by "fraudulent dealings by a client." BBC also repeated Citi's false claim that the fraud was isolated to Oceanografía.

309.   The Wall Street Journal reported on February 28, 2014, that the fraud was part of Citi's "accounts receivable financing program" and that Oceanografía had "misappropriated" $400 million.

310.   The Wall Street Journal also repeated Citi's claim that it was reviewing all of its accounts receivable programs throughout the world and that Citi was cooperating with Mexican criminal authorities and would seek recovery of the misappropriated funds.

311.   Fox Business News reiterated that the payments to Oceanografía were "misappropriated funds," a term Fox attributed to Citi. Fox also stated that "Citi CEO Michael

Corbat called the incident a 'despicable crime' and said the bank will be 'relentless' in pursuing the recovery of the funds."

312.     Similar articles appeared in mainstream and financial media outlets around the world, all parroting Citi's false claim that Oceanografía and Amado Yáñez had forged Pemex invoices to extract more money from Banamex and uniformly omitting that the alleged fraud was impossible.

*D. Citi's cover-up included successfully initiating Mexican government proceedings against Oceanografía and Amado Yáñez.*

313.     As part of Citi's effort to foist blame on Oceanografía and Amado Yáñez, Citi officers met with representatives of the Mexican Attorney General's office and repeated the false allegations from Citi's public statements—that is, that Oceanografía had engineered a massive fraud on Banamex.

314.     Citi conceded its efforts to initiate proceedings against Oceanografía and Amado Yáñez in Corbat's public memorandum when he stated that Citi was "coordinating with law enforcement agencies in Mexico," and was "work[ing] with Mexico's Attorney General to initiate criminal actions in connection with this matter." Banamex witnesses have also testified before Mexican courts that they are acting under Citi's direction.

315.     Immediately upon Citi's false accusations about Oceanografía, the *Procuraduría General de la República* (the Attorney General of Mexico or PGR) initiated a criminal investigation of Oceanografía and its officers.

316.     Three days later, on March 1, 2014, the PGR obtained a criminal order seizing Oceanografía and removed Amado Yáñez from control of his own company.

317.     The seizure was made at Citi's request.

318.     According to Mexican authorities, the seizure was made to preserve Oceanografía's assets to pay to the supposed victims of the fraud Citi alleged.

319.     Oceanografía was placed under the control of the *Servicio de Administración y Enajenación de Bienes* (or SAE).

320.     In April 2014, the SAE put Oceanografía into civil bankruptcy.

321.     On March 23, 2014, after Amado Yáñez returned to Mexico to defend himself against Citi's charges, he was placed under an order confining him to his home, pending the government's investigation. A formal arrest warrant was issued on May 12, 2014, and a second arrest warrant was issued on October 28, 2014. Yáñez's personal bank accounts were also frozen.

322.     Amado Yánez was sent to the Reclusorio Sur on October 22, 2014.

323.     The arrest warrants and the freezing of Yáñez's accounts were based on Citi's false allegations.

### E.   *Citi has never rescinded or modified its claims against Oceanografía or Yáñez.*

324.     Citi has never rescinded, amended, or qualified any of the false allegations it leveled against Oceanografía or Amado Yáñez.

325.     If Citi had corrected, rescinded or modified its claims against Oceanografía or Yáñez, Oceanografía's business might have been saved, and Yáñez could have been released from the Reclusorio Sur.

### 7.   *Citi's claims were intentionally false.*

### A.   *Citi knew that Oceanografía could not have defrauded Banamex into believing Oceanografía had $585 million in approved Pemex invoices.*

326.     Oceanografía did not receive payments from Banamex in the amounts alleged by Citi or Banamex.

*(1) Citi and Banamex knew that the Pemex Supplier Finance Program required a direct communication from Pemex.*

327.    Citi knew because of its creation and oversight of the Pemex Supplier Finance Program, that a Pemex supplier could not unilaterally factor a Pemex invoice. Factoring required a direct communication from Pemex.

