# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 17-cv-1434 (RJS)



AMADO YÁÑEZ OSUNA AND
OCEANOGRAFÍA, S.A. DE C.V.

Plaintiffs,

VERSUS

CITIGROUP INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., AND
BANCO NACIONAL DE MEXICO, S.A.,

Defendants.

MEMORANDUM AND ORDER
September 27, 2018

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Oceanografia S.A. de C.V. ("OSA") and Amado Yáñez Osuna ("Yáñez" and, together with OSA, "Plaintiffs") bring this action against Citigroup Inc. ("Citigroup"), Citibank N.A. ("Citibank"), Citigroup Global Markets Inc. ("Citigroup Global Markets" and, together with Citigroup and Citibank, "Citi" or the "Citi Defendants") and Banco Nacional de Mexico, S.A. ("Banamex" and, together with Citi, "Defendants"), alleging claims for malicious prosecution, tortious interference, breach of contract, and fraud in connection with the seizure and criminal prosecution of Plaintiffs by Mexican authorities in 2014.

Now before the Court is the Citi Defendants' motion to dismiss Plaintiffs' complaint on *forum non conveniens* grounds or, in the alternative, for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the reasons set forth below, the motion to dismiss is GRANTED, and Plaintiffs' claims against Banamex are likewise DISMISSED.

I. BACKGROUND

This case arises out of the 2014 seizure of OSA by Mexican law enforcement authorities and the subsequent prosecution of its former owner, Yáñez.[1] (Compl. ¶ 1.)

---

[1] The facts set forth in this opinion and order are taken from the First Amended Complaint (Doc. No. 34 (the "Complaint" or "Compl.")) and the documents incorporated therein by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered the Citi

Plaintiffs contend that Defendants are responsible for bringing about this seizure by making a series of false statements to cover up a fraud that Defendants themselves perpetrated. (*Id.* ¶¶ 1, 3.) For context, the Court will provide a brief overview of the parties and their course of dealing before describing the alleged fraud and cover up.

A. The Parties

Citigroup is Delaware corporation with its principal place of business in New York. (*Id.* ¶ 64.) Citibank and Citigroup Global Markets are wholly-owned subsidiaries of Citigroup; both, like Citigroup, are based in New York. (*Id.* ¶¶ 68, 69.) Although Citigroup is based in the United States, Citigroup is a global financial services firm that maintains a substantial presence in Mexico (in fact, "Mexico is Citigroup's largest market outside of the United States"). (*Id.* ¶ 66.) Banamex "is an indirect wholly-owned subsidiary of Citigroup," through which "Citi operates in Mexico." (*Id.* ¶¶ 70–71.)

OSA is a corporation organized under Mexican law that maintains its principal office in Mexico City. (*Id.* ¶¶ 60, 62, 63.) At all times relevant to this suit, OSA's primary business was "providing oilfield services to Petróleos Mexicanos, commonly known as Pemex" (*id.* ¶ 76), which is "Mexico's national oil enterprise" (*id.* ¶¶ 77, 178). From 2007 until 2014, Yáñez, who is a Mexican citizen residing in Mexico City, was the "chief executive and majority owner" of OSA. (*Id.* ¶¶ 62, 63.) Under Yáñez's direction, OSA became "one of the largest offshore oil services companies operating in Mexico." (*Id.* ¶ 79.)

B. The Pemex Supplier Finance Program

In 2008, Citi and Pemex created the "Pemex Supplier Finance Program" (the "Program") to provide financing to Pemex's contractors. (*Id.* ¶¶ 129–131.) Through the Program, Pemex suppliers sold their invoices – accounts receivable – to Banamex, which in turn paid the suppliers quickly at a discount. (*Id.* ¶¶ 138, 142, 151.) Pemex then remitted the full amount of the invoice to Banamex. (*Id.* ¶¶ 138, 140.) Plaintiffs allege that OSA participated in the Program between 2009 and 2012. (*See id.* ¶¶ 164, 182.)

C. Defendants' Other Dealings with OSA Between 2008 and 2012

In addition to the Program, Citi performed additional services for OSA in the period between 2008 and 2014. Four in particular are relevant here.

First, in 2008, Citi facilitated the issuance of $335 million in OSA bonds pursuant to a bond indenture agreement between OSA, Citibank, Banamex, and other parties not relevant to this action. (*Id.* ¶¶ 82, 88.) As part of that transaction, "Citibank and Banamex acted as trustee and collateral agent, respectively," for the bond offering. (*Id.* ¶ 85.) In the event of disputes arising in connection with the bond offering, the bond indenture "was expressly governed by New York law" and required all parties to waive any objections based on *forum non conveniens*. (*Id.* ¶¶ 87–90.)

Second, in 2012, Citigroup Global Markets entered an agreement with OSA to advise the company in its acquisition of Cal Dive International Inc., an American oil services company. (*Id.* ¶¶ 96–97, 99.) That

---

Defendants' memorandum in support of their motion to dismiss (Doc. No. 38 ("Mem.")), Plaintiffs' opposition (Doc. No. 55 ("Opp'n")), the Citi Defendants' reply (Doc. No. 68 ("Reply")), and the declarations and exhibits submitted with those briefs.

2

contract also contained choice-of-law and forum selection clauses favoring New York. (*Id.* ¶ 101.)

Third, also in 2012, Citigroup Global Markets contracted to advise OSA in its acquisition of the *Goliath*, "the world's largest oil-service vessel." (*Id.* ¶ 104.) The contract, which was executed by Citigroup Global Markets "on behalf of [a collection of entities including Citibank and Banamex]," contains choice-of-law and forum selection clauses favoring New York. (*Id.* ¶¶ 108, 110–11.)

Fourth, pursuant to "the same contract originally applicable to the Cal Dive acquisition," Citi served as OSA's "exclusive financial advisor" in connection with OSA's attempt to obtain additional equity investment. (*Id.* ¶¶ 114, 118.) The effort, known as "Project Blue," continued through January 2014. (*Id.* ¶ 122.)