328.    Therefore, Citi charged Oceanografía with conducting an impossible fraudulent scheme.

329.    Citi also knew that Banamex was no longer factoring Oceanografía's Pemex invoices. In fact, Citi and Banamex knew that Oceanografía had not triggered the accounts receivable financing program for years and that Pemex had not provided Banamex any notification that Pemex was obligated to pay any sums to Banamex.

*(2) Citi and Banamex knew that Pemex's electronic invoicing system made the alleged fraud impossible.*

330.    Citi knew that Pemex was now using electronic invoices, and therefore that Oceanografía could not have been delivering written invoices to Oceanografía as it alleged.

*(3) Citi and Banamex knew Oceanografía's financial condition and knew that Oceanografía did not have anywhere near $585 million in approved Pemex invoices.*

331.    Citi had direct and constructive knowledge of Oceanografía's banking relationship with Banamex and of Oceanografía's books and records.

332.    Citi had recently reviewed Oceanografía's books and records as part of Project Blue.

333.    Citi's ICG employees were responsible for Citi's (and therefore Banamex's) relationship with Pemex.

334.    In addition, many Citi officers had simultaneous responsibilities within Banamex, providing Citi with direct and constructive knowledge of Banamex's activities. For example, Manuel Medina-Mora simultaneously held high positions at both Citi and Banamex, including as Co-

President of Citigroup and Chairman of Banamex's Board of Directors. Francisco Aristeguieta was at relevant times both the CEO of Citigroup Latin America and a member of Banamex's Executive Committee. Both Medina-Mora and Aristeguieta resigned following the revelation of the fraudulent documents. Cervantes—the Citi/Banamex employee arrested trying to remove the original forgeries—also had dual responsibilities and a citi.com email address.

335.    Key Banamex officials controlling the factoring arrangement with Pemex were also Citi officers. Transfers to Oceanografía under both the Pemex Supplier Finance Facility and the 2012 Facility were approved by individuals who were employees of both Citi and Banamex. Most of them had email addresses that noted their affiliation to Citi by referencing Citi's ICG or the use of a citi.com email address. Others had Citi business cards. Even the solely Banamex employees reported to Citi employees.

336.    In fact, of the 12 employees discharged by Citi due to the Banamex fraud, more than half were ICG officers while also working for Banamex. Citi has conceded that employees both "inside and outside" Mexico were involved in the fraud.

337.    At a minimum, Citi learned of the exact nature of the banking relationship after it took over the relevant Banamex operations and during its purported investigation into the Banamex fraud.

338.    Citi and Banamex knew that Oceanografía did not have anywhere near $585 million in Pemex invoices and that Oceanografía was not utilizing the Citi-designed accounts receivable program.

(4) *On information and belief, Citi knew that Banamex was improperly using the Pemex line of credit.*

339.    On information and belief, Citi knew that Banamex was using Pemex's line of credit to funds its Oceanografía financings.

**B.** *Citi knew that Banamex had the means and motive to commit the fraud, which allowed Banamex to account for Oceanografía financings as Pemex debt.*

340.    Citi knew Banamex had committed the fraud, and it knew why.

341.    The nature of the forgeries is telling.

342.    First, the forgeries were found in Banamex's files, not Oceanografía's.

343.    Second, the forgeries are exactly the type of documents Banamex needed to continue to account for its Oceanografía financings as a factoring of Mexican government debt obligations, which in turn allowed Banamex (and Citi) to earn substantially more on its Oceanografía financings.

**C.** *Citi knew that Oceanografía had no motive for the fraud.*

344.    Financings under the 2012 Facility were based on Oceanografía's and Banamex's estimates of the expected cash flow from Oceanografía's Pemex contracts.

345.    Those estimates have proven correct. Pemex has paid (either Banamex, the SAE that seized Oceanografía, or the Mexican bankruptcy court) more on all the contracts placed under the 2012 Facility than Banamex transferred to Oceanografía. This fact independently demonstrates that the information and documents Oceanografía provided to Banamex were not fraudulent—they accurately reflected Oceanografía's contractual work with Pemex.

346.    Citi also knew that Oceanografía had other sources of funding so it did not need to commit massive fraud to obtain working capital from Banamex.