D. The OSA Working Capital Facility

In 2012, Mexico eliminated Pemex's monopoly over the "exploit[ation] of Mexico's petroleum reserves." (*Id.* ¶ 178.) Following that reform, "Banamex approached [OSA] with a proposal for a new working capital facility . . . as a substitute for the" Program. (*Id.* ¶¶ 182–83.) On September 21, 2012, OSA and Banamex executed a contract establishing that new capital facility (the "Facility"). (*Id.* ¶ 184.) That contract is governed by "the laws applicable in M[exico]," with disputes to be litigated in "the Federal Courts of the Federal District, M[exico]." (Doc. No. 39-1 at 21.)

Significantly, the Facility "did not follow the same format" as the Program. (Compl. ¶ 186.) Financing was not based on the assignment of specific Pemex invoices to Banamex; rather, Banamex made payment based on the "expected cash flow of [OSA's] Pemex contracts secured by a general assignment of collection rights under those contracts." (*Id.* ¶ 188; *see also id.* ¶ 202.) Nevertheless, before funds were advanced through the Facility, Banamex required OSA to provide "supporting documents" establishing that OSA had agreed to provide specific services to Pemex. (*Id.* ¶ 220.) Put another way, although OSA had assigned to Banamex its general right to receive payment under various master agreements, Banamex still demanded proof that OSA had contracted to perform specific tasks for which payment would actually be forthcoming before it conveyed funds to OSA. Then, upon completion of work, Pemex paid the amounts owed into an account at Banamex. (*Id.* ¶ 205.)

E. Fraudulent Pemex Documents Discovered

On February 11, 2014, the Secretaría de la Función Pública – "the Mexican agency responsible for overseeing public contracts" – suspended OSA's ability to obtain new Pemex contracts for twenty-one months because of OSA's failure to properly post required performance bonds. (*Id.* ¶¶ 223–29.) In response, Pemex undertook a further review of its relationship with OSA. "As part of that review, Pemex was provided copies of documents in Banamex's files that Citi claims supported about 166 transfers to [OSA] totaling some $585 million pursuant to" the Facility. (*Id.* ¶ 233.) OSA "denies that it received transfers in that amount." (*Id.*) "On February 20, 2014, Pemex stated that the Pemex documents from Banamex files had been forged or altered." (*Id.* ¶ 235.) "In total, Pemex identified about 166" fraudulent documents. (*Id.* ¶ 236.)

3

Plaintiffs contend that Banamex forged the Pemex documents so that it could "(1) book [OSA] financings as Pemex debt, (2) improperly utilize the Pemex line of credit to make the payments to [OSA],[2] (3) avoid applicable banking regulations that required it to maintain a reserve, and (4) increase its profits." (*Id.* ¶ 251.) Specifically, Plaintiffs maintain that applicable banking regulations would have required Banamex to "maintain a substantial reserve" to offset the risk associated with OSA's debt, but that no reserve was required to offset debts incurred by Pemex, a stable government entity. (*Id.* ¶ 145.) Plaintiffs' theory is that Banamex created fraudulent invoices to skirt banking regulations and thereby profit.

F. The Alleged Cover Up: Citi Blames OSA

Plaintiffs allege that rather than accept responsibility for Banamex's fraud, Citi embarked on a scheme to blame OSA for Banamex's wrongdoing. (*Id.* ¶ 248.) Plaintiff asserts that, beginning with a press release issued on February 28, 2014, Citi and Banamex portrayed themselves as the victims of an "elaborate fraud" perpetrated by OSA. (*Id.* ¶¶ 256–60.) Plaintiffs allege that, in the course of this campaign – which was allegedly carried out in public-facing documents, investor calls, public appearances, Securities and Exchange Commission filings, and statements to Mexican law enforcement officials – Citi made an array of untrue assertions about OSA's conduct to further "Citi's core claim that [OSA] orchestrated [a] fraud" by submitting false documentation to secure financing through the Facility (*id.* ¶¶ 256–301), when in reality it was Banamex that created the false documentation to justify keeping a reduced reserve (*id.* ¶ 354–57). Plaintiffs assert that this cover up was orchestrated from Citi's offices in New York and carried out by Citi personnel in the United States. (*See* Opp'n at 2 (citing Compl. ¶¶ 256–312).)

Plaintiffs aver that Citi's cover up succeeded, and that based "upon Citi's false accusations," Mexican authorities seized OSA, placed the company into bankruptcy, removed Yáñez from his post as Chief Executive Officer, and arrested him. (Compl. ¶¶ 313–23.) Over the course of the investigation and bankruptcy proceedings, OSA's value fell from $3.4 billion to about $100 million, and Yáñez lost $2.6 billion in personal wealth. (*Id.* ¶¶ 393, 401.) Further, Yáñez spent twenty-nine months in prison awaiting the final disposition of the criminal case against him. (*Id.* ¶ 396.) Plaintiffs assert that OSA has now emerged from bankruptcy and that Yáñez has been "exonerated." (Opp'n at 5.)

G. Procedural History

Plaintiffs filed this suit on February 27, 2017 against Defendant Citigroup alone, raising claims for malicious prosecution and tortious interference with business relationships. (Doc. No. 1.) On December 4, 2017, Plaintiffs filed the now-operative Amended Complaint, adding Defendants Citibank, Citigroup Global Markets, and Banamex and asserting claims for malicious prosecution, tortious interference with business relationships, breach of contract, and fraud. (Doc. No. 34.) On January 12, 2018, Defendant Citigroup – the only Defendant that had been served at that time – moved to dismiss. (Doc. No. 37.) Plaintiffs filed their opposition to that motion on February 12, 2018 (Doc. No. 49), and refiled it the next day to correct a technical error (Doc. No. 55). Then,

---
[2] Plaintiffs allege that Pemex had a "multi-billion-dollar line of credit with Banamex." (Compl. ¶ 29.)