**D.** *Citi and Banamex tried to conceal the source of the forgeries.*

347.    Another telling indication of the source of the forgeries is the attempt by a Banamex officer to destroy or conceal the original Banamex documents. At between 3 and 4 in the morning of February 27, 2014, Banamex security cameras recorded a Citi/Banamex officer named Erik Cervantes Murillo breaking into a Banamex vault containing the original Oceanografía files and documents and leaving shortly after with the files under his arm.

348.     Security guards monitoring the vault responded, and the Cervantes was arrested with the original files in the trunk of his car, but the same morning, Citi attorneys (who were then under the direct control of Samuel Libnic, Citi's General Counsel for Latin America) declined to press charges, and Cervantes was released.

349.     Neither Citi nor Banamex has ever produced the original files found in Cervantes' trunk.

350.     Cervantes was responsible for documenting the Oceanografía financings.

351.     Cervantes was both a Banamex officer and a member of Citi's ICG division.

352.     Cervantes' email address was erik.cervantesmurillo@citi.com.

353.     Cervantes' clandestine attempt to remove the original documents occurred just before Citi began its cover-up. Five days after Citi arranged Cervantes' release, Citi's CEO Michael Corbat issued Citi's first public statement blaming Oceanografía and Yáñez for the forgeries Cervantes had just tried to steal.

### E. *Banamex forged invoices related to other Pemex suppliers.*

354.     Citi also tried to conceal the source of the forgeries by falsely asserting that the fraud was limited to Oceanografía.

355.     A key element of Citi's cover-up was its claim that the fraud was limited to Oceanografía. Citi could not blame Oceanografía for fraudulent Pemex documents found in Banamex files from other Pemex suppliers.

356.     Citi has been forced to admit that the Banamex fraud was not limited to Oceanografía, but Citi has otherwise refused to publicly provide further details.

357.     The fact that forged documents were also found in other Banamex files demonstrates that Banamex itself was the culpable party. On information and belief, similar

fraudulent documents can be found in Banamex files related to non-factoring financing arrangements with many Pemex suppliers after 2012.

### F. Citi knew that its allegations against Oceanografía and Amado Yáñez were false.

358.    Citi's allegations against Oceanografía and Amado Yáñez were false.

359.    Citi knew that its allegations against Oceanografía and Amado Yáñez were false from the first time it made them on February 28, 2014.

360.    At a minimum, at some point following February 28, 2014, Citi learned that its allegations were false, but it has refused to retract its criminal complaints or public statements.

361.    Citi instituted, and pressured for the continuation of, legal proceedings against Oceanografía and Amado Yáñez and conducted its false public relations campaign intentionally and with knowledge of Oceanografía's and Yáñez's contractual relations and their rights, including their rights to be free from government interference without cause and to conduct business, and with the specific intent to interfere with those rights.

### G. Alternatively, Citi acted recklessly and maliciously in blaming Oceanografía and Amado Yáñez.

362.    In the alternative, Citi acted recklessly and maliciously in blaming Oceanografía and Amado Yáñez for the acts of its subsidiary.

363.    Citi instituted, and pressured for the continuation of, legal proceedings against Oceanografía and Amado Yáñez and conducted its false public relations campaign maliciously and with a reckless disregard of the truth and with knowledge of Oceanografía's and Yáñez's contractual relations and their rights, including their rights to be free from government interference without cause and to conduct business, and with the specific intent to interfere with those rights.

364.    Citi acted with wanton and reckless disregard and with conscious indifference and utter disregard of the effect its conduct would have on Oceanografía and Yáñez.

*H. The defendants conspired to complete the cover-up.*

365.    The Citi cover-up was orchestrated jointly by Citigroup and its subsidiaries Citibank and Citigroup Global Markets. On February 20, 2014, Citi took over the relevant Banamex operations and directed Banamex officials as part of the conspiracy under Citi's direct supervision and direction.

*8. Citi's cover-up caused substantial effects in the United States.*

*A. Citi's cover-up breached its New York law contracts with Oceanografía.*

366.    Citi executed multiple contracts with Oceanografía related to four separate transactions: (1) the $335 million bond issuance, (2) the Cal Dive acquisition, (3) the *Goliath* acquisition, and (4) Project Blue to obtain equity investment.