4

pursuant to a stipulation between the parties, the Court issued an Order providing that Defendants Citibank and Citigroup Global Markets were "deemed to have joined Citigroup's motion to dismiss" and permitting the three Citi Defendants to file a single reply memorandum together with Citigroup. (Doc. No. 63.) The Citi Defendants filed that reply on March 5, 2018. (Doc. No. 68.) As of the date of this Order, Defendant Banamex apparently has not been served.

II. DISCUSSION

The Citi Defendants move to dismiss the Amended Complaint on *forum non conveniens* grounds and for failure to state a claim upon which relief could be granted pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (*See* Mem. at 1.) Although the parties' submissions focus on *forum non conveniens*, the Court will first address Plaintiff OSA's breach of contract claim – which, if viable, would support retaining this action in this Court – before turning to Defendants' *forum non conveniens* arguments. *See Scottish Air Int'l v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1234–35 (2d Cir. 1996) ("*Forum non conveniens* is a doctrine that necessarily requires great flexibility. Depending on the facts of a particular case, a district court may dismiss part of a lawsuit while deciding the merits of other issues." (internal citations omitted)).

A. Breach of Contract

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns*, 493 F.3d at 98. Specifically, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

OSA alleges that Defendants' defamatory cover up of Banamex's wrongful conduct "breached the duty of good faith and fair dealing" implied in "the contracts related to (1) the bond indenture agreement . . . (2) the Cal Dive acquisition, (3) the acquisition of the *Goliath* . . . and (4) Project Blue." (Compl. ¶ 420.) OSA does not allege that any contract related to the Facility itself was breached.

"Under New York law, 'a covenant of good faith and fair dealing in the course of contract performance' is '[i]mplicit in all contracts.'"[3] *In re LIBOR-Based Fin.*

---

[3] OSA contends that each of the three contracts – Project Blue was allegedly carried out under the Cal Dive contract – selects New York law, which the Citi Defendants do not contest. (Compl. ¶¶ 366–67; Mem. at 24.) Accordingly, for the purposes of this motion, the Court assumes that New York law governs the parties' contracts. *See Pearson v. Walden Univ.*, 144 F. Supp. 3d 503, 508 (S.D.N.Y. 2015).

5

*Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 631–32 (S.D.N.Y. 2013) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). Essentially, the implied covenant "is a promise that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Dalton*, 663 N.E.2d at 291)).

However, the implied covenant of good faith and fair dealing is subject to an important limitation: "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989). Thus, the covenant "does not create duties which are not fairly inferable from the express terms" of the underlying contract, *Interallianz Bank AG v. Nycal Corp.*, No. 93-cv-5024 (RPP), 1994 WL 177745, at * 8 (S.D.N.Y. May 6, 1994), "does not enlarge or create new substantive rights," *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 479 (S.D.N.Y. 2007), and "does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract," *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)).

Here, the Complaint does not set out any language contained in the bond indenture agreement from which the Court could infer that the indenture was intended to extend to separately-actionable statements. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see also DeSilva v. N. Shore–L.I. Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 534 (E.D.N.Y. 2011). Moreover, although Plaintiffs also allege that Citi's conduct caused the value of OSA's bonds to fall in the secondary market (Compl. ¶ 93), the Complaint also avers that the bonds "were . . . issued in July of 2008" (*id.* ¶ 86) and does not contain any non-conclusory allegations that the cover up in any way affected the sale of those bonds. As such, OSA has failed to plausibly allege that the covenant of good faith and fair dealing implied in the bond indenture agreement was breached.

Similarly, neither the advisory-services contract related to the Cal Dive acquisition nor the agreement signed in connection with OSA's purchase of the *Goliath* contain terms from which the Court could infer that the parties expected Citi to refrain from accusing OSA of fraud. (Doc. Nos. 69-2, 69-3.) *See also Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) ("[T]he obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract."). In fact, both contracts had terminated by the time that Defendants began the alleged cover up and defamation campaign. (Doc. No. 69-2 at 5 (Cal Dive); Doc. No. 69-3 at 2 (*Goliath*).)

Put simply, Plaintiffs have failed to demonstrate that the contracts in question in any way prohibited Defendants from accusing OSA of fraud or from cooperating with Mexican authorities in their investigative efforts. As a result, Plaintiffs have failed to state a claim for breach of contract. *See I.S. Sahni, Inc. v. Scirocco Fin. Grp., Inc.*, No. 04-cv-9251 (RMB) (RLE), 2005 WL 2414762, at *6 (S.D.N.Y. Sept. 28, 2005) (noting that because the

challenged conduct "occurred *after* any contract between the parties had ended ... Defendant did not breach duties of good faith and fair dealing"). To the extent that the Citi Defendants did in fact forge documents and make "false accusations" against OSA (Compl. ¶¶ 15, 315), Plaintiffs must seek relief pursuant to tort law – or criminal prosecution – not via breach of contract.

### B. *Forum Non Conveniens*

Having dismissed Plaintiff OSA's breach of contract claim, the Court next turns to the Citi Defendants' argument that Plaintiffs' remaining claims should be dismissed pursuant to the doctrine of *forum non conveniens* in favor of litigation in Mexico. (Mem. at 7–15.) Plaintiffs resist dismissal, arguing that (1) the choice-of-law clauses in the three allegedly-breached contracts require this suit to proceed in New York; (2) this Court has a statutory obligation, under the Edge Act, to exercise jurisdiction, and (3) the *forum non conveniens* balancing test favors New York. (Opp'n at 6–20.) Because the Court has dismissed Plaintiff OSA's contract claims, the choice of forum provisions contained in those contracts are of no moment and do not require this Court to retain jurisdiction over Plaintiffs' remaining claims for malicious prosecution, tortious interference, and fraud.[4] The Court will therefore address Plaintiffs' threshold Edge Act argument before turning to the *forum non conveniens* factors.