367.    All of those contracts were made pursuant to New York law.

368.    Citi's cover-up prevented Oceanografía from obtaining the fruits of the four transactions and breached the duty of good faith and fair dealing established by New York law. Banamex joined in the cover-up and breaches as to the two contracts it executed.

*B. Citi's cover-up has caused substantial litigation in the United States.*

369.    Citi's allegations have also engendered substantial legal proceedings in the United States, including (1) investigations by the SEC and DOJ into Citi's conduct related to Banamex and Oceanografía, (2) a RICO lawsuit brought against Citi by Oceanografía's creditors in United States federal court in Florida, (3) an action by the Oklahoma Firefighters Pension and Retirement System (Oklahoma Firefighters) in Delaware state court seeking inspection of the relevant documents, (4) a derivative action against Citigroup in Delaware state court brought by the Oklahoma Firefighters and others (5) other related actions.

370.    On information and belief, these proceedings, including the SEC and DOJ investigations, have caused Citi to gather all relevant documents from Mexico.

371.    This is not the first time that Citi has been investigated by US authorities for its actions (through Banamex) in Mexico. In 2015, US regulators fined Banamex USA $100 million for inadequate controls against money laundering. Shortly thereafter, Citi closed Banamex USA. A DOJ investigation in money laundering by Banamex continues.

## 9. *The Mexican courts have exonerated Amado Yáñez and Oceanografía.*

### A. *Amado Yáñez has been exonerated.*

372.    On January 26, 2017, after Amado Yáñez had spent more than two years in jail, a Mexican court ruled that there was no legal basis for the arrest of Amado Yáñez on the criminal charges leveled by Citi. The ruling is under review.

373.    Amado Yáñez's bank accounts were unfrozen by the PGR on August 22, 2017, although Banamex refused to comply with the order until November of 2017.

### B. *Oceanografía has been exonerated.*

374.    The seizure by the Mexican Attorney's General Office and the receiver appointed by the Mexican government's SAE was dissolved on July 5, 2017.

375.    Oceanografía's bank accounts were unfrozen on August 22, 2017, although Banamex (still under Citi's control) continues to refuse to recognize the order.

376.    Oceanografía's civil bankruptcy proceeding outlasted the criminal seizure but only because Citi's cover-up had destroyed Oceanografía's business. An agreed bankruptcy plan has now been filed in the civil bankruptcy proceeding, resolving that last item.

377.    This action was approved by the former criminal receiver and the bankruptcy court receiver.

378.   Mexican courts have also rejected Banamex's claim that Oceanografía owes it money on the approximately 166 transfers from Banamex to Oceanografía claimed by Citi.

## 10. *Oceanografía and Amado Yáñez were injured by Citi's cover-up.*

### A. *Citi's cover-up interfered with all of Oceanografía's business interests, destroyed its reputation, and ultimately decimated its business value.*

379.   Citi's fraudulent cover-up caused the near total loss of the value of Oceanografía's business.

### *(1) Citi's fraudulent cover-up destroyed Oceanografía's Mexican business interests.*

380.   On March 1, 2014, based on Citi's claims, the PGR seized Oceanografía and all its assets and placed them under the control of the SAE.

381.   The seizure prevented Oceanografía from continuing its normal business operations. The seizure, coupled with the damage to Oceanografía's reputation, caused many important personnel to leave the company. Ultimately, Oceanografía was unable to complete all of its contracted work.

382.   As a result, in the eight months following initiation of Citi's public campaign to lay blame for the Banamex fraud at Oceanografía's door, Pemex terminated 20 Oceanografía contracts.

### *(2) Citi's fraudulent cover-up destroyed at least $700 million in Oceanografía's United States business interests.*

383.   Citi's cover-up also destroyed Oceanografía's United States business interests.

384.   Prior to the cover-up, Oceanografía was about to acquire Cal Dive, a key acquisition that Citi had independently determined would have substantially increased Oceanografía's value. In fact, just prior to Citi's attack, Citi (along with BBVA Bancomer) valued Oceanografía at about $3.5 billion. This estimate was based in part on the Cal Dive acquisition.