### 1. The Edge Act

Plaintiffs contend that the Edge Act, 12 U.S.C. § 611 *et seq.*, precludes *forum non conveniens* dismissal. Adopted in 1919, the Edge Act provides for the creation of federally-chartered banking institutions in an effort to "increase the stability of, and the public's confidence in, international markets" following World War I. *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1462 (D.C. Cir. 1995). Fourteen years later, Congress enacted the provision upon which Plaintiffs now rely, 12 U.S.C. § 632, which "allows a federal court to exercise jurisdiction over actions that (1) include as a party a corporation organized under the laws of the United States and (2) arise out of transactions involving international or foreign banking or other financial operations." *Samsun Logix Corp. v. Bank of China*, 740 F. Supp. 2d 484, 489 (S.D.N.Y. 2010); *see also A.I. Trade Fin.*, 62 F.3d at 1462. Plaintiffs contend that because Section 632 creates subject-matter jurisdiction for this case, this Court is obliged to exercise that jurisdiction here. (Opp'n at 7–8.)

Plaintiffs are wrong. This Court is not required to exercise jurisdiction over this case simply because Congress has created a statutory basis for it to do so. *See Colo. River Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Although courts

---

[4] Courts in this district have recognized that claims for tortious interference with business relations can fall within the scope of a forum selection clause in certain circumstances, such as when "the tort claims ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract." *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008). But Plaintiffs do not argue that the forum selection clauses apply to its tortious interference claims, and in any event it seems that they do not – all three forum selection clauses apply only to proceedings "arising out of" or relating to the relevant contract (Doc. No. 69-1 § 12.15; Doc. No. 69-2 at 5–6; Doc. No. 69-3 § 13); Plaintiffs' claim for tortious interference, which is founded in defamation, depends on harms Plaintiffs suffered in their dealings with third parties with third parties and does not appear to fall within the scope of those provisions.

generally must exercise the jurisdiction authorized by statute, *see id.*, *forum non conveniens* is an exception to that baseline rule. "The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1991); *see also In re Arbitration between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 497 (2d Cir. 2002). Indeed, there are numerous instances in which courts have dismissed suits removed to federal court under Section 632 of the Edge Act in favor of litigation in other countries on *forum non conveniens* grounds. *See generally Banco de Serguros del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251 (S.D.N.Y. 2007) (dismissing in favor of litigation in Uruguay); *Warter v. Boston Sec., S.A.*, 380 F. Supp. 2d 1299, 1316 (S.D. Fla. 2004) (dismissing in favor of litigation in Argentina).

Plaintiffs nevertheless argue that because Section 632 was adopted "to promote the foreign banking operations of US banks," the purpose of the statute would be "vitiated if federal courts refuse to accept jurisdiction on the basis that the action involves foreign banking." (Opp'n at 7–8.) But Plaintiffs misapprehend the purpose of Section 632, which was enacted to protect federally-chartered banks "against potentially divergent and conflicting strictures imposed by banking authorities of 48 *states*." *Am Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 779 (2d Cir. 2013) (emphasis added). That purpose – allowing federally-chartered banks to avoid the possibility of conflicting rulings issued by a multifarious system of state courts – is not undermined by transfer of this tort suit to a single foreign jurisdiction to which all three Citi Defendants have consented. So long as the alternate forum is adequate and the balance of private and public interest factors favor transfer, the Edge Act does not bar dismissal of this action in favor of litigation in Mexico. Accordingly, the Court will apply the various *forum non conveniens* factors to the particular facts of this case.

2. The *Forum Non Conveniens* Factors

"In this Circuit, a district court must consider three factors when analyzing a motion to dismiss on *forum non conveniens* grounds: (1) the extent to which the plaintiffs' choice of the U.S. forum is entitled to deference; (2) the adequacy and availability of the foreign forum; and (3) the balancing of various public and private interests." *Connolly v. Kinay*, No. 11-cv-606 (RJS), 2012 WL 1027231, at *4 (S.D.N.Y. Mar. 27, 2012). "The defendant bears the burden of proof on all elements of the motion." *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001). "In deciding a *forum non conveniens* challenge, a court may rely on evidence outside the pleadings, including affidavits." *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 724 (S.D.N.Y. 2011). The Court will address each factor in turn.

a. Deference to Plaintiffs' Chosen Forum

Generally, substantial deference is afforded to the plaintiff's choice of forum. *See Pollux Holding Ltd v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003). However, the deference due "varies with the circumstances." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) ("the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations"). "[T]he choice of a United States forum by a foreign plaintiff is entitled

to less deference" than a domestic plaintiff's choice to sue in its home jurisdiction. *Id.* at 71. Relying on this proposition, Defendants argue that the Court should give no weight to Plaintiffs' choice to sue in the United States. (Mem. at 7–8.) But, as Plaintiffs point out, the United States and Mexico are required by international agreement to afford citizens of the other country "equal" treatment in "courts and tribunals." *See* Int'l Covenant on Civil & Political Rights, Art. 14(1), available at https://treaties.un.org/doc/publication/unts/volume%20999/volume-999-i-14668-english.pdf. (*See also* Doc. No. 55-31 ¶ 37.) Where such a treaty is in place, a foreign plaintiff's decision to sue in the United States is entitled to "the same diminished degree of deference as would be accorded to an expatriate U.S. citizen living abroad." *Varnelo v. Eastwind Transport Corp.*, 02-cv-2084 (KMW) (AJP), 2003 WL 230741, at *12 (S.D.N.Y. Feb. 3, 2003) (recognizing that a foreign plaintiff's decision to sue in the United States should receive reduced deference "not because they lack U.S. citizenship, but simply because their overseas residence vitiates any presumption that they would find the U.S. forum convenient"); *see also Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir. 1993) ("[W]hen a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical *forum non conveniens* standards must be applied to such nationals by American courts.").

Plaintiffs further argue that their choice of forum should receive deference because (1) the Citi Defendants maintain their principal places of business in this district; (2) legitimate concerns regarding the availability of jurisdiction in Mexico drove the choice of this forum; (3) Plaintiffs have faced years of bad publicity in Mexico; and (4) OSA has substantial experience litigating cases in American courts. (Opp'n at 10–13, 15). On balance, and in light of the moderate weight afforded to Plaintiffs' choice of location pursuant to the United States' agreements with Mexico, these arguments justify awarding *some* deference to Plaintiffs' chosen forum, but not the substantial deference Plaintiffs seek.