385.   Citi's cover-up caused the cancellation of that acquisition.

386.    Citi's $3.5 billion valuation also assumed the acquisition of the *Goliath*, another acquisition being managed by Citi.

387.    Although Oceanografía was able to purchase the *Goliath* Citi's cover-up and breach of contract caused Oceanografía to almost immediately lose the *Goliath*, effectively destroying any benefits from the acquisition.

388.    The value of these two lost opportunities alone can be calculated by comparing Citi's valuation as part of Project Blue with the valuations calculated by Blackstone Energy Partners ($2.8 billion) and Avent International ($2.6 billion). These valuations were calculated in the same time frame as Citi's but without the inclusion of the Cal Dive and the *Goliath* acquisitions.

389.    Thus, Citi (Oceanografía's exclusive financial advisor on both acquisitions) estimated those United States acquisitions increased Oceanografía's value by approximately $700 million.

390.    Citi's cover-up also interfered with Oceanografía's contracts and business relationships with its financing sources, including the holders of $335 in bonds and the financiers on the majority of Oceanografía's vessels that were located in the United States.

391.    The disputes with those United States contract partners cost Oceanografía hundreds of millions of dollars if not more.

### (3) Citi's cover-up destroyed Oceanografía's value.

392.    As a result of Citi's actions, ten thousand Oceanografía employees lost their jobs.

393.    Oceanografía lost $3.4 billion. Citi's $3.5 billion valuation (including the Cal Dive acquisition) was also in line with independent and contemporaneous expert opinions about Oceanografía's value. In September 2013, Oceanografía was valued by Blackstone Energy Partners at $2.8 billion. The prior year, Avent International, another private equity firm, had valued Oceanografía at $2.6 billion. The Mexican bankruptcy court valued Oceanografía at less than $100 million.

394.    The $3.4 billion loss includes at least $1 billion of loss within the United States.

B. *Citi caused Amado Yáñez to be incarcerated and to lose his business relationships.*

395.    The damage to Amado Yáñez was even more devastating.

396.    Amado Yáñez spent more than 29 months in the Reclusorio Sur.

397.    The Reclusorio Sur was built in 1978 to contain 3,500 detainees. It currently holds more than 5,200. Conditions there are nearly indescribable. Guards are posted only at the walls, so the detainees range freely within. Even apart from the danger, the conditions are unbearable. Oppressive noise is a constant, and, within the range of horrible odors, the preference is for an overwhelming disinfectant.

398.    Amado Yáñez's family members have also suffered. In order to visit him, they have had to suffer intrusive physical searches and trips through throngs of unguarded, staring prisoners.

399.    Citi's false attack has destroyed Amado Yáñez's reputation and business interests.

400.    Yáñez lost access to his personal funds and his Oceanografía income, preventing him from maintaining his assets.

401.    He has lost at least $2.6 billion in his Oceanografía investment alone. He has also lost nearly a billion dollars more in other investments as a result of Citi's attack.

CLAIMS FOR RELIEF

*First Claim for Relief—Malicious Prosecution*

402.    Pursuant to the contracts between Citi and Oceanografía, this claim is based on New York law.

403.    Citi's conduct described above constitutes malicious prosecution under New York law.

404.    Citi initiated, procured, and pressured for the continuation of, legal proceedings against Oceanografía and Amado Yáñez through false allegations.

405.    Both Oceanografía and Amado Yáñez have been exonerated from the false allegations laid by Citi.

406.    Citi acted intentionally, maliciously, and with reckless disregard of the truth and in intentional interference with Oceanografía's and Amado Yáñez's rights.

407.    Oceanografía and Amado Yáñez are entitled to actual and to punitive damages.

408.    In the alternative, this claim is cognizable under Mexican law, which in Articulo 1916 of the Federal Civil Code imposes civil liability on "anyone who files denouncements or slanderous complaints, meaning those in which the author imputes a crime to a certain person, knowing that he is innocent or that he was not committed the alleged crime." (translated). In the original Spanish: "El que presente denuncias o querellas calumniosas, entendiéndose por tales aquellas en que su autor imputa un delito a persona determinada, sabiendo que ésta es inocente o que aquél no se ha cometido."