As to Plaintiffs' first point – that this suit should proceed in New York because the Citi Defendants are domiciled in Manhattan – "[t]he Court recognizes that choosing to bring suit in a jurisdiction where defendants are established and amenable to suit is generally not indicative of forum shopping." *Niv v. Hilton Hotels Corp.*, 710 F. Supp. 2d 328, 334 (S.D.N.Y. 2008). And although courts are skeptical of plaintiffs who choose a defendant's home forum for a suit "based on events with no connection" to that jurisdiction, *id.*, Plaintiffs here assert that at least some of the events constituting the alleged cover up occurred in New York. (*See, e.g.*, Compl. ¶¶ 281–85.) Therefore, Defendants' residence in this jurisdiction supports affording Plaintiffs' choice of this forum some deference.

Plaintiffs next argue that their decision to sue in New York was motivated by legitimate concerns that the Citi Defendants would not be amenable to suit in Mexico. (Opp'n at 11–12.) Although Defendants correctly point out that they have now consented to suit in Mexico (Reply at 5), they cite no evidence to counter the declaration of Plaintiffs' legal expert that "it would have been unlikely that the plaintiffs could have maintained jurisdiction" over the Citi Defendants in Mexico without that consent, which had not been given at the time Plaintiffs filed this action. (Doc. No. 55-31 ¶ 18.) As such, the fact that Plaintiffs' choice of this forum was motivated by apparently-legitimate, if now

obviated, jurisdictional concerns likewise supports affording deference to Plaintiffs' decision.

On the other hand, Plaintiffs' reference to the publicity that proceedings involving OSA and Yáñez have received in Mexico suggests forum shopping. The Second Circuit said as much in *Iragorri*, a case involving facts similar to those here. 274 F.3d at 72 (recognizing that "the plaintiff's popularity or the defendant's unpopularity" in the plaintiff's chosen forum supports a finding of forum shopping). Plaintiffs' desire to avoid litigation in Mexico, where they are apparently unpopular, in favor of this jurisdiction, where they are largely anonymous, bolsters the argument that Plaintiffs have engaged in forum shopping. Significantly, Plaintiffs do not argue that the Mexican judicial system will be improperly biased against them; instead, they merely seek to avoid bad press. (Opp'n at 12 ("[Plaintiff Yáñez] would prefer to try his claims away from the Mexican press . . . .").) Plaintiffs' admission cuts against deference.

Finally, Plaintiffs' "substantial litigation experience" in this forum has little bearing on the deference inquiry. Whether this action is properly maintained in this district is a question that must be resolved on the facts of this case alone; Plaintiffs' prior suits here do not bear on whether *this* action is properly maintained in this district. *See Lawford v. N.Y. Life Ins. Co.*, 739 F. Supp. 906, 919 (S.D.N.Y. 1990) ("District courts are to review motions for *forum non conveniens* on a case by case basis."). It bears noting that Plaintiffs have obviously litigated a number of civil matters in Mexico as well, and are hardly unfamiliar with that venue. (Opp'n at 13.)

Accordingly, the Court will afford some deference to Plaintiffs' choice of this jurisdiction, but not the "full strength," nearly-dispositive deference Plaintiffs seek. *LaSala v. Bank of Cyprus Public Co., Ltd.*, 510 F. Supp. 2d 246, 257 (S.D.N.Y. 2007); *see also Iragorri*, 274 F.3d at 71 ("[T]he degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale . . . ."). Because the deference paid to Plaintiffs' choice of forum does not resolve the Citi Defendants' motion, and because that deference can be outweighed by a showing that "convenience would be better served by litigating in another country's courts," *Iragorri*, 274 F.3d at 72, the Court will continue to the remaining *forum non conveniens* considerations.

### b. Adequacy and Availability of the Alternate Forum

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). As noted above, all Citi Defendants have consented to jurisdiction in Mexico (Mem. at 8), and Plaintiffs "concede that Mexican courts are generally adequate" fora for this lawsuit (Opp'n at 15.) *See also Connolly*, 2012 WL 1027231, at *7 (holding that Defendants' "represent[ation] that they are amenable to process" in the foreign jurisdiction "satisfies the first element of the alternative forum test"). Plaintiffs nevertheless argue that the Mexican courts are not the proper forum for this case because they are unable to "address the claims governed by the mandatory forum selection clauses" in the agreements that are the subject of OSA's breach of contract claims. (Opp'n at 15.) However, in light of the Court's dismissal of those claims for failure to state a claim upon which relief

10

could be granted, this argument obviously fails. As for the remaining claims, there can be no serious dispute that Mexico is an adequate, available alternative forum for this litigation.

### c. Balancing the Private and Public Interest Factors

Finally, the Court must "balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000). Although the Court's analysis is case-specific, *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1137, 1144 (S.D.N.Y. 1990), the Southern District of Florida's opinion in a lawsuit brought against Citigroup by OSA's "vendors, creditors, and bondholders" is instructive. *Otto Candies, LLC v. Citigroup, Inc.*, No. 16-cv-20725-GAYLES, 2018 WL 3008740, at *1 (S.D. Fla. July 15, 2018). There, following a fact-intensive analysis of the various considerations in favor of and cutting against transfer, the Court concluded that the private and public interest factors supported transferring plaintiffs' RICO, fraud, and breach of fiduciary duty claims to Mexico. *Id.* at *7. Here, the Court likewise concludes that, on balance, and despite the deference afforded to Plaintiffs' choice of this jurisdiction, Mexico is the proper forum for this lawsuit.