409.    Under Mexican law, Oceanografía and Amado Yáñez are entitled to their actual damages.

*Second Claim for Relief—Tortious Interference*

410.    Pursuant to the contracts between Citi and Oceanografía, this claim is based on New York law.

411.    Citi's and Banamex's conduct described above constitutes tortious interference of existing and prospective business relationships under New York law.

412.    In February 2014, Oceanografía had in place valid and lucrative contracts with Pemex and other entities in Mexico and the United States, including with Cal Dive and the owners of the *Goliath*.

413.    Oceanografía also had a long-standing and valuable business relationship with Pemex and others in Mexico and the United States apart from its existing contracts.

414.    Amado Yáñez had existing contracts with Oceanografía and with numerous other business interests in Mexico and the United States.

415.     Citi and Banamex knew of the existence of Oceanografía's and Amado Yáñez's contracts and prospective business relationships, particularly Oceanografía's contractual relationships with its bondholders, with Cal Dive, and with the owners of the *Goliath*.

416.     Without legal justification, Citi and Banamex intentionally and unjustifiably interfered with these contractual and non-contractual business relationships when Citi (1) issued public statements falsely alleging that Oceanografía and Amado Yáñez were responsible for orchestrating the Banamex fraud and that Banamex and Citi were victims and (2) caused legal proceedings to be brought against Oceanografía and Amado Yáñez that interfered with those contracts and relationships.

417.     Citi and Banamex acted intentionally, maliciously, and with reckless disregard of the truth and in intentional interference with Oceanografía's and Amado Yáñez's rights.

418.     Oceanografía and Amado Yáñez are entitled to actual and to punitive damages.

## Third Claim for Relief—Breach of Contract

419.     Pursuant to the contracts between Citi (including Banamex) and Oceanografía, these claims are based on New York law.

420.     Citi's and Banamex's conduct described above breached the duty of good faith and fair dealing as to the contracts related to (1) the bond indenture agreement (includes Banamex), (2) the Cal Dive acquisition, (3) the acquisition of The *Goliath* (includes Banamex), and (4) Project Blue,

421.     Oceanografía is entitled to its actual damages.

## Fourth Claim for Relief—Fraud

422.     Citi's conduct constituted fraud under New York and Mexican law. Citi made false statements against Oceanografía and Amado Yáñez with the express intent of injuring their interests, and the plaintiffs were injured as a result.

423.     The Mexican Federal Criminal Code states, in Article 386: A person commits the crime of fraud who deceives someone or takes advantage of an erroneous situation and illicitly

obtains a benefit or obtains an illicit profit. In the original Spanish: "Comete el delito de fraude el que engañando a uno o aprovechándose del error en que éste se haya se hace ilícitamente de alguna cosa o alcanza un lucro indebido." Civil liability for criminal fraud is established in Article 1910 of the Mexican Federal Civil Code: "Whoever, by acting illicitly or against the good customs, causes damage to another shall be obligated to compensate him, unless he can prove that the damage was caused as a result of the fault or inexcusable negligence of the victim." In the original Spanish: "El que obrando ilícitamente o contra las buenas costumbres cause daño a otro, está obligado a repararlo, a menos que demuestre que el daño se produjo como consecuencia de culpa o negligencia inexcusable de la víctima."

424.    Oceanografía and Amado Yáñez are entitled to their actual damages under New York or Mexican law and to punitive damages under New York law.

REQUEST FOR RELIEF

Oceanografía and Amado Yáñez Osuna respectfully pray that this Court award them actual and punitive damages and all other relief to which they are entitled under law or equity.

Dated: November 30, 2017

Respectfully submitted,

Maney & González-Félix PC


By: /s/ Mark Maney
Mark Maney
(admitted *pro hac vice*)
712 Main Street, Suite 2100
Houston, Texas 77002
Telephone: 713.806.2500
mmaney@maneylaw.com

ATTORNEYS FOR OCEANOGRAFÍA, S.A. DE C.V.
AND AMADO YÁÑEZ