### i. Private Interest Factors

First, the Court must consider a series of factors aimed at addressing the comparative "convenience of the litigants" – the "private interest factors." *Iragorri*, 274 F.3d at 73. "These include: (a) ease of access to evidence; (b) availability of compulsory process; (c) cost for cooperative witnesses to attend trial; (d) enforceability of a judgment; and (e) all other practical matters that make a trial 'easy, expeditious and inexpensive.'" *Connolly*, 2012 WL 1027231, at *8 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). "In applying these factors, 'the court should focus on the precise issues that are likely to be actually tried.'" *Monegasque de Reassurances*, 311 F.3d at 500 (2d Cir. 2002) (quoting *Iragorri*, 274 F.3d at 74)). These factors favor dismissal in favor of litigation in Mexico.

The first factor, ease of access to evidence, supports dismissal. Although Plaintiffs argue that their affirmative case will focus on Citi's cover up, which they contend occurred in the United States (Opp'n at 2), Plaintiffs ignore that the Citi Defendants' primary defense will be that any public statements were accurate – that is, that OSA and Yáñez "were involved in falsifying documents submitted to Banamex" (Mem. at 10). Accordingly, while Plaintiffs are correct that some of the evidence relating to the alleged cover up may be in the United States (Opp'n at 18), the issue of whether OSA and Yáñez perpetrated a fraud on the Mexican national oil enterprise will be resolved on the basis of evidence primarily located in, and arising from events that took place in, Mexico. *See Otto Candies*, 2018 WL 3008740, at *6 ("Notwithstanding Plaintiffs' expressed disinterest in obtaining evidence from the key Mexican players in the alleged fraud, Defendant certainly has the right to obtain such evidence for its defense, and those documents . . . are all located in Mexico."). Similarly, because many of the events relevant to Plaintiffs' case happened in Mexico, the documents Plaintiffs will need to prove that affirmative case – for example, documents from the criminal proceedings against Plaintiff Yáñez, which are undoubtedly relevant to Plaintiffs' malicious prosecution claim – are located in Mexico.

11

Indeed, the procedural history in this case – including Plaintiffs' own prior filings – reveals many important documents are abroad. (*See* Doc. No. 23 (Plaintiffs' request for an extension of the deadline to file an amended complaint because of limitations on access to OSA's documents located in Mexico); Doc. No. 29 (same).)

Further, the relevant documents located in Mexico are likely to be in Spanish. (Doc. No. 41 ¶ 4; Doc. No. 43 ¶ 10.) Although some translation will be required in either forum, the fact that the majority of the documents are likely to be in Spanish means that more Spanish-to-English translation will be required in this venue than English-to-Spanish translation in Mexico; accordingly, the cost associated with translation also weighs in favor of dismissal. *See Blanco*, 997 F.2d at 982.

Additionally, although some of the potential witnesses to this case are residents of the United States, many more are likely to be in Mexico. (*See* Opp'n at 18 (referring to witnesses Manuel Medina-Mora and Francisco Aristeguieta as being in the United States); *but see* Mem. at 10 (suggesting that those witnesses are now in Mexico).) Ascertaining the truth of whether Banamex perpetrated a fraud or was victimized by Plaintiffs' misconduct will require the testimony of numerous current or former Banamex employees living in Mexico. (*See, e.g.*, Compl. ¶ 336 (describing "the 12 employees discharged by Citi due to the Banamex fraud").) *See also Otto Candies*, 2018 WL 3008740, at *6 (concluding that Citigroup's "key . . . witnesses are all located in Mexico"). Moreover, the central figure in this case – Plaintiff Yáñez – resides in Mexico (Compl. ¶ 63), and many of the witnesses upon whom Plaintiffs will rely reside there as well. For example, to prove their damages case, Plaintiffs will likely be required to call witnesses familiar with the business opportunities OSA allegedly lost – such as current and former OSA and Pemex employees, who are likely in Mexico. This factor therefore weighs in support of transfer. In light of the fact that the substantial portion of the events at the heart of this case took place in Mexico, and because the documents and witnesses relevant to the ultimate determination of liability are largely in Mexico, the "factual and legal links" of this case are stronger to Mexico than the United States. *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 527 (S.D.N.Y. 2006).

Plaintiffs also argue that this action should proceed in this Court because "there is no equivalent to US discovery in Mexican civil procedure." (Opp'n at 18.) But this argument is in large part a red herring – as the *Otto Candies* court recognized, "it is not necessary that the alternative forum have comparable procedural safeguards." 2018 WL 3008740, at *6. Mexican courts do not preclude parties from gathering and presenting evidence; Plaintiffs' own expert describes the means by which litigants may obtain documents in the Mexican legal system. (Doc. No. 55-31 ¶¶ 43–47.) However, "to assuage Plaintiffs' discovery concerns," the Court will implement the approach taken by the Southern District of Florida in *Otto Candies*, 2018 WL 3008740, at *6, and suggested by the Supreme Court in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 n.25 (1981), by conditioning dismissal on the Citi Defendants' agreement to make available for discovery all relevant documents within their control (subject to the limits set out in the Federal Rules of Civil Procedure, *see Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001)) and to make available for trial all required witnesses within its control, *see*

*Saab v. Citibank, N.A.*, 50 F. App'x 467, 469 (2d Cir. 2002). Dismissal on this condition will eliminate, to a substantial degree, Plaintiffs concern that the Citi Defendants seek transfer to "avoid discovery of the evidence of its wrongs." (Opp'n at 18.)

The second and third factors – the availability of compulsory process and the cost for cooperative witnesses to attend the trial – overlap with the first factor and likewise favor litigation in Mexico. As to willing witnesses, this factor cuts, "albeit modestly, in favor of dismissal." *Palacios v. The Coca-Cola Co.*, 757 F. Supp. 2d 347, 361 (S.D.N.Y. 2010). Plaintiffs will not need to compel the attendance of their own witnesses in either forum. *See Otto Candies*, 2018 WL 3008740, at *7. And because the Court has conditioned this dismissal on the Citi Defendants making available all witnesses within their control, Plaintiffs will have no difficulty obtaining the appearance of current Citi employees. To be sure, some expense will be required in either forum, but Defendants – the parties seeking dismissal here – will be forced to bear the substantial portion of that burden if this case proceeds abroad, thus neutralizing the economic consequences of a dismissal.

As to unwilling witnesses, although the parties are likely to encounter difficulty compelling the testimony of unwilling foreign witnesses in either this Court or in Mexico, and will likely be forced to rely in part on deposition testimony (a disfavored outcome, *see VictoriaTea.com, Inc. v. Cott Beverages, Canada*, 239 F. Supp. 2d 377, 384 (S.D.N.Y. 2003)), the Court concludes that those difficulties will be minimized by dismissal in favor of litigation in Mexico. *See Do Rosario Veiga v. World Meteorological Org.*, 486 F. Supp. 2d 297, 306 (S.D.N.Y. 2007); *see also Otto Candies*, 2018 WL 3008740, at *7 (concluding that if litigation proceeded in the United States, Citigroup "would be severely prejudiced in its ability to defend its case . . . as it would be unable to compel the attendance of any witnesses located in Mexico and would be forced to defend this case on deposition testimony"). Plaintiffs identify two witnesses in the United States that they claim are not under the Citi Defendants' control (Compl. ¶ 334) whose depositions will have to be secured by the use of 28 U.S.C. § 1782, *see In re Application of Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *4 (S.D.N.Y. Apr. 22, 2005) (granting an application to take discovery under Section 1782 for use in litigation pending in the Eighteenth Civil Court of Mexico City). Plaintiffs do not explain the purpose for which those witnesses will be called. Defendants, however, have identified an array of witnesses who are located in Mexico and who are not under the control of either party. (Mem. at 12; *see also* Doc. No. 40 ¶¶ 3–4.) If this suit were to proceed in New York, the Citi Defendants would likely be unable to guarantee the in-person participation of those witnesses, and would be forced to substantially rely on deposition testimony obtained through letters rogatory or the Mexican equivalent of 28 U.S.C. § 1782. (*See* Doc. No. 55-31 ¶¶ 55–58.) Thus, it appears that more potentially-unavailable witnesses reside in Mexico than the United States, and thus this factor clearly supports transfer.

The remaining factors are largely neutral and do not bear on the Court's conclusion. The fourth factor – enforceability of a judgment – is essentially irrelevant, as neither party has expressed concern about the enforceability of a judgment handed down by a court sitting in either New York or Mexico. As to the fifth factor, neither party points to practical problems beyond

those associated with securing the documentary and testimony evidence discussed above.

In all, because a substantial portion of the events at the heart of this litigation occurred in Mexico, the majority of the documents and witnesses will be found there, and the attendance of unwilling witnesses will be more easily compelled in Mexico than in the United States, the Court concludes that "the private interest factors tilt decidedly in favor of dismissal." *Palacios*, 757 F. Supp. 2d at 362.

### ii. Public Interest Factors

"The other set of factors to be applied in the analysis are the public interest factors." *Monegasque de Reassurances*, 311 F.3d at 500. The public interest factors include (1) "the administrative difficulties associated with court congestion"; (2) "the imposition of jury duty upon those whose community bears no relationship to the litigation"; (3) "the local interest in resolving local disputes"; and (4) "the problems implicated in the application of foreign law." *Id.* Like the private interest factors, these factors support dismissal in favor of litigation in Mexico.

First, the Court does not credit Plaintiffs' claim that this litigation will take "7 to 8 years" in Mexico. Plaintiffs' assertion is based on the contention that Mexican courts allow interlocutory appeals (an "*amparo*"), the implicit assumption that Mexican courts will often stay the underlying litigation while an *amparo* is pending, and the presumption that any hypothetical *amparo*s will be handled seriatim for maximum delay. (Doc. No. 55-31 ¶¶ 79–80.) But Plaintiffs provide no support for these assumptions, which are contested by Defendants' expert, who averred that *amparo* proceedings usually do not result in a stay of the underlying litigation and are not generally filed consecutively. (Doc. No. 70 ¶ 40.) *See also Otto Candies*, 2018 WL 3008740, at *4. Accordingly, the Court rejects Plaintiffs' speculation that litigation in Mexico will take significantly longer than in the United States.

The second and third public interest factors – the burden of jury duty on residents of the forum with the lesser connection to the disputes and the interest in having local disputes resolved at home – are closely related and weigh strongly in favor of dismissal. Although the Citi Defendants are New York corporations, and although Plaintiffs allege that their cover up was directed from this jurisdiction, this dispute is, at bottom, a controversy centered in Mexico. In Plaintiffs' telling, this suit concerns a campaign of defamation waged in part by a Mexican bank (and its parent) against a Mexican citizen and the large Mexican oil services enterprise he controlled, with the Mexican national oil company being a key source of evidence. In Defendants' account, this case is about a massive fraud perpetrated by a large Mexican oil services company in which a Mexican bank and the Mexican state oil enterprise were the principal victims. Either way, the substantial connection to Mexico far outweighs any interest New York has in adjudicating this dispute. *See Pollux Holding*, 329 F.3d at 76. All of the losses in this case were suffered by OSA, a Mexican company, and Yáñez, a Mexican citizen and resident who was also imprisoned in a Mexican jail as a consequence of the alleged misconduct. (Compl. ¶ 395–401.) Indeed, the fact that this suit involves issues related to Mexican criminal proceedings provides further grounds for transferring the action to Mexico. *See Online Payment Solutions, Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 392 (S.D.N.Y. 2009) (noting that

pending "criminal charges are highly relevant to the determination that [another country] has a greater public interest in this lawsuit than the United States" and that a foreign country "has a strong interest in resolving civil disputes that arise out of the same acts on which a criminal complaint is based"). To burden a New York jury with the responsibility of unravelling the complex allegations and defenses in this Mexican legal drama would be inappropriate and highly onerous. Accordingly, the second and third factors strongly favor Mexico as the proper forum for this dispute.

The fourth factor, regarding the application of foreign law, is at least neutral and more likely supports transfer. If this action remains in New York, the Court will apply New York's choice of law principles, and under New York's "interest analysis," the law of the "jurisdiction having the greatest interest in the litigation" will apply. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.* 241 F. Supp. 2d 246, 277 (S.D.N.Y. 2002). As discussed above, Mexico has a demonstrably-stronger interest in this suit than New York, and this Court would therefore be required to apply Mexican law. Citing an expert declaration, Plaintiffs counter that "Mexico's choice of law rules focus on the loci of the wrongful conduct," which Plaintiffs contend is New York, and thus Plaintiffs assert that Mexican courts would have to apply New York law in the event of dismissal. (Opp'n at 16.) Putting to one side the doubtfulness of this proposition (particularly given the dismissal of Plaintiffs' contract claims), the fact remains that even assuming the accuracy of Plaintiffs' analysis of Mexican law, this factor would at best be neutral – if the action proceeds in New York, Mexican law will apply, and if it proceeds in Mexico, New York law will apply. Moreover, because the Court is highly skeptical of Plaintiffs' expert's determination that the "legal situatio[n]" in this case "was created" in the United States (Doc. No. 55-31 ¶ 9), it is more likely that Mexican law will apply in either forum, which would mean that this factor cuts in favor of transfer.

On the whole, there can be no serious dispute that the public interest factors strongly support dismissing this action in favor of proceedings in Mexico.

\* \* \*

Because (1) Plaintiffs' choice of forum merits some, but not dispositive, deference; (2) Mexico is an adequate and available alternative forum; and (3) the balance of public and private factors strongly favors dismissal, Defendants' motion to dismiss for *forum non conveniens* must be granted as to Plaintiffs' remaining claims against the Citi Defendants.

### III. BANAMEX

Banamex, an "indirect wholly-owned subsidiary of Citigroup," is a named defendant in this action. Nevertheless, Banamex has not yet been served and has not appeared in this district. *See* Fed. R. Civ. P. 4(m). (*See also* Doc. No. 75 (Order appointing an international process server).) Accordingly, it has not joined the Citi Defendants' motion to dismiss. However, because Plaintiffs' allegations as to Banamex suffer from the same flaws as their claims against the Citi Defendants, the Court will consider the motion to dismiss as though it were made on behalf of all Defendants. *See Garcia v. City of New York*, No. 15-cv-7470 (ER), 2017 WL 1169640, at \*1 n.1 (S.D.N.Y. Mar. 28, 2017); *Hamilton v. Broomfield*, No. 95-cv-3241 (MBM), 1998 WL 17697, at \*1 n.1 (S.D.N.Y. Jan. 20, 1998).

OSA's breach of contract claim – which is alleged against Banamex in connection with the bond indenture and the *Goliath* advisory-services agreement – must necessarily fail for the same reasons as Plaintiffs' claim against the Citi Defendants. Specifically, there is no basis in the Complaint upon which the Court could conclude that either of the two contracts to which Banamex was a party contained any language giving rise to an implied duty to refrain from accusing Plaintiffs of fraud. *See Interallianz Bank* 1994 WL 177745 at *8. Accordingly, Plaintiff OSA's claim for breach of contract against Defendant Banamex must be dismissed. *See Esposito v. Ocean Harbor Cas. Ins. Co.*, No. 13 CV 7073 (SJF) (AKT), 2013 WL 6835194, at *2 (E.D.N.Y. Dec. 19, 2013) ("District courts have inherent authority to dismiss meritless claims *sua sponte*, even if the plaintiffs have paid the filing fee.").

As for Plaintiffs' remaining claims against Banamex, the case for *forum non conveniens* is even stronger than it is with respect to the Citi Defendants. As is apparent from Plaintiffs' Complaint and the parties' submissions, Banamex's dealings with Pemex and its role in the alleged cover up are central issues in this case. Banamex's operations are in Mexico, and the witnesses under its control and documents within its possession are almost certainly in Mexico as well. (*See* Compl. ¶¶ 70–71.) Further, because Plaintiffs' litigation against the Citi Defendants will proceed in Mexico, the interest in avoiding parallel litigation supports dismissal. *See Crosstown Songs U.K. Ltd. v. Spirit Music Grp., Inc.*, 513 F. Supp. 2d 13, 17–18 (S.D.N.Y. 2007). Accordingly, Plaintiffs' claims for malicious prosecution, tortious interference, and fraud against Banamex must likewise be dismissed on *forum non conveniens* grounds.

## IV. CONCLUSION

For the reasons set forth above, the Citi Defendants' motion to dismiss is GRANTED, and Plaintiffs' claims against Banamex are also DISMISSED. Plaintiff OSA's third claim for relief, for breach of contract, is dismissed with prejudice. Plaintiffs' other claims are dismissed without prejudice to refiling in the appropriate forum, conditioned on the following:

a. Defendants shall consent to the jurisdiction of the Mexican courts;

b. Defendants shall waive all applicable statute of limitations defenses attributable to the delay between the filing of this action and any action initiated by Plaintiffs in Mexico within three months of the date of this Order;

c. Defendants shall consent to the enforcement of any final judgment of a Mexican court rendered in connection with the actions described in the Complaint against them as to their assets in Mexico or the United States; and

d. Defendants shall make available all relevant documentary evidence within their control (subject to the limits set out in the Federal Rules of Civil Procedure) and shall make available for trial all required witnesses within their control.

By October 12, 2018, Defendants shall file a letter on the Court's electronic docket indicating whether they consent to the above conditions of dismissal. If Defendants do consent, the Court will dismiss this action without prejudice and retain jurisdiction for the sole purpose of enforcing Defendants' production of discovery pursuant to this order.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 37.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 27, 2018
New York, New York

\* \* \*

Plaintiffs Amado Yáñez Osuna and Oceanografía, S.A. de C.V. are represented by Mark Maney, Maney & Gonalez-Felix PC, 700 Louisiana Street, Suite 4545, Houston, Texas 77002.

Defendants Citigroup Inc., Citibank, N.A., and Citigroup Global Markets, Inc. are represented by Adam S. Hakki, Daniel C. Lewis, and Michael P. Mitchell, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York, 10022.

Defendant Banco Nacional de Mexico, S.A., has not answered or otherwise appeared in this action and is not represented by counsel.